## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SEA LAUNCH COMPANY, L.L.C., *et al.*,[1] | ) | Case No. 09-12153 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: November 10, 2009 at 1:30 p.m. (ET)** |
| | ) | **Objections Due: November 9, 2009 at 4:00 p.m. (ET)** |

### DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND SCHEDULE FINAL HEARING

Sea Launch Company, LLC ("**Sea Launch Company**") and its subsidiaries, Sea Launch Limited Partnership, a Cayman Islands partnership ("**Sea Launch LP**"); Sea Launch ACS Limited, and Isle of Man company ("**Sea Launch ACS**"); Sea Launch ACS Limited Partnership, an Isle of Man company ("**Sea Launch ACS LP**"); Platform LDC, a Cayman Islands company ("**Platform LDC**"); and Platform Limited Partnership, a Cayman Islands limited partnership ("**Platform LP**" and collectively, with Sea Launch Company, Sea Launch LP, Sea Launch ACS, Sea Launch ACS LP, and Platform LDC, the "**Debtors**") hereby file this Emergency Motion (the "**Motion**") seeking the entry of Interim And Final Orders (A) Authorizing The Debtors To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) And Schedule Final Hearing.

---

[1]     The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) Sea Launch Company, L.L.C. (1590); (ii) Sea Launch Limited Partnership (Cayman) (8182); (iii) Sea Launch ACS Limited (5999); (iv) Sea Launch ACS Limited Partnership (Isle of Man) (6216); (v) Platform LDC (3177); and (vi) Platform Limited Partnership (3173).  The mailing address for all of the Debtors is 2700 Nimitz Road, Long Beach, CA 90802.

## I.  INTRODUCTION

1.    On June 22, 2009 (the "**Petition Date**"), each Debtor commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  On June 25, 2009, the Court entered an order approving the Debtors' application seeking joint administration of the Debtors' Chapter 11 cases for procedural purposes.  On July 8, 2009, the Office of the United States Trustee for the District of Delaware formed an official committee of creditors holding unsecured claims against the Debtors (the "**Committee**").

2.    The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code and no trustee or examiner has been appointed in these cases.

## II.  BACKGROUND

3.    As the Court is aware, the Debtors comprise a business that draws upon an international consortium of American, Russian, Ukrainian and Norwegian businesses and that provides a reliable, cost effective, heavy-lift commercial satellite launch service for primarily commercial customers.  The Debtors offer a one-of-a-kind sea-based equatorial launch site that provides the most direct route to geostationary orbit, offering maximum lift capacity for increased payload mass or extended spacecraft life.  In connection with the sea-based equatorial launches, the Debtors provide fully integrated launch services out of their home port in Long Beach, California.

4.    Specifically, following completion of fueling and encapsulation in the state-of-the-art Payload Processing Facility, the satellite payload capsule is transferred to the assembly command ship named "Sea Launch Commander" (the "**ACS**") for integration with the launch rocket.  After the satellite capsule is integrated into the launch rocket, the integrated rocket is

2

transferred to an environmentally controlled hangar in the semi-submersible launch platform named "Odyssey" (the "**Launch Platform**"). At the equatorial launch site, once the Launch Platform is positioned, the launch rocket is rolled out of its environmentally protected hangar, automatically erected on the Launch Platform, and prepared for launch. After the launch rocket receives its final preparations, the satellite is a "go" for launch.

5.      Additional information about the Debtors' businesses and the events leading up to the commencement of the Debtors' bankruptcy cases (the "**Bankruptcy Cases**") can be found in the Declaration of Brett A. Carman, which is incorporated herein by reference.

### III.    JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Bankruptcy Cases and this Motion for Postpetition Financing in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### IV.    REQUEST FOR RELIEF

**A.      Summary of Relief Requested**

7.      By this Motion, the Debtors request:

(a)      entry of an interim order (the "**Interim DIP Financing Order**") authorizing the Debtors to obtain, on an interim basis, secured priming (to the extent necessary), postpetition financing (the "**DIP Financing**"), pursuant to Sections 364(c) and (d) of the Bankruptcy Code from the DIP Lender (as defined below) under the DIP Credit Agreement (as defined below) and related documents (collectively with the DIP Credit

3

Agreement, the "**DIP Documents**") up to an aggregate principal or face amount not to exceed $5,000,000;

(b)    execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)    to grant superpriority claims to the DIP Lender payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, in each case subject to the Carve Out (as defined below) and other exceptions; and

(d)    that the Court schedule a final hearing (the "**Final DIP Financing Hearing**") to be held within 30 days of the entry of the Interim DIP Financing Order to consider entry of a final order regarding the DIP Financing (the "**Final DIP Financing Order**").

**B.    The Debtors Urgently Require Postpetition Financing**

8.    The Debtors have an urgent need to obtain DIP Financing to, among other things, (i) satisfy working capital and operational needs, (ii) maintain their relationships with vendors, suppliers and customers, and (iii) continue to fund payroll and capital expenditures.

9.    A number of factors are responsible for the Debtors' current liquidity situation. As described in the Declaration of Brett A. Carman in Support of the Debtors' First Day Motions, the satellite launch industry is historically cyclical and subject to downturns that coincide with weak economic conditions. As such, prior to the Petition Date, the Debtors were challenged by changing demands for their services, the deterioration of credit markets, and the substantial retrenchment of some of their customers. Additionally, despite the proven track record of the Debtors' sea-based launch platform, the Debtors' operations and liquidity situation

was negatively impacted by a launch anomaly that resulted in the cancelation of a launch services contract with Hughes Network Systems, LLC ("**Hughes**"). Hughes ultimately obtained an arbitral award against the Debtors in the amount $44,400,000, plus interest.

10.     The Debtors entered bankruptcy with a sizable liquidity cushion, but no agreements with any party to provide necessary financing. Although the Debtors have made enormous strides in the first four months of these cases in terms of cutting costs, reducing payroll, and managing payables, the cash with which they entered bankruptcy is reducing to critically low levels.

11.     For these reasons, the Debtors estimate that they will require significant and immediate financing to avoid disruption of operations. Based on the Debtors' current cash forecast, the Debtors require $5,000,000 of immediate postpetition financing for the period until December 3, 2009, and, ultimately, up to $25,000,000 in financing during the pendency of the Chapter 11 Cases. The DIP Facility described herein contemplates the advance of the entire $25,000,000, although only the first $12,500,000 is committed at this time. The second $12,500,000 will be the subject of further discussion and negotiation with the DIP Lender as these Cases progress.

### C.     The Debtors Conducted an Exhaustive Search for the Most Competitive Financing

12.     Given the Debtors' liquidity situation as they entered bankruptcy, the Debtors concluded that they needed to obtain postpetition financing. The Debtors have faced certain difficulties in securing such financing. Given the tight timing requirements of the postpetition financing, the complexity of the Debtors' capital structure and the need to secure a financing commitment without material contingencies, it was not only prudent but ultimately necessary to focus on a wide variety of potential lenders.

13.    Accordingly, the Debtors' financial advisors approached approximately 56 separate potential DIP Financing lenders.   41 of these contacts received a basic information package regarding the Debtors and their financing needs.   Of these 41 contacts, approximately 23 of the potential lenders entered into confidentiality agreements with the Debtors, and subsequently received a much more detailed information package.   Ultimately 4 different lenders (or groups of lenders), indicated strong interest in providing the necessary financing, and 3 of such potential lenders submitted proposed term sheets and commitment letters.

14.    After intense review of the 3 different financing proposals, and extensive negotiations with all 3 potential lenders, the Debtors determined that the proposal of Space Launch Services, LLC (the "**DIP Lender**"), contained the most favorable pricing and other terms and effectively addressed the Debtors' working capital and liquidity requirements.   As a result of the negotiations, the DIP Lender was able to provide a firm and fully approved commitment for $12,500,000 of postpetition financing requested on an expedited basis, with an option for the DIP Lender (but no obligation at this time on the part of the DIP Lender) to provide the additional $12,500,000 of necessary financing at a later date.

**D.    The DIP Credit Agreement**

15.    The Debtors and the DIP Lender engaged in good faith and extensive arm's length negotiations that culminated in an agreement by the DIP Lender to provide the Debtors with up to $25,000,000 of secured postpetition financing, but with only the first $12,500,000 committed, on the terms and subject to the conditions set forth in that certain commitment letter dated November 5, 2009 (the "**Commitment Letter**") and term sheet dated November 5, 2009 (the "**Term Sheet**") attached hereto as Exhibit A and Exhibit B, respectively.   The parties are currently working on definitive loan documents (collectively, the "**DIP Credit Agreement**"),

6

and anticipate filing forms of same by Monday, November 9, 2009.  As set forth in the

Commitment Letter and Term Sheet, the significant terms of the agreed financing (the "**DIP**

**Facility**") are as follows:[2]

| | |
|---|---|
| Borrower | Sea Launch LP |
| Guarantors | Sea Launch Company, Sea Launch ACS, Sea Launch ACS LP, Platform LDC, and Platform LP |
| DIP Lender | Space Launch Services, LLC |
| Facility Amount | Up to $25,000,000, in a multi-draw term loan |
| Committed Amount | $12,500,000, in a multi-draw term loan |
| Purpose | (a) to fund operating expenses and other working capital of the Debtors<br><br>(b) to pay transaction fees and expenses incurred in connection with the DIP Facility<br><br>(c) to pay professional fees and expenses as approved by the Bankruptcy Court, provided, however, that fees and expenses of Committee professionals shall not exceed $275,000 per month |
| Term | The earliest to occur of the following:<br><br>(a) six (6) months after the Closing Date, subject to one six (6) month extension period at the Debtors' option (the "**Optional Extension Period**")<br><br>(b) the effective date of any plan of reorganization in any of the Bankruptcy Cases<br><br>(c) the closing date of a sale pursuant to Section 363 of the Bankruptcy Code of the Sea Launch Odyssey, the Sea Launch Commander, or substantially all of any material Debtor's assets<br><br>(d) the date of conversion of any of the Bankruptcy Cases pursuant to Chapter 7 of the Bankruptcy Code |

---

[2]    The DIP Loan Documents will control to the extent of any discrepancy between this Motion and the DIP Loan Documents.

068473.1001

|  | (e) the dismissal of any Bankruptcy Case |
|---|---|
|  | (f) 45 days after the date of filing of the motion seeking approval of the DIP Facility if a final order has not been entered approving the DIP Facility |
|  | (g) acceleration of the DIP Facility following an Event of Default |
| Conditions to Optional Extension | (a) The Debtors provide written notice to the DIP Lender of its election to extend the DIP Facility at least 30 days prior to the six month anniversary from Closing |
|  | (b) There are no defaults on the DIP Facility |
|  | (c) The Debtors shall have filed a Plan of Reorganization and Disclosure Statement with the Bankruptcy Court; provided that if the Plan of Reorganization or Disclosure Statement is not acceptable to the DIP Lender in its commercially reasonable discretion, given the DIP Lender's strategic goals with regard to the Debtors, then the extension conditions shall not be satisfied |
| Closing Date | The date on which the initial borrowing under the DIP Facility is made, but in any event not later than 48 hours after the interim order approving the DIP Facility is entered |
| Priority and Liens | Liens on Unencumbered Property.   Pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority liens upon all unencumbered tangible and intangible property of the Debtors' estates and on all cash, investments, inventory, accounts receivable and other receivables whether arising before or after the Petition Date; for avoidance of doubt, liens shall be secured by, among other things, first preferred ship mortgages on the Sea Launch Odyssey and the Sea Launch Commander (the "**Marine Collateral**") |
|  | Priming Liens. Pursuant to Section 364(d)(1) of the Bankruptcy Code, priming liens (if necessary) upon all tangible and intangible property of the Debtors' estates that are encumbered (except for the liens of Manufacturers Bank on cash collateral to secure certain letters of credit, in an amount not to exceed $50,000 (the "**Manufacturers' Liens**")) |
|  | Future Property.   The DIP Collateral includes all property and assets of the Debtors and their estates, real and personal, tangible and intangible, other than all chapter 5 causes of action that do not involve the Marine Collateral, whether owned as of the |

8

| | |
|---|---|
| | Petition Date or after acquired or arising, and regardless of where located or by whomsoever held, and whether now owned or in which the Debtors have any interest or hereafter acquired or in which the Debtors obtain an interest<br><br>Priority of Liens. The DIP Liens granted pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code are, with the exception of the Carve-Out, the Manufacturers' Liens and certain permitted prior liens, first priority and superior to any security, mortgage, collateral interest or lien or claim to the DIP Collateral. Additionally, the DIP Liens are senior in priority to any and all adequate protection liens of any prepetition secured creditors (excluding the Manufacturers' Liens) and are not subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of any Debtor and its estate, (b) except as may be provided in the DIP Loan Documents, liens arising after the Petition Date including, any liens or security interests granted in favor of any federal, state municipal or other governmental unit, commission, board or court for any liability of any Debtor or (c) any intercompany or affiliate liens of any Debtor<br><br>Superpriority Administrative Claims.   The DIP Facility obligations will be granted an allowed administrative expense claim with priority, subject and subordinate to the Carve-Out, under Sections 364(c)(1) and 507(b) of the Bankruptcy Code. |
| Carve Out | $500,000, not reduced by interim payments prior to Event of Default |
| Interest Rate | The interest rate shall be the LIBOR Rate plus 300 bps; provided, that during the Optional Extension Period, the interest rate shall be the LIBOR Rate plus 400 bps, calculated on a 360/actual basis.<br><br>"LIBOR Rate" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) that appears on Bloomberg as of approximately 11:00 a.m. (Los Angeles time) on such date of determination; provided, that if such index ceases to exist or is no longer published or announced, then the term "LIBOR" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) as published in The Wall Street Journal on such date of determination; provided, however, that in no event shall the LIBOR Rate be less than three percent (3.00%) per annum. |

| | |
|---|---|
| | Interest shall accrue, and absent an Event of Default, be due and payable in cash on the first business day of each month. The default rate shall be four percent (4.00%) over and above the non-default rate. |
| Conditions Precedent | (a) No existing event of default, and no existing breach of representation, breach of warranty, or breach of covenant |
| | (b) On or before November 17, 2009, entry of an interim order acceptable to the DIP Lender approving the DIP Facility on substantially these terms and containing the usual and customary findings and rulings |
| | (c) Payment to the DIP Lender of the Work Fee (defined below) |
| | (d) Confirmation by the DIP Lender that the Marine Collateral is titled to the Debtors, and that the only liens of records are those listed |
| | (e) Receipt by the DIP Lender of satisfactory evidence (which may include audited financial statements of Sea Launch ACS Limited Partnership for fiscal year ended 2004 and a letter from JP Morgan Chase stating that such indebtedness has been paid in full), that the indebtedness secured by the First Preferred Mortgage in favor of the Secretary of State for Trade Ministry and the indebtedness secured by the Second Preferred Mortgage in favor of the Chase Manhattan Bank have both been fully paid and satisfied |
| | (f) Receipt by the DIP Lender of a written representation from the entity operating the Marine Collateral that all bills submitted to the Debtors have been fully paid when due |
| | (g) Execution and delivery of loan and collateral documentation for the DIP Facility |
| Events of Default | Usual and customary for facilities of this nature, but to include, without limitation: |
| | (a) failure by the Bankruptcy Court to enter, on or before December 18, 2009, a final order acceptable to the DIP Lender approving the DIP Facility on substantially these terms and containing the usual and customary findings and rulings |
| | (b) default in the due observance or performance of any provision of the DIP Loan documents (subject, where customary and appropriate, to applicable grace periods) |

DB02:8910439.1   068473.1001

| | |
|---|---|
| | (c) failure to timely pay principal or interest regarding the DIP Facility or any other material post-petition indebtedness or material indebtedness not subject to the automatic stay |
| | (d) occurrence of a change in control |
| | (e) termination of exclusivity by either statute or court order |
| | (f) entry of an order in any of the Bankruptcy Cases confirming a plan of reorganization that does not provide for the DIP Facility to be fully paid in cash and the DIP Lender's loan commitments terminated, except as the DIP Lender otherwise agrees |
| | (g) the sale of substantially all of any material Debtors' assets, including the Marine Collateral, that does not provide for payment in full of the DIP Facility obligations and termination of the DIP Lender's loan commitments |
| | (h) dismissal of any of the Bankruptcy Cases or conversion of any such Bankruptcy Case to a chapter 7 case |
| | (i) appointment of a chapter 11 trustee or examiner or other person with expanded powers in any of the Bankruptcy Cases |
| | (j) granting relief from the automatic stay to permit foreclosure on any asset of any of the Debtors |
| | (k) proposal of any Budget not reasonably acceptable to the DIP Lender, subject to the Debtors' ability to revise such Budget to address the DIP Lender's concerns with respect to such Budget within a reasonable period of time |
| | (l) adverse variation from an approved Budget in any given month by more than 20% in the aggregate or 20% with respect to any material line item |
| | (m) reversal, vacation or stay of the effectiveness of an order approving the DIP Facility |
| Right to Match | The DIP Lender shall have the right, but not the obligation, to provide the Debtors financing upon emergence from Chapter 11 on terms which, in the aggregate, are not materially less favorable than those offered by any other potential lender in the form of a binding commitment. For the avoidance of doubt, the Right to Match shall survive any prepayment of the DIP Facility. |

| Fees | Work fee.  $75,000 paid to the DIP Lender on or before November 14, 2009 |
|---|---|
| | Break Up Fee.  In the event that the DIP Lender is willing to provide funding described herein and the Debtors instead choose an alternative financing in lieu of financing described herein, then upon and only upon closing and funding of such alternative financing approved by the Bankruptcy Court, the Debtors shall pay the DIP Lender $250,000 |
| | Closing Fee.  A closing fee of two percent (2.00%) shall be payable on the Closing Date on the then-committed amount of the DIP Facility |
| | Attorneys' fees.  Reimbursement of all reasonable out of pocket expenses of the DIP Lender associated with the preparation, execution and delivery of, and any amendment, supplemental, waiver, or modification to, or enforcement of, the Loan Documentation, Final Order and any other documents prepared in connection herewith or therewith, its participation or monitoring of the Case (including any reasonable expenses associated with conducting diligence investigations); provided, however, that if the Closing Date occurs, the Work Fee shall be applied to such expenses.  Also to include reasonable fees and disbursements of (i) one lead outside counsel (including reasonable fees and disbursements of advisors to counsel), and (ii) one local outside counsel for each applicable jurisdiction (including reasonable fees and disbursements of advisors to counsel). |

**E.     Incurrence of Secured Superpriority Debt Pursuant to Section 364(c)
of the Bankruptcy Code**

16.     As described above, the Debtors' reorganization efforts depend critically on immediate access to sufficient postpetition financing.  Absent granting of the relief requested in this Motion, the Debtors' ability to successfully and expeditiously reorganize will be seriously jeopardized.

17.     Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize postpetition financing for a Chapter 11 debtor-in-possession." *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991).  "Having recognized the natural

DB02:8910439.1                                                                                                              068473.1001

reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [Section]

364 to provide 'incentives to the creditor to extend post-petition credit.'"  *Id.*  In particular,

Section 364(c) of the Bankruptcy Code establishes the conditions under which a debtor can

obtain certain types of secured credit.  Section 364(c) of the Bankruptcy Code provides, in

pertinent part, as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable
> under section 503(b)(1) of this title as an administrative expense,
> the court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt —
>
> > (1) with priority over any or all administrative expenses of
> > the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not
> > otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is
> > subject to a lien.

11 U.S.C. § 364(c).

18.    Generally, courts apply a three-part test to determine whether a debtor may obtain

secured credit pursuant to Section 364(c) of the Bankruptcy Code.  Specifically, the debtor must

demonstrate that (i) it cannot obtain credit unencumbered or without superpriority status, (ii) the

credit transaction is necessary to preserve the assets of the debtor's estate, and (iii) the terms of

the credit transaction are fair, reasonable and adequate given the particular circumstances of the

debtor and the proposed lender.  *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.

1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987) (debtor must show that it has made a reasonable effort

to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code).

19.    Against this statutory backdrop, courts will evaluate the facts and circumstances

of a debtor's case and accord significant weight to the necessity for obtaining the financing.  *See*

*In re* Ames *Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).  Debtors are generally

13

permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under Section 364 of the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 RR. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment. . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

### 1.    The Debtors Could Not Obtain Postpetition Financing on an Unsecured Basis

20.    As set forth above, and as the evidence at the Interim DIP Hearing and the Final DIP Hearing will demonstrate, the Debtors could not have obtained a postpetition financing facility on the terms and of the type and magnitude required in the Chapter 11 Cases on an unsecured basis or, indeed, without offering terms substantially similar to those of the DIP Financing. Prior to the Petition Date, the Debtors discussed postpetition financing with their equity investors, including Boeing. None of these potential lenders was willing to make a postpetition loan on any basis.

21.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by Section 364(c) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). The Debtors' efforts to seek postpetition financing from the DIP Lender satisfy the statutory requirements of Section 364(c) of the Bankruptcy Code. *See, e.g., Ames*, 115 B.R. at 40 (approving Section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *In re 495 Cent. Park Ave. Corp.*, 136 B.R.

14

626, 630 (Bankr. S.D.N.Y. 1992) (debtor "must make an effort to obtain credit without priming a senior lien"); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr E.D. Pa. 1987) (requiring demonstration that less onerous financing was unavailable); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 and n.9 (D. Del. 1984) (same).

### 2.    The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates

22.    As described above, the Debtors urgently require the DIP Financing to satisfy working capital and operational needs, maintain their relationships with vendors, suppliers and customers, fund payroll, and make necessary capital expenditures. Without immediate access to sufficient liquidity and working capital via the DIP Financing, the Debtors' business operations will be severely disrupted and their going concern value jeopardized, to the detriment of the Debtors' creditors, employees and other parties in interest in the Chapter 11 Cases. For these reasons, the Debtors estimate that they will require significant and immediate financing to continue their operations and preserve estate value.

### 3.    The Terms of the DIP Financing are Fair, Reasonable and Adequate

23.    The terms and conditions of the DIP Financing are fair, reasonable and adequate and were negotiated by the parties in good faith and at arm's length. The Debtors, in the reasonable exercise of their business judgment, have determined that the DIP Financing is the best financing option available to them under the present circumstances and that its pricing and other economic terms are fair, reasonable and consistent with market practice. Likewise, the various fees and charges required by the DIP Lenders under the DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Section 364 of the Bankruptcy Code. *See In re Defender Drug Stores*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing

facility pursuant to Section 364 of the Bankruptcy Code that included a lender "enhancement fee").

24.    The Debtors further request that the automatic stay provisions of Section 362 of the Bankruptcy Code be vacated and modified to the extent necessary so as to permit the DIP Lender to exercise, upon the occurrence of an Event of Default (as defined in the DIP Credit Facility and the proposed Interim Order) and the giving of five (5) business days' written notice to the Debtors, all rights and remedies provided for in the DIP Credit Facility and the proposed Interim Order as entered by the Court.

F.    **The Debtors are Seeking Relief Pursuant to Section 364(d) of the Bankruptcy Code**

25.    Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a lien on collateral senior or equal to an existing secured creditor's lien on such collateral only if the existing secured creditor's interest is adequately protected. *See* 11 U.S.C. § 364(d)(l).    Although the Debtors believe and assert that no creditor holds any liens on the Debtors' assets, for the avoidance of doubt, the Debtors are seeking relief under Section 364(d)(1) of the Bankruptcy Code, as the DIP Credit Agreement will result in the priming of any prepetition creditors.    To secure performance of its obligations under the DIP Credit Agreement, Debtors have agreed to provide the DIP Lender with first priority liens on all of their assets, save for the liens of Manufacturers Bank on a certain cash collateral account posted to secure a prepetition letter of credit.    The DIP Lender has indicated to the Debtors that it will not enter into the DIP Credit Agreement absent these protections.

26.    Given that the Debtors do not believe that any secured creditor exists, they do not propose any adequate protection at this time.    However, to the extent that any creditor objects to

16

the priming set forth above, the Debtors will be prepared to address the adequate protection issue at the Interim Hearing or Final Hearing, as appropriate.

### G.    Provisions that Potentially Implicate Local Rule 4001-2

27.    Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires that certain provisions contained in the DIP Credit Facility documents be highlighted, and that the Debtors must provide justification for the inclusion of such highlighted provision(s).

28.    The Borrowers believe that the proposed Interim Order contains provisions requiring special disclosure under Local Rule 4001-2(a)(i).  First, is the priming described in Section F above, which is addressed in Paragraph 5.b of the Interim Order, the justification for which is set forth above.  Second, although the Interim Order does not provide for disparate treatment of the professionals retained by the Debtors as opposed to the Committee with respect to the Carve-Out, there is a monthly limit on the amount of proceeds from the DIP Financing that can be used to pay Committee professionals.  Third, in the Interim Order, the DIP Lender has requested a waiver of any rights under section 506(c) of the Bankruptcy Code be granted as part of the Final Order, which is addressed in Paragraph 7 of the Interim Order.  Finally, the Lenders have required a lien on Chapter 5 causes of action related to the Marine Collateral, which is addressed in Paragraph 5.c of the Interim Order.  This relief is appropriate because the Marine Collateral is the primary asset against which the DIP Lender is advancing the DIP Financing, and therefore it wants to be confident that it has an undisputed lien on all matters relating thereto. Other than these provisions, there are no additional provisions of the Final Order that would require disclosure pursuant to Local Rule 4001-2(a)(i).

## H.   Break Up Fee

29.     Approval of the Break Up fee is reasonable under the circumstances. The DIP Lender has incurred considerable expense and effort to negotiate and finalize the DIP Financing. Thus, the DIP Lender has required the Break Up Fee.

30.     Approval of the Break Up Fee is governed by standards for determining the appropriateness of such incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *In re O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien*, 181 F.3d at 535. Here, the Break Up Fee should be approved because they will provide a benefit to the Debtors' estates.

31.     The Third Circuit identified at least two instances in which such incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second:

> if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

*Id.*

068473.1001

32.    In *In re O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien*, 181 F.3d at 536.

33.    In this regard, the DIP Financing is, in effect, a "bid" for investment in the Debtors, on the terms thereof. Accordingly, and because the DIP Financing proposed by the DIP Lender is economically more attractive than the other "bids" received by the Debtors for such financing, the Break Up Fee is appropriately evaluated under the *O'Brien* standards.

34.    As will be demonstrated at the Interim Hearing, each of the *O'Brien* factors is met here. First, the DIP Lender is unaffiliated with the Debtors, and thus there is no self-dealing or manipulation in negotiating the Break Up Fee. Second, given the size of the Break Up Fee in relation to the DIP Facility, it does not discourage bidding on the DIP Financing. Indeed, the DIP Facility itself sets an attractive ceiling on the pricing on such financing. Third, the size of the Break Up Fee is reasonable relative to the size of the DIP Facility. Fourth, the DIP Lender has placed the financing in a posture that, were another bidder to surface which offers more

attractive terms, then the DIP Lender will have set the groundwork for such other financing. Fifth, the request for the Break Up Fee comes in connection with the DIP Financing, which helps the Debtors to retain an attractive bid for such financing. Finally, the Break Up Fee will not impair the Debtors ability to accept more attractive financing. As such, the Break Up Fee should be approved.

## V.    REQUEST FOR INTERIM AND FINAL HEARING

35.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize use of cash collateral and obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

36.    The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Credit Facility in an amount not more than $5,000,000. This relief will enable the Debtors to operate their businesses in a manner that will enable them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

37.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors also respectfully request that the Court set a date for the Final DIP Hearing for December 3, 2009 at 12:00 p.m., which is the date and time of their next omnibus hearing scheduled in these cases.

068473.1001

## VI.    CONCLUSION

38.    WHEREFORE, the Debtors respectfully request entry of an interim order, substantially in the form submitted herewith, (A) authorizing the DIP Credit Agreement on an interim basis, and (B) scheduling a final hearing.

## VII.    NOTICE

39.    No trustee or examiner has been appointed in the Bankruptcy Cases.  In addition to the normal service list, the Debtors have served notice of this Motion on (a) the Office of the United States Trustee for the District of Delaware; (b) the Committee and its individual members; (c) the vendor responsible for management of the Marine Collateral; and (d) the Debtors' current and former banks.  The Debtors submit that no other or further notice need be provided.

DATED:    November 6, 2009          YOUNG CONAWAY STARGATT & TAYLOR,
          Wilmington, Delaware         LLP

                                      /s/ Kenneth J. Enos
                                      Joel A. Waite (No. 2925)
                                      Kenneth J. Enos (No. 4544)
                                      The Brandywine Building
                                      1000 West Street, 17th Floor
                                      Wilmington, Delaware 19801-0391
                                      Telephone: (302) 571-6600

                                      -and-

                                      Dennis J. Connolly
                                      Matthew W. Levin
                                      Wendy R. Reiss
                                      Sage M. Sigler
                                      ALSTON & BIRD LLP
                                      1201 West Peachtree Street
                                      Atlanta, Georgia  30309-3424
                                      Telephone:  (404) 881-7000

                                      Attorneys for the Debtors