| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SEA LAUNCH COMPANY, L.L.C., *et al.*,[1] | ) | Case No. 09-12153 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: April 27, 2010 at 1:30 p.m. (ET)** |
| | ) | **Objections Due: April 26, 2010 at 4:00 p.m. (ET)** |

## DEBTORS' THIRD EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND SCHEDULE FINAL HEARING

Sea Launch Company, LLC ("**Sea Launch Company**") and its subsidiaries, Sea Launch Limited Partnership, a Cayman Islands partnership ("**Sea Launch LP**"); Sea Launch ACS Limited, and Isle of Man company ("**Sea Launch ACS**"); Sea Launch ACS Limited Partnership, an Isle of Man company ("**Sea Launch ACS LP**"); Platform LDC, a Cayman Islands company ("**Platform LDC**"); and Platform Limited Partnership, a Cayman Islands limited partnership ("**Platform LP**" and collectively, with Sea Launch Company, Sea Launch LP, Sea Launch ACS, Sea Launch ACS LP, and Platform LDC, the "**Debtors**") hereby file this Third Emergency Motion (the "**Third DIP Motion**") seeking the entry of Interim And Final Orders (A) Authorizing The Debtors To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) And Schedule Final Hearing.

---

[1]     The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) Sea Launch Company, L.L.C. (1590); (ii) Sea Launch Limited Partnership (Cayman) (8182); (iii) Sea Launch ACS Limited (5999); (iv) Sea Launch ACS Limited Partnership (Isle of Man) (6216); (v) Platform LDC (3177); and (vi) Platform Limited Partnership (3173).  The mailing address for all of the Debtors is 2700 Nimitz Road, Long Beach, CA 90802.

# I.    INTRODUCTION

1.    On June 22, 2009 (the "**Petition Date**"), each Debtor commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").    On June 25, 2009, the Court entered an order approving the Debtors' application seeking joint administration of the Debtors' Chapter 11 cases for procedural purposes.    On July 8, 2009, the Office of the United States Trustee for the District of Delaware formed an official committee of creditors holding unsecured claims against the Debtors (the "**Committee**").

2.    The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code and no trustee or examiner has been appointed in these cases.

# II.    BACKGROUND

3.    On November 6, 2009, the Debtors filed their first motion seeking approval of debtor-in-possession financing (the "**First DIP Motion**").    On November 10, 2009, the Court entered an interim order approving the First DIP Motion and on December 3, 2009, the Court entered a final order approving the First DIP Motion (the "**First DIP Order**").    Pursuant to the First DIP Order, the Debtors borrowed $12.5 million (the "**First DIP Loan**") from Space Launch Services, LLC (the "**First DIP Lender**"), on the terms and conditions of the loan documents approved by the aforementioned orders.

4.    As noted by the Debtors in the First DIP Motion and at the interim and final hearings held to consider same, the amount committed by the First DIP Lender under the First DIP Loan was not projected to be sufficient to provide the Debtors the

DB02:9542052.1                                                                                           068473.1001

necessary liquidity to carry them through a plan of reorganization in these cases. As noted by the Debtors, further financing was necessary to see the Debtors through to an exit. Although the orders approving the First DIP Motion approved the Debtors' borrowing up to $25 million from the First DIP Lender, the First DIP Lender would only commit to lend the $12.5 million already borrowed.

5.      Accordingly, subsequent to December 3, the Debtors continued to explore the availability of other financing, both with the First DIP Lender as well as with other potential lenders. The Debtors ultimately reached an agreement with the First DIP Lender and The Heinlein Prize Trust (the "**Trust**") to advance an additional $12 million to the Debtors.

6.      On February 22, 2010, the Debtors filed the Second Emergency Motion (the "**Second DIP Motion**") seeking the entry of Interim And Final Orders Authorizing The Debtors To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Scheduling A Final Hearing.

7.      On February 24, 2010, the Court held an interim hearing on the Second DIP Motion, and granted interim relief authorizing the Debtors to borrow an additional $3 million from the First DIP Lender on the same terms and conditions as set forth in the First DIP Facility and First DIP Order (the "**Additional Borrowing**").

8.      On March 17, 2010, the Court held a final hearing on the Second DIP Motion, and entered an order granting final relief on the Second DIP Motion (the "**Second DIP Order**"), and authorizing the Debtors to borrow an additional $9 million from the Trust and the First DIP Lender on the terms and conditions of the Amended and Restated Debtor in Possession Financing Agreement (the "**Amended DIP Facility**"),

with the Trust committing to $6 million in additional borrowings, and SLS committing to $3 million in additional borrowings.

9.      Although the Trust funded the Debtors' initial $3 million draw on its $6 million commitment, unfortunately, the Trust has refused to fund the second draw on its $6 million commitment as required by the terms of the Amended DIP Facility. The Trust appears to be claiming that the Debtors have failed to satisfy one or more of the conditions to the funding set forth in section 2.2(b) of the Amended DIP Facility. Although the Debtors strongly dispute the Trust's contention, and intend to bring appropriate claims for breach of contract against the Trust at the appropriate time, they simply do not have the time at this moment to force the issue with the Trust in lengthy and costly litigation.

10.     Accordingly, the Debtors sought and obtained a third lender that is willing to lend the Debtors $30 million ($12.5 million to pay off the First DIP Loan, $3 million to pay off the Additional Borrowing, $3 million to pay off the first draw on the Amended DIP Facility, $9.5 million in incremental liquidity, and $2 million is original issue discount), on the terms and conditions as set forth herein.

### III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Bankruptcy Cases and this Third DIP Motion for Postpetition Financing in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

# IV.     REQUEST FOR RELIEF

## A.     Summary of Relief Requested

12.     By this Motion, the Debtors request:

(a)     entry of an interim order (the "**Third Interim DIP Financing Order**") authorizing the Debtors to obtain, on an interim basis, secured priming (to the extent necessary), postpetition financing (the "**Third DIP Financing**"), pursuant to Sections 364(c) and (d) of the Bankruptcy Code from the Third DIP Lender (as defined below) under the Third DIP Credit Agreement (as defined below) and related documents (collectively with the Third DIP Credit Agreement, the "**Third DIP Documents**") up to an aggregate principal or face amount not to exceed $22,500,000 ($18,500,000 to pay off the First DIP Loan, the Additional Borrowing, and the first draw on the Amended DIP Facility, and to provide for $4.0 million in incremental liquidity);

(b)     authorization to execute and enter into the Third DIP Documents and to perform such other and further acts as may be required in connection with the Third DIP Documents;

(c)     authorization to grant superpriority claims to the Third DIP Lender payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, in each case subject to the Carve Out (as defined below) and other exceptions;

DB02:9542052.1                                                          068473.1001

(d)     that the Court order the First DIP Lender and the Trust to release all liens on and security interests in the Debtors' assets, to execute all necessary documents to effectuate such releases, and otherwise to cooperate with the Debtors in the transfer of the financing to the Third DIP Lender;

(e)     that the Court schedule a final hearing (the "**Final Third DIP Financing Hearing**") to be held on May 12, 2010 to consider entry of a final order regarding the Third DIP Financing (the "**Final Third DIP Financing Order**");

**B.     The Debtors Urgently Require Postpetition Financing**

13.     The Debtors have an urgent need to obtain the Third DIP Financing to, among other things, (i) satisfy working capital and operational needs, (ii) maintain their relationships with vendors, suppliers and customers, and (iii) continue to fund payroll and capital expenditures.

14.     A number of factors are responsible for the Debtors' current liquidity situation. As described in the Declaration of Brett A. Carman in Support of the Debtors' First Day Motions, the satellite launch industry is historically cyclical and subject to downturns that coincide with weak economic conditions. As such, prior to the Petition Date, the Debtors were challenged by changing demands for their services, the deterioration of credit markets, and the substantial retrenchment of some of their customers. Additionally, despite the proven track record of the Debtors' sea-based launch platform, the Debtors' operations and liquidity situation was negatively impacted by a launch anomaly that resulted in the cancelation of a launch services contract with

DB02:9542052.1                                                                                                                                                                                                                                    068473.1001

Hughes Network Systems, LLC ("**Hughes**"). Hughes ultimately obtained an arbitral award against the Debtors in the amount $44,400,000, plus interest.

15.     The Debtors entered bankruptcy with a sizable liquidity cushion, but no agreements with any party to provide necessary financing. Although the Debtors have made enormous strides in the first eight months of these cases in terms of cutting costs, reducing payroll, and managing payables, the cash provided by the First DIP Loan is reducing to critically low levels.

16.     For these reasons, the Debtors estimate that they will require significant and immediate financing to avoid disruption of operations. Based on the Debtors' current cash forecast, the Debtors require $4,000,000 of immediate incremental postpetition financing (over and above the $18.5 million necessary to pay off the First DIP Loan, the Additional Borrowing and the Amended DIP Facility) for the period until a final hearing on the Third DIP Motion can be held, and, ultimately, up to $30,000,000 in total financing during the pendency of the Chapter 11 Cases (consistent with prior projections). The Third DIP Facility described herein contemplates the advance of $28,000,000 in actual liquidity, all of which is committed.

## C.     The Debtors Conducted an Exhaustive Search for the Most Competitive Financing

17.     Given the Debtors' liquidity situation as they entered bankruptcy, the Debtors concluded that they needed to obtain postpetition financing. The Debtors have faced certain difficulties in securing such financing. Given the tight timing requirements of the postpetition financing, the complexity of the Debtors' capital structure and the need to secure a financing commitment without material contingencies, it was not only prudent but ultimately necessary to focus on a wide variety of potential lenders.

7

18.     Accordingly, prior to entry into the First DIP Facility, the Debtors' financial advisors approached approximately 56 separate potential DIP Financing lenders. 41 of these contacts received a basic information package regarding the Debtors and their financing needs. Of these 41 contacts, approximately 23 of the potential lenders entered into confidentiality agreements with the Debtors, and subsequently received a much more detailed information package. Ultimately 4 different lenders (or groups of lenders), indicated strong interest in providing the necessary financing, and 3 of such potential lenders submitted proposed term sheets and commitment letters.

19.     After intense review of the 3 different financing proposals, and extensive negotiations with all 3 potential lenders, the Debtors determined that the proposal of the First DIP Lender contained the most favorable pricing and other terms and effectively addressed the Debtors' working capital and liquidity requirements. As a result of the negotiations, the First DIP Lender was able to provide a firm and fully approved commitment for $12,500,000 of postpetition financing requested on an expedited basis, with an option for the DIP Lender (but no obligation on the part of the DIP Lender) to provide the additional $12,500,000 of necessary financing at a later date.

20.     Subsequent to approval of the First DIP Facility, the Debtors continued their discussions with the First DIP Lender regarding its willingness and ability to commit to the second $12.5 million needed by the Debtors to reach a conclusion to these Chapter 11 cases. The Debtors also explored take-out financing options with other potential DIP Lenders, including the Third DIP Lender.

21.     The Debtors reasonably believed that they had found the necessary financing in the Amended DIP Facility. However, events have unfolded such that the

Trust is unwilling to fund its portion thereof, necessitating the Debtors to, once again, engage in a search for replacement financing.

22.     The Debtors ultimately reached an agreement with Energia Overseas Limited (Russia), a Russian Federation limited liability company (the "**Third DIP Lender**"), an entity related to S.P. Korolev Rocket and Space Corporation, Energia ("**Energia**"), which is one of the Debtor's equity holders, to provide the financing described herein.

**D.     The DIP Credit Agreement**

23.     The Debtors and the Third DIP Lender engaged in good faith and extensive arm's length negotiations that culminated in an agreement by the Third DIP Lender to provide the Debtors with $30,000,000 of committed, secured postpetition financing, on the terms and subject to the conditions set forth in that certain Debtor in Possession Financing Agreement (the "**Third DIP Credit Agreement**") attached hereto as Exhibit A. As set forth in the Third DIP Credit Agreement, the significant terms of the agreed financing (the "**Third DIP Facility**") are as follows:[2]

| Borrower | Sea Launch LP |
|---|---|
| Guarantors | Sea Launch Company, Sea Launch ACS, Sea Launch ACS LP, Platform LDC, and Platform LP |
| DIP Lender | Energia Overseas Limited (Russia), a Russian Federation limited liability company |
| Administrative Agent | The DIP Lender may, in its sole and absolute discretion, appoint an administrative and collateral agent. The Administrative Agent is not entitled to compensation from the Debtors separate |

---

[2]     The Third DIP Credit Agreement will control to the extent of any discrepancy between this Third DIP Motion and the Third DIP Credit Agreement.

| | |
|---|---|
| | from or in addition to amounts paid to the DIP Lender. |
| Facility Amount | $30,000,000, in a multi-draw term loan |
| Committed and Available Amount | $28,000,000, in a multi-draw term loan |
| Facility Discount | $2,000,000, payable at maturity. |
| Purpose | (a) to repay the SLS DIP Loan<br><br>(b) to fund operating expenses and other working capital of the Debtors<br><br>(c) to pay transaction fees and expenses incurred in connection with the DIP Facility<br><br>(d) to pay professional fees and expenses as approved by the Bankruptcy Court, provided, however, that fees and expenses of Committee professionals shall not exceed $350,000 per month |
| Term | The earliest to occur of the following:<br><br>(a) six (6) months after the Closing Date, subject to one three (3) month extension period at the Debtors' option (the "**Optional Extension Period**")<br><br>(b) the earlier of the effective date of any plan of reorganization in any of the Bankruptcy Cases or thirty (30) days following entry of a confirmation order of any plan of reorganization if the effective date has not occurred<br><br>(c) the entry of an order approving a sale pursuant to Section 363 of the Bankruptcy Code of the Sea Launch Odyssey, the Sea Launch Commander, or any other of the Debtors' material assets<br><br>(d) the date of conversion of any of the Bankruptcy Cases pursuant to Chapter 7 of the Bankruptcy Code<br><br>(e) the dismissal of any Bankruptcy Case<br><br>(f) 45 days after the date of filing of the motion seeking approval of the DIP Facility if a final order has not been entered approving the DIP Facility<br><br>(g) acceleration of the DIP Facility following an Event of Default |

DB02:9542052.1

068473.1001

| Conditions to Optional Extension | (a) The Debtors provide written notice to the DIP Lender of its election to extend the DIP Facility at least 30 days prior to the six month anniversary from Closing |
|---|---|
| | (b) There are no defaults on the Third DIP Facility |
| | (c) The Debtors shall have filed a Plan of Reorganization and Disclosure Statement with the Bankruptcy Court acceptable to the DIP Lender in its sole and absolute discretion |
| | (d) The Debtors shall have entered into, on a postpetition basis, new contracts on terms deemed satisfactory to the DIP Lender, providing for new launches on terms and in an amount such that the Debtors shall have no fewer than five contracted launches for no less than $500 million of incremental new cash consideration to be received on or before March 31, 2013 |
| | (e) The Debtors shall have entered into an Amended Supply Chain Agreement with Energia Logistics as the rocket segment prime contractor, and/or one or more of its affiliated companies, and/or its assignees, for the long-term supply of launch vehicles and launch support services (including, but not limited to, payload integration, mission control and launch analysis and support) |
| | (f) The Debtors and the Third DIP Lender (or one of its affiliates or assignees) shall have entered into definitive documents for the exit facility on terms and conditions acceptable to the Third DIP Lender |
| | (g) The Debtors shall have demonstrated to the satisfaction of the DIP Lender that no additional financing will be required prior to the extended Termination Date, unless the DIP Lender shall have agreed to provide such additional financing; and |
| | (h) The Debtors or their respective successors on the one hand and the DIP Lender or any Affiliate of the DIP Lender on the other hand shall have entered into definitive documents regarding an equity investment, a new term loan facility replacing the DIP Facility and/or any other exit financing arrangement, in each case on terms and conditions acceptable to the DIP Lender in its sole and absolute discretion. |
| Closing Date | The date on which the initial borrowing under the DIP Facility is made, but in any event not later than 48 hours after the interim order approving the DIP Facility is entered. |

DB02:9542052.1  068473.1001

| | |
|---|---|
| Conversion Right | The DIP Lender shall have the right to convert all or a portion of the outstanding DIP Obligations (including, without limitation, the principal amount of the Term Loans, any accrued and unpaid interest thereon and the DIP Breakup Fee, if any) into Conversion Shares (as that term is defined in the Third DIP Credit Agreement. |
| Priority and Liens | <u>Liens on Unencumbered Property</u>.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority liens upon all unencumbered tangible and intangible property of the Debtors' estates and on all cash, investments, inventory, accounts receivable and other receivables whether arising before or after the Petition Date; for avoidance of doubt, liens shall be secured by, among other things, first preferred ship mortgages on the Sea Launch Odyssey and the Sea Launch Commander (the "**Marine Collateral**")<br><br><u>Priming Liens</u>.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, priming liens (if necessary) upon all tangible and intangible property of the Debtors' estates that are encumbered (except for the liens of Manufacturers Bank on cash collateral to secure certain letters of credit, in an amount not to exceed $50,000 (the "**Manufacturers' Liens**"))<br><br><u>Future Property</u>.  The DIP Collateral includes all property and assets of the Debtors and their estates, real and personal, tangible and intangible, other than all chapter 5 causes of action that do not involve the Marine Collateral, whether owned as of the Petition Date or after acquired or arising, and regardless of where located or by whomsoever held, and whether now owned or in which the Debtors have any interest or hereafter acquired or in which the Debtors obtain an interest<br><br><u>Priority of Liens</u>.  The DIP Liens granted pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code are, with the exception of the Carve-Out, the Manufacturers' Liens and certain permitted prior liens, first priority and superior to any security, mortgage, collateral interest or lien or claim to the DIP Collateral.  Additionally, the DIP Liens are senior in priority to any and all adequate protection liens of any prepetition secured creditors (excluding the Manufacturers' Liens) and are not subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of any Debtor and its estate, (b) except as may be provided in the DIP Loan Documents, liens arising after the Petition Date including, any liens or security interests granted in favor of any federal, state municipal or other governmental unit, commission, board or |

| | |
|---|---|
| | court for any liability of any Debtor or (c) any intercompany or affiliate liens of any Debtor |
| | <u>Superpriority Administrative Claims</u>. The DIP Facility obligations will be granted an allowed administrative expense claim with priority, subject and subordinate to the Carve-Out, under Sections 364(c)(1) and 507(b) of the Bankruptcy Code. |
| Carve Out | $1,600,000, not reduced by interim payments prior to Event of Default |
| Interest Rate | The interest rate shall be the LIBOR Rate plus 750 bps; provided, that during the Optional Extension Period, the interest rate shall be the LIBOR Rate plus 850 bps, calculated on a 360/actual basis. |
| | "LIBOR Rate" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) that appears on Bloomberg as of approximately 11:00 a.m. (Los Angeles time) on such date of determination; provided, that if such index ceases to exist or is no longer published or announced, then the term "LIBOR" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) as published in The Wall Street Journal on such date of determination; provided, however, that in no event shall the LIBOR Rate be less than four percent (4.00%) per annum. |
| | Interest shall accrue, and absent an Event of Default, be due and payable in cash on the first business day of each month. The default rate shall be five percent (5.00%) over and above the non-default rate. |
| Conditions Precedent | (a) No existing event of default, and no existing breach of representation, breach of warranty, or breach of covenant |
| | (b) On or before April 27, 2010, entry of an interim order acceptable to the DIP Lender approving the DIP Facility on substantially these terms and containing the usual and customary findings and rulings (including a finding that notice of the interim hearing was timely provided to the Committee, each member of the Committee, the Debtors' 20 largest creditors, the entity currently operating the Sea Launch Commander and the Odyssey, and the Office of the United States Trustee) |
| | (c) Payment of the Work Fee (defined below), to be made from |

the initial advance

(d) Confirmation by the DIP Lender that the Marine Collateral is titled to the Debtors, and that the only liens of records are those listed

(e) delivery of First Preferred Mortgages in favor of the DIP Lender on the Marine Collateral, and cancelation of the existing First Preferred Mortgages in favor of SLS

(f) Receipt by the DIP Lender that the indebtedness to Space Launch Services LLC arising in connection with that Debtor in Possession Financing Agreement dated November 13, 2009, and any related mortgages on the Marine Collateral, have been or will be satisfied, released and discharged upon the payment of an identified and fixed sum certain

(g) Receipt by the DIP Lender of satisfactory evidence (which may include audited financial statements of Sea Launch ACS Limited Partnership for fiscal year ended 2004 and a letter from JP Morgan Chase stating that such indebtedness has been paid in full), that the indebtedness secured by the First Preferred Mortgage in favor of the Secretary of State for Trade Ministry and the indebtedness secured by the Second Preferred Mortgage in favor of the Chase Manhattan Bank have both been fully paid and satisfied

(h) Receipt by the DIP Lender of a written representation from the entity operating the Marine Collateral that all bills submitted to the Debtors have been fully paid when due

(i) Execution and delivery of loan and collateral documentation for the DIP Facility

(j) The DIP Lender shall have received and approved the Budget, which Budget shall be in substantially the form previously provided to the DIP Lender

(k) Receipt by the DIP Lender of satisfactory evidence that all licenses and permits necessary to operate the Marine Collateral are in effect

| Events of Default | Usual and customary for facilities of this nature, but to include, without limitation: |
| --- | --- |

(a) failure by the Bankruptcy Court to enter, on or before May 12, 2010, a final order acceptable to the DIP Lender approving the DIP Facility on substantially these terms and

DB02:9542052.1

068473.1001

containing the usual and customary findings and rulings

(b) default in the due observance or performance of any provision of the DIP Loan documents (subject, where customary and appropriate, to applicable grace periods)

(c) failure to timely pay principal or interest regarding the DIP Facility or any other material post-petition indebtedness or material indebtedness not subject to the automatic stay

(d) a trustee shall be appointed; or an examiner shall be appointed with enlarged powers under Section 1106(b) of the Bankruptcy Code

(e) the Bankruptcy Cases shall be dismissed or converted to a case under chapter 7

(f) any Person obtains Court approval of a disclosure statement for a Reorganization Plan that is not an Acceptable Plan

(g) there shall be filed by the Debtors any motion to sell any Marine Collateral or all or a substantial part of the Collateral on terms that are not acceptable to the DIP Lender in its sole and absolute discretion

(h) the Court shall enter an order granting to any Person (other than the DIP Lender or any lessor under an equipment lease) relief from the automatic stay to foreclose upon a lien or any set-off on any part of the Collateral with respect to any property of any Debtor

(i) an order shall be entered for the substantive consolidation of the estate of any Debtor with any other Person unless the substantive consolidation would not materially and adversely affect the liens created by the Loan Documents or the DIP Lender has consented in its sole and absolute discretion to such substantive consolidation

(j) any Debtor shall fail to pay as and when due and payable, all administrative costs or expenses incurred by it in the Chapter 11 Case that are due and payable on such date

(k) any Debtor shall file a motion or other request with the Court seeking authority to use any cash Proceeds of the Collateral or obtain any financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise secured by a lien upon any Collateral (in each case (i) without the DIP Lender's prior written consent or (ii) if such motion fails to contemplate

DB02:9542052.1

068473.1001

payment in full of the Obligations)

(l) an application shall be filed by any Debtor for the approval of any Super-priority Claim in the Chapter 11 Case that is pari passu with or senior to the Obligations or there shall arise or be granted any such pari passu or senior Super-priority Claim

(m) termination of exclusivity for the filing of a Reorganization Plan or the solicitation of acceptances by operation of either statute or court order; provided that DIP Lender or its affiliates shall not have objected to any request by the Debtors for the extension of exclusivity while the DIP Facility is otherwise not subject to a continuing Event of Default

(n) failure to file an Acceptable Plan, on or before April 30, 2010;

(o) payment of any supplier "catch up payments" or administrative "cure" payments on pre petition contracts or arrangements without the express prior written approval of the DIP Lender, whose approval may be withheld in its sole and absolute discretion

(p) the sale of all or substantially all of any material Debtor's assets, including Collateral, that does not provide for payment in full of the Obligations in cash and termination of the DIP Lender's commitments under the DIP Facility

(q) initiation of litigation by any Debtor, the Creditors Committee or other chapter 11 estate representative of any kind against any Debtor;

(r) the breach or violation by any Debtor of any warranty, representation or covenant contained in the DIP Financing Agreement, provided that such breach or violation shall not be deemed to be an Event of Default unless such Debtor fails to cure such breach or violation to the DIP Lender's reasonable satisfaction within ten (10) days from the date of such breach or violation

(s) the failure of the Debtors to pay any of the Obligations within five (5) Business Days of the due date thereof

(t) any Debtor shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) incur any "accumulated funding deficiency" as defined in ERISA, (iii) incur any "reportable event" as defined in ERISA, (iv) terminate any "plan", as defined in ERISA or (v) become involved in any proceeding in

which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of any "plan", as defined in ERISA, and with respect this Section 10.1 Ct), such event or condition either (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in the DIP Lender's reasonable business judgment, subject any Debtor to any tax, penalty or other liability having a Material Adverse Effect

(u) the occurrence of any default or event of default (after giving effect to any applicable grace or cure period) under any of the other Loan Documents, or any of the other Loan Documents ceases to be valid, binding and enforceable in accordance with its terms

(v) the occurrence of any default or event of default (after giving effect to any applicable grace or cure period) under any instrument or agreement evidencing or governing other Indebtedness of the Debtors (or any of them) which was entered into after the Petition Date having a principal amount in excess of $250,000

(w) a Change of Control shall occur

(x) a final judgment for the payment of money (other than the allowance of an unsecured Claim incurred prior to the Petition Date) in excess of $250,000 shall be rendered after the Petition Date against the Debtors (other than a judgment as to which a financially sound and reputable insurance company has acknowledged coverage of such claim in writing), and either (i) within thirty (30) days after the entry of such judgment, shall not have been discharged or stayed pending appeal (or if stayed pending appeal, shall not have been discharged within thirty (30) days after the entry of a final order of affirmance on appeal), or (ii) enforcement proceedings shall be commenced by any holder of such judgment

(y) the Interim Financing Order shall not have been entered by April 27, 2010, or at any time thereafter shall cease to be in full force and effect or shall be vacated, reversed, modified or stayed in any respect (and if such Interim Financing Order is the subject of a pending appeal, it shall be an Event of Default if the performance of any obligation of any party shall have been stayed pending such appeal) without the written consent of the DIP Lender

(z) the Final Financing Order shall not have been entered by

| | |
|---|---|
| | May 12, 2010, or at any time thereafter shall cease to be in full force and effect or shall be vacated, reversed, modified or stayed in any respect (and if such Interim Financing Order is the subject of a pending appeal, it shall be an Event of Default if the performance of any obligation of any party shall have been stayed pending such appeal) without the written consent of the DIP Lender; or<br><br>(aa) there shall occur a Total Loss of either Vessel (as such term is defined in the Ship Mortgages). |
| Fees | <u>Work fee</u>. $75,000 paid to the DIP Lender on or before April 27, 2010<br><br><u>Break Up Fee</u>. In the event that the DIP Lender is willing to provide funding described herein and the Debtors instead choose an alternative financing in lieu of financing described herein, then upon and only upon closing and funding of such alternative financing approved by the Bankruptcy Court, the Debtors shall pay the DIP Lender $1,125,000<br><br><u>Attorneys' fees</u>. Reimbursement of all reasonable out of pocket expenses of the DIP Lender associated with the preparation, execution and delivery of, and any amendment, supplemental, waiver, or modification to, or enforcement of, the Loan Documentation, Final Order and any other documents prepared in connection herewith or therewith, its participation or monitoring of the Case (including any reasonable expenses associated with conducting diligence investigations); provided, however, that if the Closing Date occurs, the Work Fee shall be applied to such expenses. Also to include reasonable fees and disbursements of (i) one lead outside counsel (including reasonable fees and disbursements of advisors to counsel), and (ii) one local outside counsel for each applicable jurisdiction (including reasonable fees and disbursements of advisors to counsel). |
| Interest Deferral | The DIP Lender has agreed, in principle, to defer the payment of cash Interest and any fees over the Work Fee until July 15, 2010, or the Effective Date of a plan, whichever first occurs. |

DB02:9542052.1                                                                    068473.1001

**E.  Incurrence of Secured Superpriority Debt Pursuant to Section 364(c) of the Bankruptcy Code**

24.     As described above, the Debtors' reorganization efforts depend critically on immediate access to sufficient postpetition financing.  Absent granting of the relief requested in this Third DIP Motion, the Debtors' ability to successfully and expeditiously reorganize will be seriously jeopardized.

25.     Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize postpetition financing for a Chapter 11 debtor-in-possession." *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991).  "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [Section] 364 to provide 'incentives to the creditor to extend post-petition credit.'" *Id.*  In particular, Section 364(c) of the Bankruptcy Code establishes the conditions under which a debtor can obtain certain types of secured credit.  Section 364(c) of the Bankruptcy Code provides, in pertinent part, as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

DB02:9542052.1                                          068473.1001

26. Generally, courts apply a three-part test to determine whether a debtor may obtain secured credit pursuant to Section 364(c) of the Bankruptcy Code. Specifically, the debtor must demonstrate that (i) it cannot obtain credit unencumbered or without superpriority status, (ii) the credit transaction is necessary to preserve the assets of the debtor's estate, and (iii) the terms of the credit transaction are fair, reasonable and adequate given the particular circumstances of the debtor and the proposed lender. *See In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 553 (E.D. Pa. 1987) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of the Bankruptcy Code).

27. Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and accord significant weight to the necessity for obtaining the financing. *See In re* Ames *Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). Debtors are generally permitted to exercise their basic business judgment consistent with their fiduciary duties when evaluating the necessity of proposed protections for a party extending credit under Section 364 of the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 RR. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment. . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

### 1. The Debtors Could Not Obtain Postpetition Financing on an Unsecured Basis

28. As set forth above, and as the evidence at the Interim DIP Hearing and the Final DIP Hearing will demonstrate, the Debtors could not have obtained a postpetition financing facility on the terms and of the type and magnitude required in the Chapter 11

Cases on an unsecured basis or, indeed, without offering terms substantially similar to those of the Third DIP Financing.

29. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by Section 364(c) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). The Debtors' efforts to seek postpetition financing from the Third DIP Lender satisfy the statutory requirements of Section 364(c) of the Bankruptcy Code. *See, e.g., Ames*, 115 B.R. at 40 (approving Section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor "must make an effort to obtain credit without priming a senior lien"); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr E.D. Pa. 1987) (requiring demonstration that less onerous financing was unavailable); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 and n.9 (D. Del. 1984) (same).

### 2. The Third DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates

30. As described above, the Debtors urgently require the Third DIP Financing to satisfy working capital and operational needs, maintain their relationships with vendors, suppliers and customers, fund payroll, and make necessary capital expenditures. Without immediate access to sufficient liquidity and working capital via the Third DIP Financing, the Debtors' business operations will be severely disrupted and their going concern value jeopardized, to the detriment of the Debtors' creditors, employees and

21

other parties in interest in the Chapter 11 Cases. For these reasons, the Debtors estimate that they will require significant and immediate financing to continue their operations and preserve estate value.

### 3. The Terms of the Third DIP Financing are Fair, Reasonable and Adequate

31. The terms and conditions of the Third DIP Financing are fair, reasonable and adequate and were negotiated by the parties in good faith and at arm's length. The Debtors, in the reasonable exercise of their business judgment, have determined that the Third DIP Financing is the best financing option available to them under the present circumstances and that its pricing and other economic terms are fair, reasonable and consistent with market practice. Likewise, the various fees and charges required by the Third DIP Lender under the Third DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Section 364 of the Bankruptcy Code. *See In re Defender Drug Stores*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to Section 364 of the Bankruptcy Code that included a lender "enhancement fee").

32. The Debtors further request that the automatic stay provisions of Section 362 of the Bankruptcy Code be vacated and modified to the extent necessary so as to permit the Third DIP Lender to exercise, upon the occurrence of an Event of Default (as defined in the Third DIP Credit Facility and the proposed Interim Order) and the giving of five (5) business days' written notice to the Debtors, all rights and remedies provided for in the Third DIP Credit Facility and the proposed Interim Order as entered by the Court.

**F.      The Debtors are Seeking Relief Pursuant to Section 364(d) of the Bankruptcy Code**

33.      Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a lien on collateral senior or equal to an existing secured creditor's lien on such collateral only if the existing secured creditor's interest is adequately protected. *See* 11 U.S.C. § 364(d)(l). Although the Debtors believe and assert that no creditor holds any liens on the Debtors' assets (aside from SLS and the Trust, who will be repaid out of the proceeds of the Third DIP Credit Agreement), for the avoidance of doubt, the Debtors are seeking relief under Section 364(d)(1) of the Bankruptcy Code, as the Third DIP Credit Agreement will result in the priming of any prepetition creditors. To secure performance of its obligations under the Third DIP Credit Agreement, Debtors have agreed to provide the Third DIP Lender with first priority liens on all of their assets, save for the liens of Manufacturers Bank on a certain cash collateral account posted to secure a prepetition letter of credit. The Third DIP Lender has indicated to the Debtors that it will not enter into the Third DIP Credit Agreement absent these protections.

34.      Given that the Debtors do not believe that any secured creditor exists, they do not propose any adequate protection at this time. However, to the extent that any creditor objects to the priming set forth above, the Debtors will be prepared to address the adequate protection issue at the Interim Hearing or Final Hearing, as appropriate.

**G.      Provisions that Potentially Implicate Local Rule 4001-2**

35.      Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") requires that certain provisions contained in the Third DIP Credit Facility documents be

highlighted, and that the Debtors must provide justification for the inclusion of such highlighted provision(s).

36.    The Borrowers believe that the proposed Interim Order contains provisions requiring special disclosure under Local Rule 4001-2(a)(i). First, is the priming described in Section F above, which is addressed in Paragraph 5 of the Interim Order, the justification for which is set forth above. Second, although the Interim Order does not provide for disparate treatment of the professionals retained by the Debtors as opposed to the Committee with respect to the Carve-Out, there is a monthly limit on the amount of proceeds from the Third DIP Financing that can be used to pay Committee professionals (which is the same provision as was approved under the Amended DIP Facility). Third, in the Interim Order, the Third DIP Lender has requested a waiver of any rights under section 506(c) of the Bankruptcy Code be granted as part of the Final Order, which is addressed in Paragraph 7 of the Interim Order. Finally, the Third DIP Lender has required a lien on Chapter 5 causes of action related to the Marine Collateral, which is addressed in Paragraph 5 of the Interim Order. This relief is appropriate because the Marine Collateral is the primary asset against which the Third DIP Lender is advancing the Third DIP Financing, and therefore it wants to be confident that it has an undisputed lien on all matters relating thereto (again, this is a similar term as was in the Amended DIP Facility, and has been previously approved). Other than these provisions, there are no additional provisions of the Final Order that would require disclosure pursuant to Local Rule 4001-2(a)(i).

## H. Break Up Fee

37. Approval of the Break Up fee is reasonable under the circumstances. The Third DIP Lender has incurred considerable expense and effort to negotiate and finalize the Third DIP Financing. Thus, the Third DIP Lender has required the Break Up Fee.

38. Approval of the Break Up Fee is governed by standards for determining the appropriateness of such incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999). In *In re O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien*, 181 F.3d at 535. Here, the Break Up Fee should be approved because they will provide a benefit to the Debtors' estates.

39. The Third Circuit identified at least two instances in which such incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second:

> if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

*Id.*

DB02:9542052.1 068473.1001

40. In *In re O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien*, 181 F.3d at 536.

41. In this regard, the Third DIP Financing is, in effect, a "bid" for investment in the Debtors, on the terms thereof. Accordingly, and because the Third DIP Financing proposed by the Third DIP Lender is economically more attractive than the other committed "bids" received by the Debtors for such financing, the Break Up Fee is appropriately evaluated under the *O'Brien* standards.

42. As will be demonstrated at the Interim Hearing, each of the *O'Brien* factors is met here. First, although the Third DIP Lender is an indirect related party of a minority member of the Debtors, the Debtors submit is no self-dealing or manipulation in negotiating the Break Up Fee. This agreement was negotiated at arms length, and is similar to the break up fee granted to the First DIP Lender. Second, given the size of the

26

Break Up Fee in relation to the Third DIP Facility, it does not discourage bidding on the Third DIP Financing. Indeed, the Third DIP Facility itself sets a ceiling on the pricing on such financing. Third, the size of the Break Up Fee is reasonable relative to the size of the Third DIP Facility. Fourth, the Third DIP Lender has placed the financing in a posture that, were another bidder to surface which offers more attractive terms, then the Third DIP Lender will have set the groundwork for such other financing. Fifth, the request for the Break Up Fee comes in connection with the Third DIP Financing, which helps the Debtors to retain an attractive bid for such financing. Finally, the Break Up Fee will not impair the Debtors ability to accept more attractive financing. As such, the Break Up Fee should be approved.

## V.     REQUEST FOR INTERIM AND FINAL HEARING

43.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize use of cash collateral and obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

44.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the Third DIP Credit Facility in an amount not more than $22,500,000. This relief will enable the Debtors to pay off the First DIP Loan, the Additional Borrowing and the Amended DIP Facility (or to reserve for same), and operate their businesses in a manner

27

that will enable them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

45.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors also respectfully request that the Court set May 12, 2010, as the date for the Final DIP Hearing.

## VI.     CONCLUSION

46.     WHEREFORE, the Debtors respectfully request entry of an interim order, substantially in the form submitted herewith, (A) authorizing the Third DIP Credit Agreement on an interim basis, and (B) scheduling a final hearing.

DB02:9542052.1                                                         068473.1001

## VII.  NOTICE

47.     No trustee or examiner has been appointed in the Bankruptcy Cases.  The

Debtors have served notice of this Motion on:  (a) the Office of the United States Trustee

for the District of Delaware; (b) counsel to the Committee; (c) the vendor responsible for

management of the Marine Collateral; (d) SLS and the Trust; (e) the Debtors' current and

former banks; and (f) all parties that have requested notice pursuant to Local Rule 2002-

1(b).  The Debtors submit that no other or further notice need be provided.


DATED:  April 22, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Kenneth J. Enos*
Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Dennis J. Connolly
Matthew W. Levin
Wendy R. Reiss
Sage M. Sigler
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777

Attorneys for the Debtors