# Exhibit A

## DEBTOR IN POSSESSION FINANCING AGREEMENT

**Energia Overseas Limited (Russia)**

**(as Lender)**

**and**

**Sea Launch Limited Partnership**

**(as Borrower)**

**Dated: April 27, 2010**

# TABLE OF CONTENTS

SECTION 1. Definitions.................................................................................1
   1.1    Defined Terms. As used in this Financing Agreement: ..................................1

SECTION 2. Conditions Precedent. .............................................................13
   2.2    Additional Cash Advances.....................................................................15
   2.3    Excess Loan ...........................................................................................16

SECTION 3. Term Loans. ...............................................................................16
   3.1    Term Loans. ............................................................................................16
   3.2    Provisions Regarding all Term Loans....................................................18

SECTION 4. Guarantee. ..................................................................................18
   4.1    The Guarantee ........................................................................................18
   4.2    Obligations Unconditional .....................................................................19
   4.3    Reinstatement.........................................................................................20
   4.4    Subrogation; Subordination ...................................................................20
   4.5    Remedies.................................................................................................20
   4.6    Instrument for the Payment of Money ...................................................21
   4.7    Continuing Guarantee ............................................................................21
   4.8    General Limitation on Guarantee Obligations.......................................21

SECTION 5. Collateral.....................................................................................21
   5.1    Grant of Security Interest.......................................................................21
   5.2    Limited License ......................................................................................23
   5.3    Representations, Covenants and Agreements Regarding Collateral
            Generally.................................................................................................23
   5.4    Covenants and Agreements Regarding Equipment. .............................24
   5.5    General Intangibles ................................................................................25
   5.6    Commercial Tort Claims.........................................................................25
   5.7    Letter of Credit Rights ...........................................................................25
   5.8    Real Estate .............................................................................................25
   5.9    Vessels. ...................................................................................................26
   5.10   Reference to Other Loan Documents....................................................28

SECTION 6. Representations, Warranties and Covenants............................28
   6.1    Representations and Warranties..............................................................28
   6.2    Affirmative Covenants............................................................................29
   6.3    Negative Covenants ...............................................................................35
   6.4    No Further Negative Pledge...................................................................37

SECTION 7. Interest, Facility Discount, DIP Breakup Fee .........................37
   7.1    Interest on Term Loans ..........................................................................37
   7.2    Default Interest Rate ...............................................................................37
   7.3    Facility Discount.....................................................................................37
   7.4    Taxes, Reserves and Other Conditions ..................................................37

7.5     DIP Breakup Fee.................................................................................................38

SECTION 8.  Powers.....................................................................................................38
8.1     Authority...........................................................................................................38
8.2     Limitations on Exercise ...................................................................................39

SECTION 9.  Events of Default and Remedies..........................................................39
9.1     Events of Default .............................................................................................39
9.2     Remedies...........................................................................................................42
9.3     General Indemnity ...........................................................................................43

SECTION 10. Early Termination ...............................................................................44

SECTION 11. Miscellaneous.......................................................................................44
11.1    Waivers .............................................................................................................44
11.2    Entire Agreement; Amendments.....................................................................44
11.3    Usury Limit.......................................................................................................44
11.4    Severability.......................................................................................................45
11.5    WAIVER OF JURY TRIAL; SERVICE OF PROCESS ............................45
11.6    Notices ..............................................................................................................45
11.7    CHOICE OF LAW ..........................................................................................46
11.8    CHOICE OF FORUM .....................................................................................46
11.9    Order Controls .................................................................................................46

EXHIBIT A    1

TERM LOAN PROMISSORY NOTE...........................................................................1

EXHIBIT B    1

COMPLIANCE CERTIFICATE .....................................................................................1

Schedule 1.1(a) - Existing Indebtedness.........................................................................2

Schedule 1.1(b) - Description of Existing Liens .............................................................3

Schedule 1.1(c) - Description of Mortgaged Vessels .....................................................4

Schedule 1.1(d) - Permitted Intercompany Leases .........................................................5

Schedule 5.6 - Commercial Tort Claims.........................................................................6

Schedule 6.1(a) - Company and Collateral Information..................................................7

Schedule 6.1(e) - Environmental Matters .......................................................................9

EXHIBIT C    10

FORM OF GENERAL ASSIGNMENT..........................................................................10

NewYork 1329482.10

EXHIBIT D    11

FORM OF SHIP MORTGAGE.................................................................................................11

NewYork 1329482.10

**ENERGIA OVERSEAS LIMITED (RUSSIA) (as defined below)** having its principal office at 11 Bolhsoy Savvinski Pereulok, Moscow, Russia 119435, organized under the laws of the Russian Federation ("**Lender**"), is pleased to confirm the terms and conditions under which Lender shall make term loan to **SEA LAUNCH LIMITED PARTNERSHIP**, a Cayman Islands limited partnership ("**Borrower**").

## SECTION 1. <u>Definitions</u>

    **1.1**    **<u>Defined Terms</u>.** As used in this Financing Agreement:

    <u>**Acceptable Plan**</u> shall mean a Reorganization Plan which either (a) provides for full payment of all Obligations on the effective date of such Reorganization Plan and provides for an effective date no later than 30 days after the date of entry of the Confirmation Order, or (b) which is otherwise acceptable to the Lender in its sole and absolute discretion.

    <u>**Accounts**</u> shall mean all of the Companies' present and future: (a) accounts (as defined in the UCC); (b) instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing, including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant to this Financing Agreement; (f) guaranties, other supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies and rights relating to any insurance policies, including existing or future claims and rights to return of premiums; (h) general intangibles pertaining to any of the foregoing (including rights to payment, including those arising in connection with bank and non-bank credit cards), and all books and records and any electronic media and software relating thereto; (i) notes, deposits or other property of the Companies' account debtors securing the obligations owed by such account debtors to the Companies; and G) all Proceeds of any of the foregoing.

    <u>**Affiliate**</u> shall have the meaning provided in 11 U.S.C. §101(2).

    <u>**Administrative Agent**</u> shall mean the entity or person which may be designated by the Lender at any time as the agent for servicing the Loan and maintaining control of the collateral for the economic benefit of Lender.

    <u>**Applicable Margin**</u> shall mean 750 bps, provided that during the Optional Extension Period and the Interregnum Period, the Applicable Margin shall mean 850 bps.

    <u>**Bankruptcy Code**</u> shall mean the provisions of Title 11 of the United States Bankruptcy Code (11 U.S.C. §§101 et. seq.) as amended, and any successor statute.

    <u>**Block DM**</u> shall have the same meaning as defined in the Creation Agreement.

    <u>**Budget**</u> shall mean, collectively, (i) a thirteen (13) week cash expense budget detailing the Companies' anticipated cash receipts and expenditures including Professional Expenses but excluding fuel costs, and (ii) a fuel budget which will be set at $100,000 per month and revisited at the end of each month based on the previous two months diesel fuel consumption multiplied

by the actual fuel costs, in each case as amended or supplemented from time to time with the Lender's prior written consent, which consent shall not be unreasonably withheld or delayed, which budgets (and any amendments or supplements thereto) shall be in form and substance reasonably acceptable to the Lender.

**Business** shall mean the business, or any part thereof, of providing spacecraft launch services for launches of commercial payloads on specialized rockets from the Platform as conducted by the Companies, including all ancillary activities, including, without limitation, the assembly of the rockets and the payload on the Sea Launch Commander.

**Business Day** shall mean any day which is not a weekend or legal holiday in Russia or the United States of America and is not a day when banks in the State of New York are authorized to close.

**Capital Expenditures** shall mean, for any period, the aggregate expenditures of the Companies during such period on account of property, plant, equipment or other fixed assets that, in conformity with GAAP, are required to be reflected as capital assets on a Consolidated Balance Sheet.

**Capital Lease** shall mean any lease of property (whether real, personal or mixed) which, in conformity with GAAP, is accounted for as a capital lease or a Capital Expenditure on a Consolidated Balance Sheet.

**Carve-Out** shall have the meaning given to such term in Section 5 of this Financing Agreement.

**Casualty Proceeds** shall mean (a) payments or other proceeds from an insurance carrier with respect to any loss, casualty or damage to Collateral, and (b) payments received on account of any condemnation or other governmental taking of any of the Collateral.

**Change of Control** shall mean either: (a) the failure of Kjell Karlsen, Brett Carman or Christopher L. Picone to remain actively engaged in the management of the Companies (other than by reason of death); (b) the sale, assignment or other transfer of the ownership interests in the Parent presently held (directly or indirectly) by the current holders thereof (collectively, the "Current Holders"), or any voting rights associated therewith, to any person or entity; (c) the failure of Parent and the Current Holders to own, directly or indirectly, 100% of the issued and outstanding ownership interests in the Borrower, or (d) the failure of Borrower to continue to own less than one hundred percent (100%) of the issued and outstanding ownership interests in each of its Subsidiaries.

**Chapter 11 Case** shall mean the jointly administered cases filed by the Companies under Chapter 11 of the Bankruptcy Code which are pending in the Court and are jointly administered under Case No. 09-12153 (BLS).

**Closing Date** shall mean the date on which this Financing Agreement is executed by the parties hereto and delivered to Lender, but in any event not later than forty-eight (48) hours after entry of the Interim Financing Order.

**Collateral** shall mean, collectively, the Companies' interests in all present and future Accounts, Equipment, Inventory and other Goods, Documents of Title, General Intangibles, Investment Property, Real Estate and Other Collateral whether owned as of the Petition Date or after acquired and regardless of where located or by whomsoever held, except for all claims arising under Chapter 5 of the Bankruptcy Code, other than claims of that type relating to the Mortgaged Vessels and including, without limitation, the Vessels.

**Common Stock** shall mean the common stock issued by the reorganized Borrower, Parent or any other entity holding substantially all of the pre-petition assets of the Borrower and the Companies pursuant to the Reorganization Plan.

**Companies** shall mean, collectively, the Borrower, the Parent, Platform LDC, Platform Limited Partnership, Sea Launch ACS Limited, and Sea Launch ACS Limited Partnership (each individually a "**Company**").

**Confirmation Order** shall mean an order entered by the Court confirming a Reorganization Plan.

**Consolidated Balance Sheet** shall mean an unaudited consolidated balance sheet for Parent and the Companies, eliminating all intercompany transactions and prepared in accordance with GAAP.

**Conversion Amount** shall have the meaning set forth in Section.3.1(c) of this Financing Agreement.

**Conversion Shares** shall mean that number of shares of Common Stock determined by dividing the Conversion Amount, stated in U.S. dollars, by the lowest of (i) the value of one such share based on the value attributable to one such share in the Reorganization Plan, (ii) the lowest net price per share received from any other purchaser of such Common Stock or Common Stock equivalents in connection with the Reorganization Plan (other than as a result of settling claims) to the pre-petition stakeholders of the Borrower and the Companies in connection with the Reorganization Plan, and (iii) the lowest net price per share received by the reorganized Borrower (or any other entity issuing the Common Stock) from any issuance of Common Stock or Common Stock equivalents to any unaffiliated third party for cash or in exchange for assets in connection with the Reorganization Plan (other than claims). Any fractional share resulting from such calculation shall be paid in cash.

**Copyrights** shall mean all of the Companies' present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, all reissues and renewals thereof, all licenses thereof, all other general intangible, intellectual property and other rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all income, royalties and other Proceeds of any of the foregoing. Court shall mean the United States Bankruptcy Court for the District of Delaware.

**Court** shall mean the United States Bankruptcy Court for the District of Delaware.

NewYork 1329482.10

**Creation Agreement** shall mean that certain Agreement for Creation of Sea Launch Companies dated May 3, 1995 , as amended.

**Creditors' Committee** shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case.

**DDTC** shall mean the Directorate of Defense Trade Controls of the United States Department State, or any successor thereto having responsibility for enforcement of ITAR regulations.

**Default** shall mean any event specified in Section 9.1 hereof, regardless of whether any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act, has occurred or been satisfied.

**Default Rate of Interest** shall mean a rate of interest equal to five hundred basis points (5.00%) per annum greater than the interest rate accruing on the Obligations pursuant to Section 7.1 hereof, which Lender shall be entitled to charge the Borrower in the manner set forth in Section 7.2 of this Financing Agreement.

**DIP Breakup Fee** shall have the meaning set forth in Section 7.5 of this Financing Agreement.

**Documents of Title** shall mean all present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or non-negotiable, together with all Inventory and other Goods relating thereto, and all Proceeds of any of the foregoing.

**Early Termination Date** shall mean a date prior to any Termination Date on which the Borrower voluntarily terminates this Financing Agreement pursuant to Section 10.

**Effective Date** shall mean the closing date of any exit financing pursuant to a Plan of Reorganization. with respect to the Borrower or any reorganized company holding the assets of the Borrower and the Companies.

**Energia-Logistics** shall mean общество с ограниченной ответственностью «Энергия-Лоджистикс». The full name in English is Limited Liability Company «Energia-Logistics»; and the short name in English is LLC «Energia-Logistics». The legal address is Russian Federation, 119435, Moscow, 11 B. Savvinski Pereulok; почтовый адрес: Российская Федерация, 119435, г. Москва, Б. Саввинский переулок, д.11. The main state registration number (ОГРН) is 1107746056362.

**Energia Overseas Limited Russia** means общество с ограниченной ответственностью «Энергия-Оверсиз». The full name in English is Limited Liability Company «Energia-Overseas»; and the short name in English is LLC «Energia-Overseas». The legal address is Russian Federation, 119435, Moscow, 11 Bolshoy Savvinski Pereulok;

NewYork 1329482.10

почтовый адрес: Российская Федерация, 119435, г. Москва, Большой Саввинский переулок, д.11.  The state registration certificate 77 № 013261632.

**Equipment** shall mean all of the Companies' present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, rolling stock, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto and all Proceeds of any of the foregoing.

**ERISA** shall mean the Employee Retirement Income Security Act or 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

**Event(s) of Default** shall have the meaning given to such term in Section 9.1 of this Financing Agreement.

**Excess Loan** shall have the meaning given to such term in Section 2.3 of this Financing Agreement.

**Extension Conditions** shall have the meaning given to such term in Section 3.1(d) of this Financing Agreement.

**Facility** shall mean this Term Loan Line of Credit.

**Facility Discount** shall have the meaning set forth in Section 7.3 of this Financing Agreement.

**Final Financing Order** shall mean any order which is entered by the Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), together with all extensions, modifications and amendments thereto, which is in form and substance satisfactory to the Lender in all respects, and which among other things, authorizes on a final basis the incurrence by the Borrower of secured and Super-priority Claim indebtedness under the Facility in accordance with the Financing Documents on substantially the terms set forth in the Financing Documents grant a perfected security interest in the Collateral with the priority established in Section 5.1(b) and containing the usual and customary findings and rulings (including a finding that (i) notice of the interim hearing and the final hearing were both timely provided to the Creditors' Committee, each member of the Creditors' Committee, the 20 largest creditors of Borrower, the entity currently operating the Mortgaged Vessels, the Office of the United States Trustee and all other parties entitled to notice and (ii) the Lender is extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code).

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply.

**General Assignment** shall mean a general assignment of (i) the Earnings (as defined in the Ship Mortgages), (ii) the Required Insurances and (iii) any Requisition Compensation (as defined in the Ship Mortgages) in the form set out in Exhibit C.

**General Intangibles** shall mean all of the Companies' present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all Trademarks, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) Permits, (f) any other forms of intellectual property, (g) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, (h) rights and/or licenses to utilize Zenit Rocket and Block DM and other technology arising from Borrower's Creation Agreement, (i) all monies and claims for monies now or hereafter due and payable in connection with the foregoing, including, without limitation, payments for infringement and royalties arising from any licensing agreement between any Company and any licensee of any of such Company's General Intangibles, and (j) all Proceeds of any of the foregoing.

**Goods** shall mean all present and hereafter acquired "Goods", as defined in the UCC, and all Proceeds thereof.

**Governmental Entity** shall man any federal, state, municipal or local government, or governmental body, agency, authority, department, commission, board, bureau, official, instrumentality, or court, (other than the Court), tribunal, arbitrator or arbitral body in any jurisdiction, in each case either domestic or foreign, including, without limitation, the DDTC.

**Guarantors** shall mean Parent, each other Company (other than the Borrower) any other future or present direct and indirect subsidiary of the Borrower and any future guarantor of all or any part-of the Obligations.

**IMCA** shall mean the Isle of Man Companies Act of 1931, as amended, or any successor statute thereto.

**Indebtedness** shall mean, without duplication, all liabilities, contingent or otherwise, which are either (a) obligations in respect of borrowed money or for the deferred purchase price of property, services or assets, other than Inventory, or (b) obligations with respect to Capital Leases.

**Indemnified Party** shall have the meaning given to such term in Section 9.4 of this Financing Agreement.

**Interest Payment Date** shall mean the first Business Day after the earlier of (i) July 15, 2010 or (ii) the Effective Date, provided, however, that if the Borrower has filed and is pursuing confirmation of an Acceptable Plan as defined in clause (b) of the definition of "Acceptable Plan", then the Interest Payment Date shall mean the Effective Date of such Acceptable Plan.

**Interest Period** shall mean: (a) with respect to an initial request by the Borrower for a LIBOR Loan, a three-month period commencing on the borrowing date with respect to such LIBOR Loan and ending three months thereafter; and (b) with respect to any continuation of a LIBOR Loan, a three-month period commencing on the last day of the immediately preceding Interest Period applicable to such LIBOR Loan and ending three months thereafter; provided that (i) if any Interest Period would otherwise end on a day which is not a Working Day, such Interest Period shall be extended to the next succeeding Working Day, and (ii) if any Interest Period begins on the last Working Day of any month, or on a day for which there is no numerically

corresponding day in the month in which such Interest Period ends, such Interest Period shall end on the last Working Day of the month in which such Interest Period ends.

**Interim Financing Order** shall mean any order which is entered by the Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), together with all extensions, modifications and amendments thereto, which is in form and substance satisfactory to the Lender in all respects, and which, among other things, authorizes on an interim basis the incurrence by the Borrower of secured and Super-priority Claim indebtedness under the Facility in accordance with the Financing Documents on substantially the terms set forth in the Financing Documents grant a perfected security interest in the Collateral with the priority established in Section 5.1(b) and containing the usual and customary findings and rulings (including a finding that (i) notice of the interim hearing was timely provided to the Creditors' Committee, each member of the Creditors' Committee, the Borrowers 20 largest creditors, the entity currently operating the Mortgaged Vessels, the Office of the United States Trustee and all other parties entitled to notice and (ii) the Lender is extending credit to the Borrower in good faith within the meaning of Section 304(e) of the Bankruptcy Code).

**Interregnum Period** shall have the meaning set forth in Section 3.1(e) of this Financing Agreement.

**Inventory** shall mean all of the Companies' present and hereafter acquired inventory (as defined in the UCC) including, without limitation, all merchandise and inventory in all stages of production (from raw materials through work-in-process to finished goods), and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging or shipping of the foregoing, and all Proceeds of any of the foregoing.

**Investment Property** shall mean all of the Companies' present and hereafter acquired "Investment Property", as defined in the UCC, together with all stock and other equity interests held by each Company, and all Proceeds thereof.

**ITAR** shall mean International Traffic in Arms Regulations or similar rules and regulations governing the registration, license and export of satellite and missile launch technologies and related technical data.

**LIBOR** shall mean, for any Interest Period the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) that appears on Bloomberg as of approximately 11:00 a.m. (Los Angeles time) on such date of determination; provided, that if such index ceases to exist or is no longer published or announced, then the term "LIBOR" means the three-month London Interbank Offered Rate (rounded upward to the nearest 1/16 of one percent) as published in The Wall Street Journal on such date of determination; provided, however, that in no event shall the LIBOR Rate be less than four percent (4.00%) per annum.

**LIBOR Loan** shall mean any loans made pursuant to this Financing Agreement that bear interest based upon LIBOR.

**Loan Documents** shall mean this Financing Agreement, the General Assignments, the Promissory Notes, the Ship Mortgages, mortgages and deeds of trust on any Real Estate, the

other closing documents executed by the Borrower or the Guarantors, and any other ancillary loan and security agreements executed by the Borrower or the Guarantors from time to time in connection with this Financing Agreement, all as may be renewed, amended, restated or supplemented from time to time.

**Manufacturers Bank** shall mean Manufacturers Bank, a subsidiary of Sumitomo Mitsui Banking Corporation.

**Manufacturers' Liens** shall mean certain liens of Manufacturers Bank as set forth on Schedule 1.1(b) on cash collateral to secure certain letters of credit in an amount not to exceed $50,000.

**Material Adverse Effect** shall mean a material adverse effect on either (a) the business, condition (financial or otherwise), operations, performance or properties of the Companies, taken as a whole, (b) the ability of any Company to perform its obligations under this Financing Agreement or any other Loan Document, or to enforce its rights against account debtors of such Company, (c) the value of the Collateral or (d) the ability of Lender to enforce the Obligations or its rights and remedies under this Financing Agreement or any of the other Loan Documents.

**Mortgaged Vessels** shall mean, collectively, the Vessels of the Borrower and the Companies and the Subsidiaries that are subject to a security interest in favor of the Lender pursuant to one or more Ship Mortgages, including, as of the Closing Date, the Vessels listed on Schedule 1.l(c).

**Obligations** shall mean: (a) all loans, advances and other extensions of credit made by Lender to the Companies (or any of them), or to others for the Companies' account (including, without limitation, all Term Loans); (b) any and all other indebtedness, obligations and liabilities which may be owed by the Companies (or any of them) to Lender and arising out of, or incurred in connection with, this Financing Agreement, including any amendments thereto, or any of the other Loan Documents (including all Out-of-Pocket Expenses), whether (i) now in existence or incurred by the Companies (or any of them) from time to time hereafter, (ii) secured by pledge, lien upon or security interest in any Companies' assets or property or the assets or property of any other person, firm, entity or corporation, (iii) such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect, or (iv) the Companies are liable to Lender for such indebtedness as principal, surety, endorser, guarantor or otherwise; (c) all indebtedness, obligations and liabilities owed by the Companies (or any of them) to Lender under any other agreement or arrangement now or hereafter entered into between the Companies (or any of them), on the one hand, and Lender, on the other hand, whether or not such agreement or arrangement relates to the transactions contemplated by this Financing Agreement; (d) indebtedness, obligations and liabilities incurred by, or imposed on, Lender as a result of environmental claims relating to any Companies' operations, premises or waste disposal practices or disposal sites; (e) the Companies' liabilities to Lender as maker or endorser on any promissory note or other instrument for the payment of money; and (f) the Companies' liabilities to Lender under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which Lender may make or issue to others for the account of the Companies (or any of them).

NewYork 1329482.10

**Optional Extension Period** shall mean the three (3) month period of extension pursuant to Section 3.1(d).

**Other Collateral** shall mean all of the Companies': (a) present and hereafter established lockbox, blocked account and other deposit accounts maintained with any bank or financial institution into which the proceeds of Collateral are or may be deposited; (b) cash and other monies and property in the possession or control of Lender; (c) books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; and (d) all Proceeds of any of the foregoing.

**Out-of-Pocket Expenses** shall mean all of Lender's reasonable present and future costs, fees and expenses incurred in connection with the proposal, negotiation and documentation of this Financing Agreement and the other Loan Documents, including, without limitation, reimbursement of all reasonable out of pocket expenses of the Lender associated with the preparation, execution and delivery of, and any amendment, supplemental, waiver, or modification to, or enforcement of, the Loan Documents, Interim Financing Order, Final Financing Order and any other documents prepared in connection herewith or therewith, its participation or monitoring of the Case (including any reasonable expenses associated with conducting diligence investigations), the Lender's prosecution, enforcement or defense of any rights, claims or entitlements arising under or in connection with the Loan Documents (including any costs associated with obtaining, or eliminating the need for, any necessary consents from DDTC) ; provided, however, that if the Closing Date occurs, the Work Fee shall be applied to such expenses. Also to include reasonable fees and disbursements of (i) Salans LLP as outside counsel (including reasonable fees and disbursements of consulting or expert advisors to counsel), and (ii) one local outside counsel for each applicable jurisdiction (including reasonable fees and disbursements of consulting or expert advisors to counsel).

**Parent** shall mean Sea Launch Company, L.L.C., a Delaware limited liability company.

**Patents** shall mean all of the Companies' present and hereafter acquired patents, patent applications, registrations, all reissues and renewals thereof, all licenses thereof, all inventions and improvements claimed thereunder, all general intangible, intellectual property and other rights of any Companies with respect thereto, and all income, royalties and other Proceeds of the foregoing.

**Permits** shall mean any and all licenses, permits, franchises, registrations, filings, consents, orders, approvals, variances, exemptions and authorizations of, from or with any Governmental Entity whether or not held by a third party for the benefit of Borrower.

**Permitted Distributions** shall mean:

(a)     dividends from a wholly-owned subsidiary of a Company to such Company; and

(b)     dividends payable solely in stock or other equity interests of the Companies.

**Permitted Encumbrances** shall mean: (a) all liens existing on the Closing Date and listed on Schedule 1.1(b); (b) deposits made (and the liens thereon) in the ordinary course of

business of any Companies (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts; (c) liens granted to Lender by the Companies; and (d) Permitted Tax Liens.

**Permitted Indebtedness** shall mean: (a) current Indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, Taxes or labor; (b) Indebtedness arising under this Financing Agreement; (c) deferred Taxes and other expenses incurred in the ordinary course of business; (d) Permitted Intercompany Loans; and (e) other Indebtedness existing on the Closing Date and listed on Schedule 1.1(a) attached hereto.

**Permitted Intercompany Leases** shall mean the leases set forth in Schedule 1.1(d).

**Permitted Intercompany Loan** shall mean a loan made by one of the Companies to another of the Companies, but only so long as (a) such loan is evidenced by a promissory note, the original of which shall be delivered to Lender, and (b) the promissory note evidencing such loan provides (in form and substance satisfactory to Lender) that the repayment thereof is subordinated to the full and final payment of the Obligations.

**Permitted Tax Liens** shall mean liens for Taxes not yet due and payable and liens for Taxes that any of the Companies is contesting in good faith, by appropriate proceedings which are sufficient to prevent imminent foreclosure of such liens, and with respect to which adequate reserves are being maintained by any of such Companies in accordance with GAAP; provided that in either case, such liens (a) are not filed of record in any public office, (b) other than with respect to Real Estate, are not senior in priority to the liens granted by any of such Companies to Lender, or (c) do not secure taxes owed to the United States of America (or any department or agency thereof) or any State or State authority, if applicable State law provides for the priority of tax liens in a manner similar to the laws of the United States of America.

**Petition Date** shall mean June 22, 2009.

**Platform** shall mean Platform Limited Partnership's sea-based self propelled commercial satellite launch platform, known as the "Odyssey".

**Proceeds** shall have the meaning given to such term in the UCC, including, without limitation, all Casualty Proceeds.

**Professional Expenses** shall mean the reasonable fees and reimbursable expenses of a Professional Person for which the Companies are liable in respect of compensation for services rendered or reimbursement of expenses allowed by the Court to any Professional Person; provided, however, that the payment by Borrower of fees and expenses of any Professional person shall be deferred to the extent necessary to (a) assure compliance with the Budget and (b) to maintain the Cash Balance required by Section 6.2(l) of this Financing Agreement.

**Professional Person** shall mean a Person who is an attorney, accountant, appraiser, auctioneer or other person and who is retained pursuant to Sections 327 and 328 of the Bankruptcy Code (a) by the Companies or (b) by a Creditors' Committee appointed pursuant to Section 1103(a) of the Bankruptcy Code.

**Promissory Notes** shall mean the notes in the form of Exhibit A attached hereto, delivered by the Borrower to Lender to evidence the Term Loans.

**Real Estate** shall mean all of the Companies' present and future fee and leasehold interests in real property.

**Reorganization Plan** shall mean a plan of reorganization proposed by the Borrower or any other Person (including the Lender) in the Chapter 11 Case.

**Required Insurance** shall have the meaning provided for in Section 6.2(c) of this Financing Agreement.

**RSC Energia** shall mean S.P. Korolev Rocket and Space Company, a limited partner in the Borrower.

**Security Period** shall mean the period commencing on the date of this Agreement and ending on the date on which the Lender notifies the Borrower and the Companies that:

(a)   all amounts which have become due for payment by the Borrower or any Guarantor under the Loan Documents have been paid;

(b)   no amount is owing or has accrued (without yet having become due for payment) under any Loan Document; and

(c)   neither the Borrower nor any Guarantor has any future or contingent liability under any provision of this Agreement or another Loan Document (other than the general indemnity provided for in Section 9.3 and any other provisions which expressly survive the termination of this Financing Agreement).

**Ship Mortgage** shall mean any of the first preferred mortgages or first preferred fleet mortgages of a vessel or vessels registered in the Republic of Liberia in the form of Exhibit D, and with the additional requirement that such mortgage satisfies the definition of "preferred mortgage" under 46 USC Section 31301 (6).

**Sea Launch Commander** shall mean Sea Launch ACS Limited's command ship, known as the "SEA LAUNCH COMMANDER".

**Subsidiaries** shall mean any of the Companies whose equity interests are wholly owned by the Borrower or Parent.

**Super-priority Claim** shall mean an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code and over any and all administrative expenses or other claims arising under

Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

**Taxes** shall mean all federal, state, municipal and other governmental taxes, levies, charges, claims and assessments which are or may be owed or collected by the Companies with respect to their business, operations, Collateral or otherwise.

**Term Loans** shall mean the term loans to be made to the Borrower by Lender upon the satisfaction of the conditions set forth in Section 2 of this Financing Agreement.

**Term Loan Line of Credit** shall mean Lender's commitment to make Term Loans to the Borrower in the aggregate original principal amount of up to $30,000,000 pursuant to Section 3 of this Financing Agreement.

**Termination Date** shall mean the earliest of the date: (a) which is six (6) months after the Closing Date, subject to extension pursuant to Section 3.1(d); (b) the earlier of (i) the effective date of any Reorganization Plan and (ii) thirty (30) days following the entry of a Confirmation Order if the effective date under such Reorganization Plan has not occurred; (c) of the entry of an Order pursuant to Section 363 of the Bankruptcy Code approving the sale of any Mortgaged Vessel or any other material asset of any Company; (d) of conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (e) of dismissal of the Chapter 11 Case; (f) forty-five (45) days after the date of the filing of a motion seeking approval of the Facility if a final order has not been entered approving the Facility or a stay of the Final Financing Order has been entered by an Appellate court; (g) any Early Termination Date chosen by Borrower; or (h) the acceleration of the Obligations pursuant to Section 9.

**Trade Accounts Receivable** shall mean that portion of each Company's Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of such Company's business.

**Trademarks** shall mean all of the Companies' present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, corporate names, business names, service marks, logos and any other designs or sources of business identities, prints and labels (on which any of the foregoing may appear), all reissues and renewals thereof, all licenses thereof, all other general intangible, intellectual property and other rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all income, royalties and other Proceeds of any of the foregoing.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York.

**Vessels** shall mean, collectively, all platforms, ships and any other maritime vessel, at any time owned by Borrower, the Companies and the Subsidiaries including without limitation, the "SEA LAUNCH COMMANDER", the Platform and, individually, any of such vessels

**Work Fee** shall mean a fee of $75,000 payable to the Lender on or before the date of the Interim Financing Order.

NewYork 1329482.10

**Zenit Rocket** shall have the same meaning as defined in the Creation Agreement.

**Working Day** shall mean any Business Day on which dealings in foreign currencies and exchanges between banks may be transacted.

## SECTION 2. Conditions Precedent.

    **2.1**    **Conditions Precedent to Initial Funding.** The obligation of Lender to make the initial Term Loan in the amount of $22,500,000.00, immediately prior to or concurrently with the making of such Term Loan, is subject to the satisfaction or waiver in writing by Lender of the following conditions precedent immediately prior to or concurrently with the making of such Term Loan:

    **(a)**    **Disbursement Authorizations.** The Borrower shall have delivered to Lender at least two (2) Business Days in advance all information necessary for Lender to issue wire transfer instructions on behalf of Borrower for the initial and subsequent loans and/or advances to be made under this Financing Agreement, including disbursement authorizations in form acceptable to Lender.

    **(b)**    **Interim Financing Order.** On or before April 27, 2010, the Interim Financing Order shall have been entered into.

    **(c)**    **Legal Restraints/Litigation.** As of the Closing Date, there shall be no injunction, writ or restraining order restraining or prohibiting the consummation of the financing arrangements contemplated under this Financing Agreement.

    **(d)**    **Additional Documents.** The Borrower and the Guarantors shall have executed and delivered to Lender the Loan Documents necessary to consummate the lending arrangement contemplated by this Financing Agreement, including copies of all licenses on that certain confidential Sea Launch schedule dated March 2, 2010

    **(e)**    **UCC Filings.** All UCC financing statements and similar documents required to be filed in order to create in favor of the Lender a first priority and exclusive perfected security interest (to the extent that such a security interest may be perfected by a filing under the UCC or applicable law) in the Collateral shall have been provided in proper form appropriate for filing in each office in each jurisdiction required.

    **(f)**    **Budget.** The Lender shall have received and approved the Budget, which Budget shall be in substantially the form previously provided to the Lender.

    **(g)**    **Work Fee.** The Lender shall have received payment of the Work Fee, which payment shall be made from the proceeds of the initial Term Loan;

    **(h)**    **Title to Vessels.** The Lender shall have received satisfactory evidence that the Vessels are titled to the Companies, and that the only liens of records are those referred in Section 2.1 (j);

**(i)** **Termination of Certain Indebtedness.** The Lender shall have received satisfactory evidence:

  **(i)** That the indebtedness to Space Launch Services LLC arising in connection with that Debtor in Possession Financing Agreement dated November 13, 2009, and any related mortgages on the Vessels, have been or will be satisfied, released and discharged upon the payment of an identified and fixed sum certain;

  **(ii)** That that the indebtedness secured by the First Preferred Mortgage in favor of the Secretary of State for Trade Ministry and the indebtedness secured by the Second Preferred Mortgage in favor of the Chase Manhattan Bank have both been fully paid and satisfied (which evidence may include audited financial statements of Sea Launch ACS Limited Partnership for fiscal year ended 2004 and a letter from JP Morgan Chase stating that such indebtedness has been paid in full).

**(j)** **Organization of Companies.** The Lender shall have received satisfactory evidence that the organization and registration of each of the Companies is valid and recognized by each of jurisdictions in which the Companies are formed and operating, including but not limited to the Isle of Man, the Cayman Islands and the State of Delaware.

**(k)** **Payment of Certain Expenses.** The Lender shall have received a written representation from the entity operating each of the Vessels that all bills submitted to the Borrower have been fully paid when due.

**(l)** **No Material Adverse Change.** There shall not have occurred any event, change or condition since January 1, 2010 that, individually or in the aggregate, has had or could reasonably be expected to have, a material adverse effect on the Vessels.

**(m)** **Ship Mortgages: Certificates of Ownership; Searches; Class Certificates; Insurance.** On the Closing Date:

  **(i)** Platform Limited Partnership shall have duly authorized, executed and delivered, and shall have made arrangements satisfactory to the Lender for the recording thereof in the appropriate vessel registry, a first preferred Ship Mortgage, with respect to the Platform and the Ship Mortgage shall be effective, when filed, to create in favor of the Lender a legal, valid and enforceable first priority security interest, in and lien upon the Platform, subject only to Permitted Encumbrances.

  **(ii)** Sea Launch ACS Limited Partnership shall have duly authorized, executed and delivered, and shall have made arrangements satisfactory to the Lender for the recording thereof in the appropriate vessel registry, a first preferred Ship Mortgage with respect to the SEA LAUNCH COMMANDER which ship Mortgage shall be effective, when filed, to create in favor of the Lender a legal, valid and enforceable first priority security interest, in and lien upon the SEA LAUNCH COMMANDER, subject only to Permitted Encumbrances.

  **(iii)** The Lender shall have received (x) certificates of ownership or abstracts of title from appropriate authorities showing (or confirmation updating previously

reviewed certificates and indicating) the registered ownership of each Vessel by the relevant Company and (y) the results of maritime registry searches with respect to the Vessels, indicating no record liens other than the first priority security interest and lien in favor of the Lender, Permitted Encumbrances.

(iv)    The Lender shall have received a copy of the Certificate of Financial Responsibility for each Vessel required by the Minerals Management Service or the United States Coast Guard to be covered by such a certificate.

(v)    The Lender shall have also received duly executed letters subordinating the existing bareboat charters of the Vessels to the Ship Mortgages.

(vi)    The Lender shall have received for each Vessel a satisfactory certificate, in Lender's sole and absolute discretion, from the relevant classification society that such Vessel remains in class without conditions or recommendations.

(vii)    The Lender shall have received for each Vessel satisfactory evidence in Lender's sole and absolute discretion that such Vessel is insured in accordance with the provisions of the Ship Mortgage and all requirements therein have been complied with;

provided, however, that notwithstanding the forgoing, no legal opinions from any counsel of the Borrower regarding the enforceability of the Ship Mortgages shall be required until the date of the Final Financing Order, pursuant to with Sections 3.1(b)(iv) and 5.9(e)(ii)(3) below

(n)    **Vessel Control**.  The Lender shall have received satisfactory evidence:

(i)    All necessary licenses relating to equipment or intellectual property on or used in connection with the Vessels are in effect and that all licensors, or sub licensors have provided all necessary consents to the Mortgages, the General Assignments, and any security interests under this Financing Agreement and the other Loan Documents, or that such consents are not necessary; and

(ii)    All necessary leases relating to equipment used on or in connection with the Vessels are in effect and that all lessors or sub lessors have provided all necessary consents to the Mortgages and liens under this Financing Agreement, or that such consents are not necessary; .

(o)    **Permits**.  The Lender shall have received satisfactory evidence that the Companies or its Affiliates hold directly or through third parties all Permits necessary or required for the conduct of the Business.

2.2    **Additional Cash Advances**.  Subject to Section 3.1 below, Borrower may request the following additional Term Loans on the conditions set forth below:

(a)    An additional Term Loan in the maximum amount of $25,000,000 in cash less the amount of the initial Term Loan under Section 2.1 to be made on the date or after entry of the Final Financing Order.

NewYork 1329482.10

**(b)**     An additional Term Loan in the maximum amount of $28,000,000 in cash less the amount of all prior Term Loans to be made on or after June 15, 2010, provided that the Effective Date has not yet occurred by such date.

**(c)**     Any such additional Term Loan shall be subject to the prior satisfaction of the covenants set forth in Section 5.9.

**2.3     Excess Loan**.  Subject to Section 3.1 below, Borrower may request and Lender, in its sole and absolute discretion, may agree to provide an additional term loan (the "**Excess Loan**"), in excess of the Term Loan Line of Credit to be made on or after the date of the Confirmation Order but prior to the Effective Date.  Any such Excess Loan shall be subject to (i) the prior satisfaction of the covenants set forth in Section 5.9, (ii) the prior delivery of an acceptable Budget applicable to the Interregnum Period, (iii) evidence of Borrower and Guarantors holding available cash or cash equivalents in the aggregate of at least $2,500,000 on the date of the Confirmation Order; and (iv) modification of the interest rate applicable to the Excess Loan in the Lenders sole and absolute discretion.  Any Excess Loan provided under this Section 2.3 shall be deemed to be a Term Loan for all purposes of this Financing Agreement.

## SECTION 3.  Term Loans.

**3.1     Term Loans.**

**(a)     Commitment; Use of Proceeds of Term Loans.**  Within the available and unused Term Loan Line of Credit, and subject to satisfaction of the applicable conditions set forth in Section 2, upon the request of the Borrower and Lender's receipt of a Promissory Note in the amount of the Term Loan requested by the Borrower, Lender hereby agrees to make Term Loans to the Borrower. The Borrower agrees to use the proceeds of Term Loans (i) to fund operating expenses and other working capital of the Borrower, (ii) pay transaction fees and expenses incurred in connection with this Facility and (iii) pay professional fees and expenses as approved by the Bankruptcy Court, provided, however, that the proceeds of the Term Loans may not be used to pay the fees and expenses of Creditors' Committee professionals in excess of $350,000 per month. No proceeds of any extension of credit under this Facility or any Collateral may be used to commence or prosecute or join in any legal action against the Lender or any of its Affiliates.

**(b)     Conditions to Funding of Term Loans.**  In addition to satisfaction of the applicable conditions set forth in Section 2, Lender's commitment to make any Term Loan is subject to the satisfaction of following conditions:

**(i)**     the Borrower must give Lender two (2) Business Days prior written notice of its intention to borrow such Term Loan;

**(ii)**     no Default or Event of Default shall have occurred and remain outstanding (x) at the time the Borrower requests such Term Loan or (y) on the date on which Lender makes such Term Loan to the Borrower;

**(iii)**     each of the representations and warranties made by each of the Companies in or pursuant to this Financing Agreement shall be true and correct on and as of such

date as if made on and as of the date of each Term Loan, except to the extent (i) previously fulfilled in accordance with the terms hereof, (ii) applicable to a specific date or otherwise subsequently inapplicable, or (iii) previously waived in writing by Lender with respect to any particular factual circumstance, and

    **(iv)** prior to the issuance of an Additional Cash Advance in accordance with Section 2.2 (a), the Lender shall have received an opinion from Borrower's counsel reasonably satisfactory to Lender regarding the enforceability of the Ship Mortgages.

The Borrower shall be entitled to request and borrow Term Loans on the dates specified in Section 2.

    **(c)** **Repayment of Term Loans.** The principal amount of each Term Loan shall be due and payable on the Termination Date. All payments by the Companies to the Lender shall be in U.S. Dollars in cash made without setoff or counterclaim by wire transfer to an account of Lender pursuant to written instructions delivered by Lender from time to time, provided that Lender shall have the right to:

    **(i)** convert the all or a portion of the outstanding Obligations (including, without limitation, the principal amount of the Term Loans, any accrued and unpaid interest thereon and the DIP Breakup Fee, if any) (the **"Conversion Amount"**) into Conversion Shares; or

    **(ii)** apply all or a portion of the outstanding Obligations (including, without limitation, the principal amount of the Term Loans, any accrued and unpaid interest thereon and the DIP Breakup Fee, if any) against any payment for the assets of the Borrower and/or the Companies due in accordance with a Reorganization Plan.

    **(d)** **Extension of Termination Date.** Borrower shall have the option to extend the maturity of the Facility for a single three month period, subject to satisfaction of the following conditions precedent (the **"Extension Conditions"**):

    **(i)** the Borrower provides written notice to the Lender of its election to extend the Facility at least 30 days prior to the six month anniversary from Closing Date;

    **(ii)** there are no Defaults on an Events of Default existing under the Facility; and

    **(iii)** the Borrower shall have filed a Plan of Reorganization and Disclosure Statement with the Court acceptable to Lender in its sole discretion.

    **(iv)** the Borrower shall have entered into new contracts on a post-petition basis on terms deemed satisfactory to the Lender (the **"New Launch Contracts"**), including, without limitation, launch and payment terms that provide that SEA LAUNCH COMMANDER and Platform shall have no fewer than five contracted launches for no less than $500 million of incremental new cash consideration to be received by Borrower on or before March 31, 2013;

**(v)** the Parent and/or the Borrower shall have entered into an Amended Supply Chain Agreement with Energia Logistics as the rocket segment prime contractor, and/or one or more of its affiliated companies, and/or its assignees, for the long-term supply of launch vehicles and launch support services (including, but not limited to, payload integration, mission control and launch analysis and support);

**(vi)** the Borrower shall have demonstrated to the satisfaction of Lender that no additional financing will be required prior to the extended Termination Date, unless Lender shall have agreed to provide such additional financing; and

**(vii)** the Parent, the Borrower and/or any Company or their respective successors on the one hand and the Lender or any Affiliate of Lender on the other hand shall have entered into definitive documents regarding an equity investment, a new term loan facility replacing the Facility and/or any other exit financing arrangement, in each case on terms and conditions acceptable to the Lender in its sole and absolute discretion.

**(e)** **Extension of Termination Date for Excess Loan.** In the event Lender has agreed to provide the Excess Loan in accordance with Section 2.3 of this Financing Agreement and provided the Extension Conditions have been met, then the maturity of the Facility shall be extended until the earlier of (i) the Effective Date, (ii) a breach of Borrower's covenants under Sections 6.2 or 6.3, (iii) a breach of any representations, warranties or covenants contained in any exit financing, if Lender (or an affiliate of Lender) is the provider of such exit financing, or (iv) September 30, 2010, unless Lender (or an affiliate of Lender) provide the exit financing, in which case it shall be the date agreed between the parties in connection with such exit financing (the "**Interregnum Period**").

**3.2** **Provisions Regarding all Term Loans.**

**(a)** **Repayment Upon Termination.** In the event this Financing Agreement is terminated by either Lender or the Borrower for any reason whatsoever, all Term Loans, together with all accrued interest thereon, shall be due and payable in full on the effective date of such termination, notwithstanding any other provision of this Financing Agreement or the Promissory Notes to the contrary.

**(b)** **Optional Prepayments.** The Borrower, at its option, may prepay any Term Loan at any time, in whole or in part, provided that on the date of such prepayment, there shall be due and payable accrued interest on the principal so prepaid to the date of such prepayment.

**(c)** **No Reborrowing.** To the extent repaid, the principal amount of any Term Loan may not be reborrowed under this Section 3.

**SECTION 4. Guarantee.**

**4.1** **The Guarantee.** The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to Lender, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency

EXECUTION COPY

petition under Title 11 of the United States Code) on the Loans made by the Lender to, and the Notes held by the Lender of, Borrower, and all other Obligations from time to time owing to Lender by any Company under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if Borrower or any other Guarantor shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**4.2    Obligations Unconditional.** The obligations of the Guarantors under Section 4.1 shall constitute a guaranty of payment and are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of Borrower under this Financing Agreement, the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of anyone or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

      **(i)**    at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

      **(ii)**    the failure of Lender (a) to assert any claim or demand or to enforce any right or remedy against the Borrower or any other Company or any other person under the provisions of this Financing Agreement, any Note, any other Loan Document or otherwise or (b) to exercise any right or remedy against any other Guarantor of, or collateral securing , any of the Guaranteed Obligations;

      **(iii)**    an Event of Default shall be declared, the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

      **(iv)**    any lien or security interest granted to, or in favor of, the Lender as security for any of the Guaranteed Obligations shall fail to be perfected; or

      **(v)**    the release of any other Guarantor.

Each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever (other than any notices expressly provided for in this Financing Agreement to be furnished to such Guarantor with respect to making payment under the Guarantee), and any requirement that Lender exhaust any right, power or remedy or proceed against Borrower or any other Guarantor under this Financing Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by Lender upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between Borrower and the Lender shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Lender, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Lender or any other person at any time of any right or remedy against Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lender, and its successors and assigns, notwithstanding that from time to time during the term of this Financing Agreement there may be no Guaranteed Obligations outstanding.

**4.3    Reinstatement**.  The obligations of the Guarantors under this Section 4 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Borrower or other Company in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**4.4    Subrogation; Subordination.**  Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Term Loan Line of Credit under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 4.1, whether by subrogation or otherwise, against Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.

**4.5    Remedies**.  The Guarantors jointly and severally agree that, as between the Guarantors and the Lender, the obligations of Borrower under this Financing Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 9.1 for purposes of Section 4.1, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 4.1.

NewYork 1329482.10

**4.6    Instrument for the Payment of Money.**  Each Guarantor hereby acknowledges that the guarantee in this Section 4 constitutes an instrument for the payment of money, and consents and agrees that the Lender, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

**4.7    Continuing Guarantee.**  The guarantee in this Section 4 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

**4.8    General Limitation on Guarantee Obligations.**  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 4 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 4, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Company or any other person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

## SECTION 5.  Collateral.

### 5.1    Grant of Security Interest.

**(a)**    As security for the prompt payment in full of all Obligations, each Company hereby pledges and grants to Lender a priming first priority perfected security interest pursuant to § 364(c)(2) and § 304(d) of the Bankruptcy Code in, all of the Collateral in which such Company has rights.

The Borrower pledges and warrants that all Obligations arising under this Financing Agreement or any other Financing Document upon the entry of the Interim Financing Order (or the Final Financing Order, as applicable) will be entitled to a Super-priority Claim, junior only to the Carve-Out and the Manufacturers' Liens.  Additionally, the Obligations shall be senior in priority to any and all adequate protection liens of any prepetition secured creditors (excluding the Manufacturers' Liens) and are not subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of any Company and its estate, (b) except as may be provided in any Loan Document, liens arising after the Petition Date including, any liens or security interests granted in favor of any federal, state municipal or other governmental unit, commission, board or court for any liability of any Company or (c) any intercompany or affiliate liens of any Company.

**(b)    Extent of Security Interests.**  The security interests granted hereunder shall extend and attach to:

(i)    all Collateral which is presently in existence or hereafter acquired and which is owned by any Company or in which any Company has any interest, whether held by such Company or by others for the such Company's account, and wherever

located, and, if any Collateral is Equipment, whether such Company's interest in such Equipment is as owner, lessee or conditional vendee;

(ii)     all Equipment whether the same constitutes personal property or fixtures, including, but without limiting the generality of the foregoing, all dies, jigs, tools, benches, molds, tables, accretions, component parts thereof and additions thereto, as well as all accessories, motors, engines and auxiliary parts used in connection with, or attached to, the Equipment; and

(iii)     all Inventory and any portion thereof which may be returned, rejected, reclaimed or repossessed by either Lender or the Company from the Company's customers, as well as to all supplies, goods, incidentals, packaging materials, labels and any other items which contribute to the finished goods or products manufactured or processed by the Company, or to the sale, promotion or shipment thereof.

Provided however, that in no event shall the security interests granted hereunder or under the Interim or Final Financing Order be senior to the Carve-Out or prime the Manufacturers' Liens. The Lender agrees that, subject to the Cash Balance requirement of Section 6.2(l), the prior approval of any changes to the Budget or prior approval of any expenditures not consistent with the Budget and so long as no Event of Default shall have occurred and be continuing, and notice of such Event of Default having been given to the Companies, the Companies shall be permitted to pay Professional Expenses allowed by the Court. and such payments will not count against the Carve-Out.

(c)     **Carve Out**.   The Lenders security interest on the Collateral owned by the Companies and their administrative claim under Sections 364(c)(1) of the Bankruptcy Code afforded the Obligations shall be subject and subordinate only to a carve-out for the following (herein after referred to as the "**Carve-Out**"):

(i)     prior to occurrence of an Event of Default and delivery of a notice of such Event of Default to the Borrower, up to an amount of $1,600,000 that are necessary to pay (A) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (B) fees and expenses incurred by the Borrower in respect of compensation for services rendered or reimbursement of Professional Expenses (whether or not allowed prior to the occurrence of an Event of Default), in each case incurred (whether or not paid or allowed by the Bankruptcy Court) prior to the delivery of the notice of the occurrence of an Event of Default (the "**Carve-Out Notice**");

(ii)     after the delivery of a Carve-Out Notice, an amount not exceeding $100,000] to pay 50% of the total fees or expenses incurred following the delivery of such Carve-Out Notice by the Borrower, and its Professionals, in respect of compensation for services rendered or reimbursement of expenses allowed by the Court; provided, however, that the dollar amount in this clause (ii) shall not be reduced by payments made pursuant to clause (c) (i) of this Section 5.1.

(d)     **Prohibited Use of Cash Collateral.**  No proceeds from the Term Loans or cash collateral (as that term is defined in 11 U.S.C. 363(a)) is to be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Lender, and/or challenging or raising any defenses to the Obligations, or the Lender's security interests in the Collateral.

(e)     **No Other Senior Liens**.  Except as set forth herein or in the Interim or Final Financing Orders, no other claim having a priority superior to or pari passu with that granted to Lenders by the Orders shall be granted or approved while any Obligations under this Financing Agreement remain outstanding.

(f)     **No Recording Necessary** . Subject to the priorities set forth in subsection (a) above and to the Carve-Out, as to all Collateral, including, without limitation, all real property the title to which is held by the Companies, or the possession of which is held by any Company pursuant to a leasehold interest, each Company hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Lender, all of the right, title and interest of the Companies in all of such Collateral, including without limitation, all owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Companies in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. Each Company acknowledges that, pursuant to the Interim or Final Financing Orders, the security interests granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. Notwithstanding subsections (a), (b), (c), (d) and (e) of this Section 5.1, or any failure on the part of any Borrower and Administrative Agent to take any further act to perfect, maintain, protect or enforce the Liens and security interests in the Collateral granted hereunder, the Orders (when entered) shall automatically, and without further action by any Person, perfect such Liens and security interests against the Collateral. Each Company further agrees that (i) the Lender shall have rights and remedies set forth in Section 9.2(b) in respect of the Collateral and (ii) if requested by Lender, the Companies shall enter into separate security agreements, control agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to counsel to Lender.

5.2     **Limited License.**  Regardless of whether Lender's security interests in any of the General Intangibles has attached or is perfected, each Company hereby irrevocably grants to Lender a royalty-free, non-exclusive license to use such Company's Trademarks, Copyrights, Patents and other proprietary and intellectual property rights, in connection with the (i) advertisement for sale, and the sale or other disposition of, any finished goods Inventory by Lender in accordance with the provisions of this Financing Agreement, and (ii) the manufacture, assembly, completion and preparation for sale of any unfinished Inventory by Lender in accordance with the provisions of this Financing Agreement.

5.3     **Representations, Covenants and Agreements Regarding Collateral Generally.**

(a)     **Representations and Warranties.**  The Companies represent and warrant to Lender that except for the Permitted Encumbrances, (i) upon the entry of the Interim or Final Financing Orders, the Lender will have a valid, perfected, first priority and exclusive security

interest in all Collateral (ii) Lender's security interests in the Collateral constitute, and will at all times constitute, first priority and exclusive liens on the Collateral, and (iii) each Company is, or will be at the time additional Collateral is acquired by such Company, the absolute owner of such additional Collateral with full right to pledge, sell, transfer and create a security interest therein, free and clear of any and all claims or liens other than Permitted Encumbrances.

(b)     **Covenants.**  The Companies, at their expense, agree to forever warrant and defend the Collateral from any and all claims and demands of any other person, other than holders of Permitted Encumbrances.

(c)     **Ship Mortgages.**  Each of the Ship Mortgages is in proper legal form under the laws of the Republic of Liberia for the enforcement thereof under such laws, subject only to such matters which may affect enforceability arising under the laws of the State of New York or under the laws of the Republic of Liberia, and such other matters that do not substantially interfere with the practical realization of the principal benefits expressed in the Ship Mortgages, except for the economic consequences of any procedural delay that might result from such matters. To ensure the legality, validity, enforceability or admissibility in evidence of each such Ship Mortgage or other Loan Document in the Republic of Liberia it is not necessary that any such Ship Mortgage or other Loan Document or any other document be filed or recorded with any court or other authority in the Republic of Liberia, except as have been made or provided to the Lender, or will be made or provided to the Lender, in accordance with this Financing Agreement or such Ship Mortgage. Each Ship Mortgage executed and delivered creates in favor of the Mortgagee (as defined in each Ship Mortgage) for the benefit of the Lender a legal, valid, and enforceable first preferred mortgage lien over the Mortgaged Vessel or Mortgaged Vessels covered thereby and when duly recorded in accordance with the laws of the Mortgaged Vessel's registry, will constitute a "preferred mortgage" within the meaning of Section 31301(6) of Title 46 of the United States Code, entitled to the benefits accorded a preferred mortgage on a foreign vessel, in the case of Mortgaged Vessels not registered under the laws and flag of the United States, and in the case of Mortgaged Vessels registered under the laws and flag of the United States, constitutes a "preferred mortgage" within the meaning of Section 31301(6) of Title 46 of the United States Code, entitled to the benefits accorded a preferred mortgage on a registered vessel under the laws and flag of the United States.

**5.4     Covenants and Agreements Regarding Equipment.**

(a)     **Maintenance of Equipment.**  Each Company agrees to (i) maintain the Equipment in as good and substantial repair and condition as the Equipment owned by such Company is now maintained (or at the time that Lender's security interest may attach to such Equipment) and is required to be maintained in order to conduct the Business, ordinary wear and tear excepted, (ii) make any and all repairs and replacements when and where necessary, in accordance with prudent business practices, and (iii) safeguard, protect and hold all Equipment owned by such Company in accordance with the terms hereof and subject to Lender's security interest. The Equipment will only be used by the Companies in the operation of their Business and will not be sold or held for sale or lease, except as expressly provided in Section 5.6(b) below.

(b)     **Sales of Equipment.**  The Companies may sell obsolete Equipment or surplus Equipment from time to time, provided that in each such instance: (i) no Event of Default shall have occurred and remain outstanding at the time of such sale; (ii) the decision as to whether such Equipment is obsolete or surplus is reasonable by the standards of a prudent operator in the sector; (iii) the aggregate book value of the Equipment subject to sale does not exceed $1,000,000 in any fiscal year of the Companies; and (iv) all net proceeds in excess of $100,000 of such sales are either (x) promptly delivered by the Companies to Lender, for application against the Term Loans (and if the Term Loans have been fully repaid, for application to other Obligations in such manner and in such order as Lender may elect in the exercise of its reasonable business judgment), or (y) within 90 days of such sale, used to purchase replacement Equipment that the Companies determine in their reasonable business judgment to have a value at least equal to the Equipment sold. Except as set forth above, the Companies agree not to sell, transfer, lease or otherwise dispose of any item of Equipment without Lender's prior written consent. Upon the sale, transfer, lease or other disposition of Equipment, Lender's security interest in the Equipment shall, without break in continuity and without further formality or act, continue in, and attach to, all Proceeds. Such Proceeds shall not be commingled with the Companies' other property, but shall be segregated and held by the Companies in trust for Lender as Lender's exclusive property, to be applied as set forth in this section. As to any such sale, transfer, lease or other disposition, Lender shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

**5.5     General Intangibles.**  Each Company represents and warrants to Lender that as of the date hereof, such Company possesses all General Intangibles reasonably necessary to conduct the Business. Each Company agrees to maintain such Company's rights in, and the value of, all such General Intangibles, and to pay when due all payments required to maintain in effect any licensed rights. The Companies shall provide Lender with adequate notice of the acquisition of rights with respect to any additional Patents, Trademarks and Copyrights so that Lender may, to the extent permitted under the documentation granting such rights or applicable law, perfect its security interest in such rights in a timely manner.

**5.6     Commercial Tort Claims.**  Each Company represents and warrants to Lender that as of the date hereof, such Company holds no interest in any commercial tort claim, except as set forth on Schedule 5.6. If any Company at any time holds or acquires a commercial tort claim, such Company agrees to promptly notify Lender in writing of the details thereof, and in such writing such Company shall grant to Lender a security interest in such commercial tort claim and in the Proceeds thereof, all upon the terms of this Financing Agreement.

**5.7     Letter of Credit Rights.**  Each Company represents and warrants to Lender that as of the date hereof, such Company is not the beneficiary of any letter of credit. If any Company becomes a beneficiary under any letter of credit, such Company agrees to promptly notify Lender, and upon request by Lender, such Company agrees to either (a) cause the issuer of such letter of credit to consent to the assignment of the proceeds of such letter of credit to Lender pursuant to an agreement in form and substance satisfactory to Lender, or (b) cause the issuer of such letter of credit to name Lender as the transferee beneficiary of such letter of credit.

**5.8     Real Estate.**  Upon the request of Lender, each Company agrees to execute and deliver to Lender from time to time, a mortgage or deed of trust (as appropriate) in form and

substance satisfactory to Lender on any Real Estate as Lender shall require to obtain a valid first priority lien thereon, subject only to Permitted Encumbrances; provided, however, that as to the leasehold interest in the home port facilities in Long Beach, California, this obligation shall be limited to the exercise of the Companies' reasonable commercial efforts to obtain any necessary consents to such mortgage from the fee owner.

**5.9**     **Vessels.**

    **(a)**     The Companies agree to do or cause to be done all things necessary for each Company which owns or operates, or will own or operate, one or more Vessels to, at all times while owning or operating such Vessels, be qualified to own and operate such Vessels under the laws of the jurisdiction of such Vessel's registry and, in particular, to the extent a Vessel is registered in the United States, each Company which owns a Vessel or Vessels to be qualified to operate in the US coastwise waters shall at all times be a US Citizen. Without limiting the generality of the foregoing, each Company shall maintain the current registration and flag of its Vessels.

    **(b)**     No Company that is an owner of a Vessel shall take any action that is reasonably likely to be the basis for termination, revocation or denial of any material insurance coverage required to be maintained under such Company's respective Ship Mortgage or that could be the basis for a defense to any claim under any Insurance Policy maintained in respect of the relevant Vessel, and each Company shall otherwise comply in all material respects with all Insurance Requirements in respect of such Vessel; provided, however, that each Company may, at its own expense and after written notice to the Lender, (i) contest the applicability or enforceability of any such Insurance Requirements by appropriate legal proceedings, the prosecution of which does not constitute a basis for cancellation or revocation of any insurance coverage required under Section 6.2(c) or (ii) cause the Insurance Policy containing any such Insurance Requirement to be replaced by a new policy complying with the provisions of Section 6.2(c).

    **(c)**     The Companies shall cause the Vessels to maintain the classification for such Vessels existing as of the date hereof as issued by a Classification Society. Promptly after Borrower's receipt of a written request therefor from the Lender, but no more frequently than once each calendar year (unless an Event of Default has occurred and is continuing), furnish to the Lender (a) class certificates evidencing that the Vessels comply with this Section 5.9 and (b) the insurance certificate(s) evidencing that the Vessels comply with the insurance requirements of Section 6.2(c).

    **(d)**     Each Company agrees that the Vessels shall remain at their current location in Long Beach, California at all times unless the Lender consents otherwise, which consent shall not be unreasonably withheld.

    **(e)**     Borrower agrees as follows:

       **(i)**     On or before the date of the Interim Financing Order, Borrower agrees to cause (unless the provisions of Section 5.9(e)(ii) have been earlier satisfied):

1.      Posting of notice to all officers and members of Sea Launch ACS Limited, and publishing of a copy of the notice, as required by Section 273b of the IMCA;

2.      Submission of the necessary requests to the Isle of Man Attorney General, the Isle of Man Assessor of Income Tax and the Isle of Man Collector of Customs and Excise as required by the IMCA; and

3.      Submission of application by a partner of Sea Launch ACS Limited Partnership to the proper court for a registration order.

(ii)      On or before the date of the Final Financing Order, the Borrower agrees to cause:

1.      Sea Launch ACS Limited Partnership to make arrangements satisfactory to the Lender for the recording thereof in the appropriate vessel registry, a first preferred Ship Mortgage as to the "SEA LAUNCH COMMANDER";

2.      all UCC financing statements and similar documents required to be filed in order to create in favor of the Lender a first priority and exclusive perfected security interest (to the extent that such a security interest may be perfected by a filing under the UCC or applicable law) in the assets of Sea Launch ACS Limited Partnership and Sea Launch ACS Limited, to be provided in proper form appropriate for filing in each office in each jurisdiction required;

3.      Lender shall have received an opinion from Borrower's counsel reasonably satisfactory to Lender regarding the enforceability of the Ship Mortgages;

4.      Sea Launch ACS Limited Partnership and Sea Launch ACS Limited to promptly execute and deliver any documents, ratifications, notices and take such other action reasonably required by Lender to ensure that such Companies are legally bound by this Agreement and the first preferred Ship Mortgage as to the "SEA LAUNCH COMMANDER"; and

5.      the Lender shall have received for each Vessel a favourable opinion from an independent insurance consultant acceptable to the Lender on such matters relating to the insurances for such Vessel as the Lender may require.

(iii)      On or before the date of the Final Financing Order, the Borrower agrees to cause the Companies to make all declarations, filings, registrations and take any other action with respect to any Permits that reasonably may be deemed necessary so that the consummation of the transactions contemplated by this Financing Agreement and the Loan Documents will be in compliance with any existing Permit and applicable laws or regulations.

**(f)** Costs and expenses related to each action, recording and opinion required by Section 5.9 shall be payable by the Borrower. On each date specified in Section 5.9 Borrower shall provide evidence satisfactory to Lender that the required actions have been taken.

**5.10 Reference to Other Loan Documents**. Reference is hereby made to the other Loan Documents for additional representations, covenants and other agreements of the Companies regarding the Collateral covered by such Loan Documents.

## SECTION 6. Representations, Warranties and Covenants.

**6.1 Representations and Warranties.** The Companies represent and warrant to Lender that:

**(a) Organization Matters; Collateral Locations.** Schedule 6.1(a) attached hereto correctly and completely sets forth (w) each Company's exact name, as currently reflected by the records of each Company's jurisdiction of incorporation or formation, (x) each Company's jurisdiction of incorporation or formation, (y) each Company's federal employer identification number and State organization identification number (if any), and (z) the address of each Company's chief executive office and all locations of Collateral.

**(b) Power and Authority; Conflicts; Enforceability.**

**(i)** Each Company has full power and authority to execute and deliver this Financing Agreement and the other Loan Documents to which such Company is a party, and to perform all of such Company's obligations thereunder.

**(ii)** The execution and delivery by each Company of this Financing Agreement and the other Loan Documents to which such Company is a party, and the performance of such Company's obligations hereunder and thereunder, have been duly authorized by all necessary corporate or other relevant action, and do not (w) require any consent or approval of any director, shareholder, partner or member of such Company that has not been obtained, (x) violate any term, provision or covenant contained in the organizational documents of such Company (such as the certificate or articles of incorporation, certificate of origin, partnership agreement, by-laws or operating agreement), (y) violate, or cause such Company to be in default under, any law, rule, regulation, order, judgment or award applicable to such Company or its assets, or (z) violate any term, provision, covenant or representation contained in, or constitute a default under, or result in the creation of any lien under, any loan agreement, lease, indenture, mortgage, deed of trust, note, security agreement or pledge agreement to which such Company a signatory or by which such Company or such Company's assets are bound or affected.

**(iii)** This Financing Agreement and the other Loan Documents to which the Companies (or any of them) are parties constitute legal valid and binding obligations of the Companies, enforceable in accordance with their respective terms, subject to the Interim or Final Financing Orders and applicable bankruptcy, insolvency, moratorium, fraudulent transfer and other laws affecting creditors' rights generally, and subject to

NewYork 1329482.10

general principles of equity, regardless of whether considered in a proceeding at law or in equity.

(c) **Schedules.** Each of the Schedules attached to this Financing Agreement set forth a true, correct and complete description of the matter or matters covered thereby.

(d) **Compliance with Laws, Permits.** Each Company and such Company's properties are in compliance with all federal, state and local acts, rules and regulations, and all orders of any Governmental Entity, except to the extent the failure to so comply would not have a Material Adverse Effect. Each Company has obtained and maintains all Permits necessary or required to conduct its Business as presently conducted, except to the extent the failure to have such Permits would not have a Material Adverse Effect. No notice has been received by any Company and no proceeding or investigation is pending or, to the knowledge of any Company, threatened, with respect to any alleged failure by any Company to have any such Permit or not to be in compliance therewith, except as would not have a Material Adverse Effect.

(e) **Environmental Matters.** Except as set forth on Schedule 6.1 (e):

(i) None of the operations of any Company are the subject of any federal, state or local investigation to determine whether any remedial action is needed to address the presence or disposal of any environmental pollution, hazardous material or environmental clean-up of the Real Estate or such Company's leased real property. No enforcement proceeding, complaint, summons, citation, notice, order, claim, litigation, investigation, letter or other communication from a federal, state or local authority has been filed against or delivered to any Company, regarding or involving any release of any environmental pollution or hazardous material on any real property now or previously owned or operated by such Company.

(ii) No Company has any known contingent liability with respect to any release of any environmental pollution or hazardous material on any real property now or previously owned or operated by such Company.

(iii) Each Company is in compliance with all environmental statutes, acts, rules, regulations and orders applicable to the operation of such Company's Business, except to the extent that the failure to so comply would not have a Material Adverse Effect.

(f) Pending Litigation. Except as previously disclosed by the Companies to Lender in writing, there exist no actions, suits or proceedings of any kind by or against any Company pending in any court or before any arbitrator or governmental body, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

6.2 **Affirmative Covenants.** Until the termination of this Financing Agreement and the full and final payment and satisfaction of the Obligations:

(a) **Maintenance of Financial Records; Inspections.** Each Company agrees to maintain books and records pertaining to such Company's financial matters in such detail, form and scope as Lender reasonably shall require. The Companies agree that Lender or its agents may enter upon any Company's premises at any time during normal business hours, and with

NewYork 1329482.10

advance written notice, from time to time, in order to (i) examine and inspect the books and records of any Company, and make copies thereof and take extracts therefrom, and (ii) verify, inspect and perform physical counts and other valuations of the Collateral and any and all records pertaining thereto. The Companies irrevocably authorize all accountants and third parties to disclose and deliver directly to Lender, at the Company's expense, all financial statements and information, books, records, work papers and management reports generated by them or in their possession regarding the Company or the Collateral. All costs, fees and expenses incurred by Lender in connection with such examinations, inspections, physical counts and other valuations shall constitute Out-of-Pocket Expenses for purposes of this Financing Agreement.

(b) **Further Assurances.** Each Company agrees to comply with the requirements of all applicable laws in order to grant to Lender valid and perfected first priority security interests in the Collateral, subject only to the Permitted Encumbrances. Lender is hereby authorized by the Companies to file any financing statements, continuations and amendments covering the Collateral without the Companies' signatures in accordance with the provisions of the UCC. The Companies hereby consent to and ratify the filing of any financing statements covering the Collateral by Lender on or prior to the Closing Date. The Companies agree to do whatever Lender reasonably may request from time to time, by way of (i) filing notices of liens, financing statements, amendments, renewals or continuations thereof, (ii) cooperating with Lender's agents and employees, (iii) keeping Collateral records, (iv) transferring proceeds of Collateral to Lender's possession in accordance with the terms hereof and (v) performing such further acts as Lender reasonably may require in order to effect the purposes of this Financing Agreement, including the execution of control agreements with respect to Depository Accounts and Investment Property. Each Company agrees to deliver or cause to be delivered to the Lender from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Lender as the Lender shall reasonably deem necessary to perfect or maintain the security interest and liens on the Collateral pursuant to the Loan Documents. Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any governmental authority execute and deliver all applications, certifications, instruments and other documents and papers that the Lender may require.

(c) **Insurance and Condemnation.**

(i) **Required Insurance.** On or before the date of the Interim Financing Order, the Borrower shall have delivered to Lender evidence satisfactory to Lender that all Required Insurance is in full force and effect, and Lender shall have confirmed that Lender has been named as a loss payee or additional insured with respect to the Required Insurance in a manner satisfactory to Lender. On or before the date of the Final Financing Order, the Lender shall have received for each Vessel a favourable opinion from an independent insurance consultant acceptable to the Lender on such matters relating to the insurances for such Vessel as the Lender may require. On and after the Closing Date, the Companies agree to maintain insurance on all Real Estate, Equipment and Inventory under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times reasonably satisfactory to Lender ( the "**Required Insurance**"). For the avoidance of doubt the Required Insurance shall include, without limitation, (x) the entries of any Vessel in a

protection and indemnity risks association (including pollution risks) and/or hull, machinery and equipment, marine and war risks insurances, which are effected in respect of such Vessel, her earnings or otherwise in relation to her; (y) all rights and other assets relating to, or derived from, any of such entries, including any rights to a return of a premium; and (z) any and all other insurance-related actions, if any, identified by the independent insurance consultant referenced in the second sentence of this Section 6.2(c) as necessary. All policies covering the Real Estate, Equipment and Inventory are, subject to the rights of any holder of a Permitted Encumbrance having priority over the security interests of Lender, to be made payable solely to Lender, in case of loss, under a standard non-contributory "mortgagee", "secured party" or "lender's loss payable" clause or endorsement, and are to contain such other provisions as Lender reasonably may require to fully protect Lender's interest in the Real Estate, Inventory and Equipment and to any payments to be made under such policies. Each loss payable endorsement in favor of Lender shall provide (x) for not less than thirty (30) days prior written notice to Lender of the exercise of any right of cancellation and (y) that Lender's right to payment under any property insurance policy (other than marine insurance) will not be invalidated by any act or neglect of, or any breach of warranty or condition by, the Companies (or any of them) or any other party. If an Event of Default shall have occurred and remain outstanding, Lender, subject to the rights of any holder of a Permitted Encumbrance having priority over the security interests of Lender, shall have the sole right, in the name of Lender or the Companies (or any of them), to file claims under any insurance policies, to receive, receipt and give acquaintances for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(ii)     Lender's Purchase of Insurance. In the event the Companies fail to provide Lender with evidence of the Required Insurance in the manner set forth in Section 6.2(c)(i) above, Lender may purchase insurance at the Companies' expense to protect Lender's interests in the Collateral. The insurance purchased by Lender may, but need not, protect the Companies' interests in the Collateral, and therefor such insurance may not pay any claim which the Companies may make or any claim which is made against the Companies in connection with the Collateral. The Companies may later request that Lender cancel any insurance purchased by Lender, but only after providing Lender with satisfactory evidence, at the sole and absolute discretion of the Lender, that the Companies have the Required Insurance. If Lender purchases insurance covering all or any portion of the Collateral, the Companies shall be responsible for the costs of such insurance, including interest (at the applicable rate set forth hereunder) and other charges accruing on the purchase price therefor, until the effective date of the cancellation or the expiration of the insurance. The costs of the premiums of any insurance purchased by Lender may exceed the costs of insurance which the Companies may be able to purchase on their own. In the event that Lender purchases insurance, Lender will notify the Companies of such purchase within thirty (30) days after the date of such purchase. If, within thirty (30) days after the date of receipt of such notice, the Companies provides Lender with proof that the Companies had the Required Insurance as of the date on which Lender purchased insurance and the Companies have continued at all times thereafter to have the Required Insurance, then Lender agrees to cancel the insurance purchased by

Lender and credit the Companies for the amount of all costs, interest and other charges associated with such insurance that Lender previously charged to the Companies.

(iii)    Application of Insurance and Condemnation Proceeds. So long as no Default or Event of Default shall have occurred and remain outstanding as of the date of Lender's receipt of any Casualty Proceeds:

**(d)**    In the event of any loss or damage to any Inventory by condemnation, fire or other casualty such proceeds shall be made available to the Companies.

**(e)**    In the event of any loss or damage to any item of Collateral other than Inventory by condemnation, fire or other casualty, if the Casualty Proceeds relating to such condemnation, fire or other casualty are less than or equal to $100,000, such proceeds shall be made available to the Companies.

**(f)**    In the event of any loss or damage to any item of Equipment or Real Estate owned by any Company by condemnation, fire or other casualty, if the Casualty Proceeds relating to such condemnation, fire or other casualty exceed $100,000, Borrower agrees to apply the Casualty Proceeds to repay the Term Loans.

**(g)**    In the event of any loss or damage to any Real Estate leased by the Company by condemnation, fire or other casualty, the Company may use the Casualty Proceeds in the manner required or permitted by the lease agreement relating thereto.

If a Default or an Event of Default shall have occurred and remain outstanding as of the date of Lender's receipt of any Casualty Proceeds, Lender may, subject to the rights of any holder of a Permitted Encumbrance having priority over the security interests of Lender, apply the Casualty Proceeds to the payment of the Obligations in such manner and in such order as Lender may elect in its sole and absolute discretion.

**(h)**    **Payment of Taxes.** The Companies agree to pay when due all Taxes lawfully levied, assessed or imposed upon the Company or the Collateral (including all sales taxes collected by the Companies on behalf of the Companies' customers in connection with sales of Inventory and all payroll taxes collected by the Companies on behalf of the Companies' employees), unless the Companies are contesting such Taxes in good faith, by appropriate proceedings, and is maintaining adequate reserves for such Taxes in accordance with GAAP. Notwithstanding the foregoing, if a lien securing any Taxes is filed in any public office and such lien is not a Permitted Tax Lien, then the Companies shall pay all Taxes secured by such lien immediately and remove such lien of record promptly. Pending the payment of such Taxes and removal of such lien, Lender may, at its election and without curing or waiving any Event of Default which may have occurred as a result thereof, pay such Taxes on behalf of the Companies, and the amount paid by Lender shall become an Obligation which is due and payable on demand by Lender.

**(i)**    **Compliance With Laws.**

**(i)**    The Companies agree to comply with all federal, state and local acts, rules and regulations, and all orders of any Governmental Entity, if the failure to so comply

would have a Material Adverse Effect, provided that the Companies may contest any acts, rules, regulations, orders and directions of such Governmental Entity in any reasonable manner which Lender determines, in the exercise of its reasonable business judgment, will not materially and adversely effect Lender's rights or priorities in the Collateral.

      **(ii)**     Without limiting the generality of the foregoing, each Company agrees to comply with all environmental statutes, acts, rules, regulations or orders, as presently existing or as adopted or amended in the future, applicable to the ownership and/or use of such Company's real property and operation of the Business, if the failure to so comply would have a Material Adverse Effect.

      **(j)**     **Notices Concerning Environmental, Employee Benefit and Pension Matters.** The Companies agree to notify Lender in writing of:

      **(i)**     any expenditure (actual or anticipated) in excess of $100,000 for environmental clean-up, environmental compliance or environmental testing and the impact of said expenses on the any Company's working capital;

      **(ii)**     any Company's receipt of notice from any local, state or federal authority advising the Company of any environmental liability (real or potential) arising from such Company's operations, its premises, its waste disposal practices, or waste disposal sites used by such Company; and

      **(iii)**     any Company's receipt of notice from any governmental agency or any sponsor of any "multiemployer plan" (as that term is defined in ERISA) to which such Company has contributed, relating to any of the events described in Section 9.1(f) hereof.

The Companies agree to provide Lender promptly with copies of all such notices and other information pertaining to any matter set forth above if Lender so requests.

      **(k)**     **Financial Reporting.** The Companies agree to furnish to Lender:

      **(i)**     within ninety (90) days after the end of each fiscal year of each Company, a Consolidated Balance Sheet as of the close of such year, and unaudited statements of profit and loss and cash flow of the Companies for such year;

      **(ii)**     as soon as available, copies of the financial information currently prepared by the Companies, which shall continue to be prepared in the manner and at the dates currently prepared;

      **(iii)**     as and when filed by each Company, copies of all (x) financial reports, registration statements and other documents filed by such Company with the U.S. Securities and Exchange Commission, as and when filed by such Company, and (ii) annual reports filed pursuant to ERISA in connection with each benefit plan of each Company subject to ERISA;

      **(iv)**     promptly after receipt thereof, a copy of any "management letter" or audit received by any Company from its certified public accountants;

**(v)** on or before Wednesday of each week, (A) a report in form acceptable to the Lender setting forth any variances in actual cash receipts and expenditures from those projected in the Budget, and (B) an update to the Budget setting forth any changes therein reasonably anticipated by the Companies (it being understood that no such changes shall become part of the Budget unless approved by the Lender in writing); and

**(vi)** promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Lender may reasonably request.

Each financial statement which the Companies are required to submit pursuant to clause (i) in this Section 6.2(k) must be accompanied by an officer's certificate substantially in the form set forth on Exhibit C attached hereto, signed by an authorized financial or accounting officer of the Borrower (or any other authorized officer satisfactory to Lender). Such certificate shall also be delivered within thirty (30) days after the end of each month. In addition, should the Companies modify their accounting principles and procedures from those in effect on the Closing Date, the Company agree to prepare and deliver to Lender statements of reconciliation in form and substance reasonably satisfactory to Lender.

**(l)** **Cash Balance**. Borrower agrees, from and after the Closing Date, to maintain at all times an available balance of cash or cash equivalents of at least of at least $2,500,000.

**(m)** **Business Qualification.** The Companies agree to qualify to do business, and to remain qualified to do business and in good standing, in each jurisdiction where the failure to so qualify, or to remain qualified or in good standing, would have a Material Adverse Effect.

**(n)** **Anti-Money Laundering and Terrorism Regulations.** The Companies agree to comply with all applicable anti-money laundering and terrorism laws, regulations and executive orders in effect from time to time (including, without limitation, the USA Patriot Act (Pub. L. No. 107-56)). The Companies also agree to ensure that no person who owns a controlling interest in or otherwise controls the Companies (or any of them) is a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (issued September 23, 2001) or any other similar Executive Order. The Companies acknowledge that Lender's performance hereunder is subject to compliance with all such laws, regulations and executive orders, and in furtherance of the foregoing, the Companies agree to provide to Lender all information about the Companies' ownership, officers, directors, customers and business structure as Lender reasonably may require to comply with, such laws, regulations and executive orders.

**(o)** **Compliance with Orders.** The Companies agree to comply with the Interim or Final Financing Orders and all other orders entered by the Court in the Chapter 11 Case having applicability to the Companies. The Companies shall provide, or cause their counsel in the Chapter 11 Case to provide, the Lender's counsel with copies of all pleadings, motions, reports, applications and other papers filed by the Companies with the Court or the U.S. Trustee. The Companies shall include counsel for Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Chapter 11 Case.

**(p)** **Payment of Administrative Expenses.** The Companies agree to make, pursuant to and subject to the Budget, all payments of its (i) post-petition operating costs and expenses as and when due and (ii) administrative costs and expenses as and when such administrative costs and expenses are due and payable, including but not limited to allowed Professional Expenses (as the same may be limited by the Budget, the Loan Documents, the Interim Order or the Final Order); provided however, that, payment of any Professional Expenses shall deferred by Order of the Court (to the extent not already set forth in the Interim Order). to the extent necessary for the Borrower to maintain a balance of cash or cash equivalents in order to comply with subsection (l) of this Section 6.2.

**6.3** **Negative Covenants.** Until termination of this Financing Agreement and full and final payment and satisfaction of all Obligations, each Company agrees not to:

**(a)** **Liens and Encumbrances.** Mortgage, assign, pledge, transfer or otherwise permit any lien (including lienable claims for necessaries), charge, security interest, encumbrance or judgment (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise) to exist on any of the Collateral or its other assets, whether now owned or hereafter acquired, except for the Permitted Encumbrances.

**(b)** **Indebtedness.** Incur or create any Indebtedness (i) other than the Permitted Indebtedness or (ii) other Indebtedness in an aggregate outstanding principal amount not to exceed $50,000.

**(c)** **Sale of Assets.** Sell, lease, assign, transfer or otherwise dispose of (i) Collateral, except as otherwise specifically permitted by this Financing Agreement, or (ii) all or any substantial part of its assets, if any, which do not constitute Collateral.

**(d)** **Corporate Change.** (i) Merge or consolidate with any other entity, (ii) change its name or principal places of business, (iii) change its structure or organizational form, or reincorporate or reorganize in a new jurisdiction, (iv) enter into or engage in any operation or activity materially different from that presently being conducted by such Company; provided that any Company, may change its name or its principal place of business so long as such Company provides the Lender with thirty (30) days prior written notice thereof and the appropriate parties execute and deliver to Lender, prior to making such change, all documents and agreements required by Lender in order to ensure that the liens and security interests granted to Lender hereunder continue in effect without any break or lapse in perfection.

**(e)** **Guaranty Obligations.** Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except pursuant to this Agreement and the other Loan Documents, and by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

**(f)** **Dividends and Distributions.** Declare or pay any dividend or distribution of any kind on, or purchase, acquire, redeem or retire, any of its equity interests (of any class or type whatsoever), whether now or hereafter issued and outstanding, other than Permitted Distributions.

**(g)** **Investments.** (i) Create any new subsidiary, or (ii) make any advance or loan to, or any investment in, any firm, entity, person or corporation other than Permitted Intercompany

Loans, or (iii) acquire all or substantially all of the assets of, or any capital stock or any equity interests in, any firm, entity or corporation, other than current investments of such Company in existing subsidiaries of such entities.

      **(h)**     **Related Party Transactions.** Except with respect to renewing existing agreements with Boeing and Energia, and with respect to the Permitted Intercompany Leases, enter into any transaction, including, without limitation, any purchase, sale, lease, loan or exchange of property, with any shareholder, officer, director, parent (direct or indirect), subsidiary (direct or indirect) or other person or entity otherwise affiliated with the Companies, unless (i) such transaction otherwise complies with the provisions of this Financing Agreement, (ii) such transaction is for the sale of goods or services rendered in the ordinary course of business and pursuant to the reasonable requirements of the Companies, and upon standard terms and conditions and fair and reasonable terms, no less favorable to such entity than such entity could obtain in a comparable arms length transaction with an unrelated third party, and (iii) no Event of Default shall have occurred and remain outstanding at the time such transaction occurs, or would occur after giving effect to such transaction.

      **(i)**     **Restricted Payments.** Pay any management, consulting or other similar fees to any shareholder, director, parent (direct or indirect), subsidiary (direct or indirect) or other person or entity otherwise affiliated with the Companies, except (i) to the extent permitted by the Court and (ii) with the Lender's consent, such consent not to be unreasonably withheld.

      **(j)**     **Payment of Claims**. Make any payment of principal or interest on account of any Claim against any Company that arose prior to the Petition Date, other than rent under leases in existence on the Petition Date, Claims permitted to be paid by the Budget, "first day orders" to the extent approved by order of the Court, environmental Claims with respect to Real Estate owned by the Companies and any other payments authorized by the Court.

      **(k)**     **Filing of Motions and Applications**. Apply to the Court for authority to (i) take any action that is prohibited by the terms of any of the Financing Documents, (ii) refrain from taking any action that is required to be taken by the Financing Documents or the Interim or Final Financing Orders, (iii) permit any Indebtedness or Claim to be pari passu with or senior to any of the Obligations or (iv) use any cash Proceeds of the Collateral other than in payment of the Obligations or as otherwise expressly authorized herein or by the Court.

      **(l)**     **Modification to Financing Order**. Seek or consent to any amendment, supplement or any modification of any of the terms of the Interim or Final Financing Orders without the express written consent from Lender.

      **(m)**     **Budget**.

          **(i)**     As to the non-fuel Budget, make or commit or agree to make for such week and the preceding three weeks (or the then elapsed number of weeks in the case of the first three weeks of the non-fuel Budget) on a cumulative basis, or with respect to any material line item, exceeding the applicable expenditures provided in the non-fuel Budget for the applicable rolling four week (or then elapsed less than four week) period, subject

36

to variances not to exceed 15% in the aggregate or 15% with respect to any material line item of such applicable expenditures.

(ii)     As to the fuel Budget, make or commit or agree to make expeditions for fuel in excess of that provided in the fuel Budget. The parties fully understanding that fuel is not purchased each month, therefore this Budget item will be treated on an accrual basis and the funds for fuel will not be spent on other Budget items without the express written consent of the Lender.

**6.4     No Further Negative Pledge**. Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Company to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation.

## SECTION 7.  Interest, Facility Discount, DIP Breakup Fee

**7.1     Interest on Term Loans**.  Interest shall accrue from and after the Closing Date at a rate per annum equal to the Applicable Margin plus the applicable LIBOR on the outstanding principal balance of such Term Loan and shall be due and payable on the Interest Payment Date and on the first day every month thereafter, notwithstanding the Interest Period with respect thereto. All interest rates shall be calculated based on a 360-day year and actual days elapsed.

**7.2     Default Interest Rate.**  Upon the occurrence of an Event of Default, (a) provided that Lender has given the Borrower written notice of such Event of Default, all Obligations may, at the election of Lender, bear interest at the Default Rate of Interest until such Event of Default is waived, and (b) at Lender's election at any time thereafter, interest on each outstanding Term Loan shall be due and payable on the first day of each month, notwithstanding the Interest Period with respect thereto.

**7.3     Facility Discount**.  As additional compensation for Lender, Borrower shall pay to Lender, a facility discount in an amount equal to $2,000,000 (the "**Facility Discount**"), which Facility Discount shall be earned and payable to Lender on the Closing Date; provided that only upon entry of the Final Financing Order such Facility Discount shall be paid on a paid-in-kind basis (but not in cash before the Termination Date) and shall be capitalized and added to the outstanding principal amount of the Term Loans of the applicable Lenders as of the Closing Date. The Facility Discount shall thereafter be deemed as, and treated in all respects as, a principal portion of the Term Loans hereunder and such increased principal amount shall thereafter bear interest at the interest rate accruing on the principal amount of the Term Loans as provided in Section 7.1.

**7.4     Taxes, Reserves and Other Conditions.**  In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by Lender with any new request or directive (whether or not having the force of law) of any central bank or other governmental or regulatory authority, shall:

(a)     subject Lender to any tax of any kind whatsoever with respect to this Financing Agreement or the other Loan Documents, or change the basis of taxation of payments to Lender

or such financial institution of principal, fees, interest or any other amount payable hereunder or under any of the other Loan Documents (except for changes in the rate of tax on the overall net income of Lender by the federal government or other jurisdiction in which it maintains its principal office);

**(b)**    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by Lender by reason of or in respect to this Financing Agreement and the Loan Documents, including (without limitation) pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

**(c)**    impose on Lender any other condition with respect to this Financing Agreement or any other document;

and the result of any of the foregoing is to (i) increase the cost to Lender of making, renewing or maintaining Lender's loans hereunder by an amount deemed material by Lender or such financial institution in the exercise of its reasonable business judgment, or (ii) reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the loans made hereunder by an amount that Lender deems to be material in the exercise of its reasonable business judgment, the Companies agree to pay to Lender, no later than five (5) days following demand by Lender, such additional amount or amounts as will compensate Lender for such increase in cost or reduction in payment, as the case may be.

**7.5**    **DIP Breakup Fee**.  In the event that after (i) an Interim Financing Order, approving the terms of this Facility is entered into and (ii) the Lender is willing to provide funding described in this Financing Agreement but prior to entry of a Final Financing Order, the Lender or the Companies instead choose an alternative financing in lieu of this Facility; then, immediately upon (and only upon) closing and funding of such alternative financing approved by the Court, Loan Parties shall pay Lender $1,125,000 (the "**DIP Break Up Fee**").  In the event that Lender agrees to provide any exit financing to the Borrower or the reorganized Borrower, the DIP Breakup Fee, if paid, shall be credited against any break-up fee payable under the terms of such exit financing.

**SECTION 8.  Powers.**

**8.1**    **Authority.**  The Companies hereby authorize Lender, Administrative Agent or any other person or agent which Lender may designate, at the Companies' cost and expense, to exercise all of the following powers, which authority shall be irrevocable until the termination of this Financing Agreement and the full and final payment and satisfaction of the Obligations:

**(a)**    To receive, take, endorse, sign, assign and deliver, all in the name of Lender or the Companies (or any of them), any and all checks, notes, drafts, and other documents or instruments relating to the Collateral;

**(b)**    To receive, open and dispose of all mail addressed to the Companies (or any of them), and to notify postal authorities to change the address for delivery thereof to such address as Lender may designate;

(c)     To request from customers indebted on Accounts at any time, in the name of Lender, information concerning the amounts owing on the Accounts;

(d)     To request from customers indebted on Accounts at any time, in the name of the Companies (or any of them), any certified public accountant designated by Lender or any other designee of Lender, information concerning the amounts owing on the Accounts;

(e)     To transmit to customers indebted on Accounts notice of Lender's interest therein and to notify customers indebted on Accounts to make payment directly to Lender for the Companies' account; and

(f)     To take or bring, in the name of Lender or the Companies (or any of them), all steps, actions, suits or proceedings deemed by Lender necessary or desirable to enforce or effect collection of the Accounts.

8.2     **Limitations on Exercise.**  Notwithstanding any other provision of this Financing Agreement to the contrary, the powers set forth in Sections 8.l(a), (b), (c), (e) and (f) may only be exercised if an Event of Default shall have occurred and remain outstanding.

## SECTION 9.  Events of Default and Remedies.

9.1     **Events of Default.**  Each of the following events shall constitute an Event of Default under this Agreement:

(a)     the suspension or cessation of the Business of any Company;

(b)     any Company shall fail to comply with any of the provisions of the Financing Agreement, the Interim Financing Order or Final Financing Order in any respect;

(c)     a trustee shall be appointed in the Chapter 11 Case; an examiner shall be appointed in the Chapter 11 Case with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(d)     the Chapter 11 Case shall be dismissed or converted to a case under chapter 7;

(e)     any Person obtains Court approval of a disclosure statement for a Reorganization Plan that is not an Acceptable Plan;

(f)     there shall be filed by any Company any motion to sell any Mortgaged Vessel or all or a substantial part of the Collateral on terms that are not acceptable to the Lender in its sole and absolute discretion;

(g)     the Court shall enter an order granting to any Person (other than the Lender or any lessor under an equipment lease) relief from the automatic stay to foreclose upon a lien or any set-off on any part of the Collateral with respect to any property of any Company;

(h)    an order shall be entered for the substantive consolidation of the estate of any Company with any other Person unless the substantive consolidation would not materially and adversely affect the liens created by the Loan Documents or the Lender has consented in its sole and absolute discretion to such substantive consolidation;

(i)    any Company shall fail to pay as and when due and payable, all administrative costs or expenses incurred by it in the Chapter 11 Case that are due and payable on such date;

(j)    any Company shall file a motion or other request with the Court seeking authority to use any cash Proceeds of the Collateral or obtain any financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise secured by a lien upon any Collateral (in each case (i) without the Lender's prior written consent or (ii) if such motion fails to contemplate payment in full of the Obligations);

(k)    or an application shall be filed by any Company for the approval of any Super-priority Claim in the Chapter 11 Case that is *pari passu* with or senior to the Obligations or there shall arise or be granted any such *pari passu* or senior Super-priority Claim; or failure by the Court to enter, on or before May 12, 2010, a Final Financing Order.

(l)    termination of exclusivity for the filing of a Reorganization Plan or the solicitation of acceptances by operation of either statute or court order; provided that Lender or its affiliates shall not have objected to any request by the Companies for the extension of exclusivity while the Facility is otherwise not subject to a continuing Event of Default;

(m)    failure to file an Acceptable Plan, on or before April 30, 2010;

(n)    payment of any supplier "catch-up payments" or administrative "cure" payments on pre-petition contracts or arrangements without the express prior written approval of the Lender, whose approval may be withheld in its sole and absolute discretion;

(o)    the sale of all or substantially all of any material Company assets, including Collateral, that does not provide for payment in full of the Obligations in cash and termination of the Lender's commitments under the Facility;

(p)    initiation of litigation by any Company, the Creditors Committee or other chapter 11 estate representative of any kind against any Company;

(q)    the breach or violation by any Company of any warranty, representation or covenant contained in this Financing Agreement (other than those referred to in Section 9.1 (d) below), provided that such breach or violation shall not be deemed to be an Event of Default unless such Company fails to cure such breach or violation to Lender's reasonable satisfaction within ten (10) days from the date of such breach or violation;

(r)    the breach or violation by any Company of any warranty, representation or covenant contained in Sections 5, 6.3, and 6.4; provided, however, that it shall not constitute an Event of Default if the breach is related to Collateral having *de minimus* value;

(s)     the failure of the Companies to pay any of the Obligations within five (5) Business Days of the due date thereof;

(t)     any Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) incur any "accumulated funding deficiency" as defined in ERISA, (iii) incur any "reportable event" as defined in ERISA, (iv) terminate any "plan", as defined in ERISA or (v) become involved in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of any "plan", as defined in ERISA, and with respect this Section 10.1 Ct), such event or condition either (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in Lender's reasonable business judgment, subject any Company to any tax, penalty or other liability having a Material Adverse Effect;

(u)     the occurrence of any default or event of default (after giving effect to any applicable grace or cure period) under any of the other Loan Documents, or any of the other Loan Documents ceases to be valid, binding and enforceable in accordance with its terms;

(v)     the occurrence of any default or event of default (after giving effect to any applicable grace or cure period) under any instrument or agreement evidencing or governing other Indebtedness of the Companies (or any of them) which was entered into after the Petition Date having a principal amount in excess of $250,000;

(w)     a Change of Control shall occur;

(x)     a final judgment for the payment of money (other than the allowance of an unsecured Claim incurred prior to the Petition Date) in excess of $250,000 shall be rendered after the Petition Date against the Companies (or anyone of them) or any Guarantor (other than a judgment as to which a financially sound and reputable insurance company has acknowledged coverage of such claim in writing), and either (i) within thirty (30) days after the entry of such judgment, shall not have been discharged or stayed pending appeal (or if stayed pending appeal, shall not have been discharged within thirty (30) days after the entry of a final order of affirmance on appeal), or (ii) enforcement proceedings shall be commenced by any holder of such judgment;

(y)     the Interim Financing Order shall not have been entered by April 27, 2010, or at any time thereafter shall cease to be in full force and effect or shall be vacated, reversed, modified or stayed in any respect (and if such Interim Financing Order is the subject of a pending appeal, it shall be an Event of Default if the performance of any obligation of any party shall have been stayed pending such appeal) without the written consent of Lender;

(z)     the Final Financing Order shall not have been entered by May 12, 2010, or at any time thereafter shall cease to be in full force and effect or shall be vacated, reversed, modified or stayed in any respect (and if such Interim Financing Order is the subject of a pending appeal, it shall be an Event of Default if the performance of any obligation of any party shall have been stayed pending such appeal) without the written consent of Lender; or

(aa)     there shall occur a Total Loss of either Vessel (as such term is defined in the Ship Mortgages).

**9.2** **Remedies**. Upon the occurrence and continuance of an Event of Default, the Lender may immediately Terminate the Financing Agreement and/or take all or any of the following actions without further order of or application to the Court, provided that the Lender provide the Borrower, the U.S. Trustee, and counsel to any official committee appointed in the Cases with written notice at least five (5) Business Days in advance, during which time any party can seek a hearing regarding whether an Event of Default has occurred, the materiality of such Event of Default, and the continuing existence of such Event of Default. Unless the Court determines within that 5-day period that either (i) an Event of Default has not occurred, (ii) such Event of Default is not material, or (iii) such Event of Default does not continue to exist, then the automatic stay under Section 362 of the Bankruptcy Code shall be deemed to be automatically modified to permit the Lender, at its sole option, to take the following actions:

**(a)** **Remedies With Respect to Outstanding Loans.** All loans, advances and extensions of credit provided for in this Financing Agreement thereafter shall be made in Lender's sole and absolute discretion, and upon any Event of Default the obligation of Lender to make Term Loans shall cease unless such Default is cured to Lender's satisfaction or such Event of Default is waived in accordance herewith. In addition, upon the occurrence of an Event of Default, Lender may, at its option, and subject to any limitations in the Interim or Final Financing Order (i) declare all Obligations immediately due and payable, (ii) charge the Companies the Default Rate of Interest on all then outstanding or thereafter incurred Obligations, and (iii) immediately terminate this Financing Agreement upon notice to the Company.

**(b)** **Remedies With Respect to Collateral.** To the extent permitted by applicable law, including ITAR regulations and any treaties affecting use of the Collateral: (i) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including electronic records, contracts and signatures pertaining thereto), documents, instruments and files, and any receptacles or cabinets containing same, relating to the Accounts, and Lender may use, at the Companies' expense, such of the Companies' personnel, supplies or space at any Companies' place of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (ii) bring suit, in the name of the Companies (or any of them) or Lender, and generally shall have all other rights respecting the Accounts, including, without limitation, the right to (x) accelerate or extend the time of payment, (y) settle, compromise, release in whole or in part any amounts owing on any Accounts and (z) issue credits in the name of the Companies (or any of them) or Lender; (iii) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed merchandise, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at Lender's sole option and discretion, and Lender may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Companies; (iv) foreclose Lender's security interests in the Collateral by any available judicial procedure, or take possession of any or all of the Collateral without judicial process, and to enter any premises where any Collateral may be located for the purpose of taking possession of or removing the same; and (v) exercise any other rights and remedies provided in law, in equity, by contract or otherwise. Lender shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral whether in its then condition or after further preparation or processing, in the name of the Companies (or any of them) or Lender, or in the name of such other party as Lender may designate, either at public or private sale or at any

broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including, without limitation, warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as Lender in its sole and absolute discretion may deem advisable, and Lender shall have the right to purchase at any such sale for cash or setoff against Obligations in whole or in part. If any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, Lender shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as Lender shall deem appropriate. The Companies agree, at the request of Lender, to assemble the Inventory and Equipment, and to make it available to Lender at premises of the Companies or elsewhere and to make available to Lender the premises and facilities of the Companies for the purpose of Lender's taking possession of, removing or putting the Inventory and Equipment in saleable form. If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law. The net cash proceeds resulting from Lender's exercise of any of the foregoing rights (after deducting all Out-of-Pocket Expenses relating thereto) shall be applied by Lender to the payment of the Obligations, whether due or to become due, in such order as Lender may elect, and the Companies shall remain liable to Lender for any deficiencies, and Lender in turn agrees to remit to the Companies or their successors or assigns, any surplus resulting therefrom. The enumeration of the foregoing rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other right of the Lender under applicable law, the Interim or Final Financing Order or the Financing Documents, all of which shall be cumulative.

**9.3** **General Indemnity.** In addition to the Companies agreement to reimburse Lender for Out-of-Pocket Expenses, but without duplication, the Company hereby agree to indemnify Lender, any Administrative Agent and their members, managers, officers, directors, employees, attorneys and agents (each, an **"Indemnified Party"**) from, and to defend and hold each Indemnified Party harmless against, any and all losses, liabilities, obligations, claims, actions, judgments, suits, damages, penalties, costs, fees, expenses (including reasonable and documented attorney's fees) of any kind or nature which at any time may be imposed on, incurred by, or asserted against, any Indemnified Party:

(a) as a result of Lender's exercise of (or failure to exercise) any of Lender's rights and remedies hereunder, including, without limitation, (i) any sale or transfer of the Collateral, (ii) the preservation, repair, maintenance, preparation for sale or securing of any Collateral, and (iii) the defense of Lender's interests in the Collateral (including the defense of claims brought by the Companies (or any of them) as a debtor-in-possession or otherwise, any secured or unsecured creditors of the Companies (or any of them), or any trustee or receiver in bankruptcy);

(b) as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate, the Companies' operation and use of the Real Estate, and the Companies' off-site disposal practices;

(c) in connection with any regulatory investigation or proceeding by any regulatory authority or agency having jurisdiction over the Companies (or any of them); and

43

**(d)** otherwise relating to or arising out of the transactions contemplated by this Financing Agreement and the other Loan Documents, or any action taken (or failure to act) by any Indemnified Party with respect thereto; provided that an Indemnified Party's conduct in connection with any of the foregoing matters has not resulted primarily from the Lender's gross negligence or willful misconduct, or a breach of the commitment under the Loan Documents as finally determined by a court of competent jurisdiction. This indemnification shall survive the termination of this Financing Agreement and the payment and satisfaction of the Obligations.

## SECTION 10. Early Termination

Provided Lender has not extended to Borrower an Excess Loan pursuant to Section 3.1(e), the Borrower may terminate this Financing Agreement at any time prior to any Termination Date upon ten Business Days prior written notice to Lender. **THIS FINANCING AGREEMENT, UNLESS A TERMINATION DATE SHALL HAVE OCCURRED AND NOT BEEN EXTENDED AS PROVIDED IN THIS FINANCING AGREEMENT, SHALL AUTOMATICALLY CONTINUE.** All of Lender's rights, liens and security interests granted pursuant to the Loan Documents shall continue after any termination of this Financing Agreement until the end of the Security Period. The provisions of Sections 7.3, 7.4, 9.3 and 11 shall survive and remain in full force and effect regardless of the repayment of the Obligations, the termination of this Facility or any other Loan Document or any provision thereof.

## SECTION 11. Miscellaneous.

**11.1 Waivers.** The Companies hereby waive diligence, demand, presentment, protest and any notices thereof as well as notices of nonpayment, intent to accelerate and acceleration. No waiver of an Event of Default by Lender shall be effective unless such waiver is in writing and signed by Lender. No delay or failure of Lender to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or remedy, or shall operate as a waiver of such right or remedy, or as a waiver of such Event of Default. A waiver on any occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No single or partial exercise by Lender of any right or remedy precludes any other or further exercise thereof, or precludes any other right or remedy.

**11.2 Entire Agreement; Amendments.** This Financing Agreement and the other Loan Documents (a) constitute the entire agreement between the Companies and Lender; (b) supersede any prior agreements; (c) may be amended only by a writing signed by the Companies and Lender; and (d) shall bind and benefit the Companies and Lender and their respective successors and assigns. Should the provisions of any other Loan Document conflict with the provisions of this Financing Agreement, the provisions of this Financing Agreement shall apply and govern.

**11.3 Usury Limit.** In no event shall the Companies, upon demand by Lender for payment of any indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, Lender shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law. If

Lender ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such. If as a result, the entire principal amount of the Obligations is paid in full, any remaining excess shall be refunded to the Companies. This Section 11.3 shall control every other provision of the Financing Agreement, the other Loan Documents and any other agreement made in connection herewith.

**11.4** **Severability.** If any provision hereof or of any other Loan Document is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

**11.5** **WAIVER OF JURY TRIAL; SERVICE OF PROCESS.** EACH COMPANY AND LENDER EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREUNDER. EACH COMPANY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN ACCORDANCE WITH THE NOTICE PROVISIONS OF THIS AGREEMENT. IN NO EVENT WILL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

**11.6** **Notices.** Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (messages sent bye-mail or other electronic transmission (other than by telecopier) shall not constitute a writing, however any signature on a document or other writing that is transmitted by E-mail or telecopier shall constitute a valid signature for purposes hereof), and shall be deemed to have been validly served, given or delivered when received by the recipient if hand delivered, sent by commercial overnight courier or sent by facsimile, or three (3) Business Days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified as follows:

(a)    if to Lender, at:

Energia Overseas OOO, LLC
11 Bolhsoy Savvinski Pereulok,
Moscow, Russia 119435
Facsimile No :        +7

with a copy to:

Salans LLP
620 Fifth Avenue
New York, NY 10020
Attn: Lee P. Whidden
Facsimile No. :        +1 (212) 307 3373

**(b)**     if to the Borrower at:

Sea Launch Limited Partnership
2700 Nimitz Road
Long Beach, California 90802
Attn: Brett A. Carman
Facsimile No.:          +1 (562) 499-4755

with a copy to:

Brian A. Betancourt
Alston & Bird LLP
90 Park Avenue
New York, New York 10016
Facsimile No.:          +1 (212) 922-3982

**(c)**     to such other address as any party may designate for itself by like notice.

**11.7     CHOICE OF LAW.** THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS FINANCING AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION.

**11.8     CHOICE OF FORUM.** FORUM SHALL BE THE BANKRUPTCY COURT OR THE U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK.

**11.9     Order Controls.** To the extent that there is a conflict between the Loan Documents and either the Interim Order or the Final Order (as applicable), then the terms of the Interim Order and the Final Order (as applicable) shall control.

**IN WITNESS WHEREOF,** the parties hereto have caused this Financing Agreement to be executed, accepted and delivered by their proper and duly authorized officers as of the date set forth above.

**BORROWER:**

**SEA LAUNCH LIMITED**
**PARTNERSHIP**

By: **SEA LAUNCH COMPANY, LLC**
    : Title  General Partner
    :By:


**PLATFORM LIMITED PARTNERSHIP**

By: **PLATFORM COMPANY LDC**
    Title :  General Partner
    By:

**LENDER:**

**ENERGIA OVERSEAS OOO, LLC**

By: _____
    Name:
    Title:


**SEA LAUNCH ACS LIMITED**
**PARTNERSHIP**

By: **SEA LAUNCH ACS LIMITED**
    Title :  General Partner
    By:

1

## EXHIBIT A

## <u>TERM LOAN PROMISSORY NOTE</u>

$30,000,000.00                                                        April __, 2010

FOR VALUE RECEIVED, the undersigned, Sea Launch Limited Partnership, a Cayman Islands company (the "Borrower"), absolutely and unconditionally, promise to pay to the order of Energia Overseas Limited (Russia) ("Lender") at its office located at 11 Bolhsoy Savvinski Pereulok, Moscow, Russia 119435, in lawful money of the United States of America and in immediately available funds, the principal amount of Thirty Million Dollars ($30,000,000.00), on the Termination Date.

The Borrower absolutely and unconditionally, further agree to pay interest at said office, in like money, on the unpaid principal amount owing hereunder from time to time from the date hereof on the dates and at the rate specified in Section 7 of the Debtor in Possession Financing Agreement dated as of April 27, 2010 among the Borrower and Lender (the "Financing Agreement"). Capitalized terms used in this Note and defined in the Financing Agreement shall have the meanings given to such terms in the Financing Agreement unless otherwise specifically defined herein.

This Note is a Promissory Note referred to in the Financing Agreement, evidences a Term Loan made to the Borrower thereunder, and is subject to, and entitled to, all provisions and benefits thereof and is subject to optional and mandatory prepayment, in whole or in part, as provided therein.

Notwithstanding any other provision of this Note to the contrary, upon the occurrence of any Events of Default specified in the Financing Agreement, or upon termination of the Financing Agreement for any reason, all amounts then remaining unpaid on this Note may become, or be declared to be, at the sole election of Lender, immediately due and payable as provided in the Financing Agreement.

**SEA LAUNCH LIMITED PARTNERSHIP**

By:    SEA LAUNCH COMPANY, L.L.C.,
       Its general partner


By:    _____
Title: _____

# EXHIBIT B

## COMPLIANCE CERTIFICATE

[Date]

Energia Overseas Limited (Russia)
11 Bolhsoy Savvinski Pereulok
Moscow, Russia 119435

> RE:    Debtor in Possession Financing Agreement dated as of April ___,
> 2010 (the "Financing Agreement") between Energia Overseas
> Limited (Russia) ("Lender") and Sea Launch Limited Partnership
> (the "Borrower")

Ladies and Gentlemen:

Reference is made to the Financing Agreement. Capitalized terms used herein and not specifically defined shall have the meanings given to such terms in the Financing Agreement.

Pursuant to Section 6.2(k) of the Financing Agreement, I enclose the Borrower's financial statements for the fiscal year-to-date period ended [    ],20__. As the of the Borrower, I hereby certify to Lender, on behalf of the Borrower, that: (a) the financial statement(s) fairly and accurately the Borrower's financial condition at the end of the particular accounting periods covered by such financial statements, as well as the Borrower's operating results during such accounting periods, subject to year-end audit adjustments; and (b) during the month ended [    ], 20__, (i) to my knowledge, there has occurred no Default or Event of Default under the Financing Agreement, or, if I have knowledge that any Default or Event of Default has occurred during such period, a detailed description thereof is set forth on the Exhibit A attached hereto, and (ii) the Borrower have not received any notice of cancellation with respect to property insurance policies for itself or the Companies.

Very truly yours,

[attach appropriate exhibits]

## Schedule l.1(a) - Existing Indebtedness

1.      Indebtedness to Manufacturers Bank, a subsidiary of Sumitomo Mitsui Banking Corporation on Letter of Credit Obligations, in an amount of no more than $50,000.

## Schedule l.l(b) - Description of Existing Liens

1.　Lien on bank account and up to $50,000 deposited therein in favor of Manufacturers Bank, a subsidiary of Sumitomo Mitsui Banking Corporation.

## <u>Schedule l.1(c)</u> - Description of Mortgaged Vessels

1.  Launch Platform "Odyssey"; Flag registration: Liberia; call sign ELTA7; Official No. (Liberia) 10468; IMO No. 8753196; MMSI No. 63601468; DNV Classified No. 17633.

2.  "Sea Launch Commander"; Flag registration: Liberia; call sign ELUH7; Official No. (Liberia) 10677; IMO No. 9133812; Classified No. (DNV) 19284.

### Schedule l.l(d) - Permitted Intercompany Leases

1.      "Barecon 89" Bareboat Charter, dated March 31, 1998, by and between Platform Limited Partnership and Sea Launch Limited Partnership, as amended.

2.      "Barecon 89" Bareboat Charter, dated March 31, 1998, by and between Swale Shipping Company Limited and Sea Launch Limited Partnership, as novated to Sea Launch ACS Limited by a Novation and Amendment Agreement dated 13 November 1998, as amended.

**<u>Schedule 5.6</u> - Commercial Tort Claims**

1.  Potential Claim against SkyTerra LP related to termination of Contract for Launch Services, dated as of May 11, 2007, amended.

## Schedule 6.l(a) - Company and Collateral Information

**Exact Name of Each Company in Jurisdiction of Incorporation or Formation:**

Sea Launch Limited Partnership, Cayman Islands,British West Indies
Sea Launch Company, L.L.C., State of Delaware, United States of America
Sea Launch ACS Limited Partnership, Isle of Man
Sea Launch ACS Limited, Isle of Man
Platform Limited Partnership, Cayman Islands,British West Indies
Platform Company LDC, Cayman Islands,British West Indies

**Jurisdiction of Incorporation or Formation of each Company:**

See above

**F.E.I.N. of Each Company (if applicable):**

Sea Launch Limited Partnership #98-0158182
Sea Launch Company, L.L.C. #33-0921590
Sea Launch ACS Limited Partnership #52-2276216
Sea Launch ACS Limited #98-0405999
Platform Limited Partnership #91-2053173
Platform Company, LDC #91-2053177

**State Organizational No. for Each Company (if applicable):**

Sea Launch Limited Partnership #10580
Sea Launch Company, L.L.C. #3251816
Sea Launch ACS Limited Partnership
Sea Launch ACS Limited #078027C
Platform Limited Partnership #10507
Platform Company, LDC #63445

**Address of Chief Executive Office of Each Company:**

Sea Launch Limited Partnership
One Regis Place,90 Fort Street
P.O. Box 472
Georgetown, Grand Cayman
Cayman Islands,British West Indies

Sea Launch Company, LLC
2700 Nimitz Road
Long Beach, CA 90802
United States of America

Sea Launch ACS Limited Partnership
15-19 Athol Street

Douglas
Isle of Man IM1 1LB

Sea Launch ACS Limited
15-19 Athol Street
Douglas
Isle of Man IM1 1LB
Attn: C. Coldale, Deputy Registrar

Platform Limited Partnership
One Regis Place,90 Fort Street
P.O. Box 472
Georgetown, Grand Cayman
Cayman Islands,British West Indies
Attn: Delano O. Soloman, Registrar of Companies

Platform Company, LDC
One Regis Place,90 Fort Street
P.O. Box 472
Georgetown, Grand Cayman
Cayman Islands,British West Indies

EXHIBIT C

**FORM OF GENERAL ASSIGNMENT**

**<u>Schedule 6.1(e)</u> - Environmental Matters**

NewYork 1329482.8
NewYork 1329482.10

## EXHIBIT D

## **FORM OF SHIP MORTGAGE**