# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| SEA LAUNCH COMPANY, | ) Case No. 09-12153 (BLS) |
| L.L.C., *et al.*,[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR THE
## DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION

ALSTON & BIRD LLP
Dennis J. Connolly
Matthew W. Levin
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7940
Facsimile: (404) 881-7777

- and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to the Debtors and Debtors in Possession

Dated: June 21, 2010

---

[1] The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) Sea Launch Company, L.L.C. (1590); (ii) Sea Launch Limited Partnership (Cayman) (8182); (iii) Sea Launch ACS Limited (5999); (iv) Sea Launch ACS Limited Partnership (Isle of Man) (6216); (v) Platform LDC (3177); and (vi) Platform Limited Partnership (3173). The mailing address for all of the Debtors is 2700 Nimitz Road, Long Beach, CA 90802.

# Table of Contents

I. INTRODUCTION AND PLAN SUMMARY..................................................................................1
    A.    Case Background..........................................................................................................1
    B.    Summary of Classes Under the Plan and Their Treatment.........................................2
    C.    Impaired Claims Entitled to Vote................................................................................7
    D.    Claims and Interests Not Entitled to Vote..................................................................7
    E.    The Debtors' and Other Parties' Recommendation.....................................................7
    F.    Plan Voting Procedures and Deadlines .......................................................................8
    G.    Reservations and Disclaimers, Available Information and Cautionary Statement
        Concerning Forward-Looking Statements....................................................................8
II. GENERAL INFORMATION ABOUT THE DEBTORS AND THESE CASES .....................9
    A.    The Debtors and their Pre-Petition Operations ..........................................................9
    B.    Launch History..........................................................................................................11
    C.    Launch Anomaly.......................................................................................................11
    D.    Return to Sea-Based Launch Capabilities.................................................................12
    E.    Customer Payments/Obligations...............................................................................12
III. DEBTORS' PREPETITION DEBT STRUCTURE .................................................................12
    A.    Bank Debt .................................................................................................................12
    B.    Partner Debt ..............................................................................................................13
IV. THE CHAPTER 11 CASES ....................................................................................................14
    A.    Matters Leading to the Bankruptcy Cases ................................................................14
    B.    The Filing of the Bankruptcy Cases..........................................................................15
    C.    Significant Post-Petition Events................................................................................15
        *i.*      *Obtaining Post-Petition Financing*.............................................................15
        *ii.*     *Retention of Professionals* .........................................................................16
        *iii.*    *Evaluating the Debtors' Assets*..................................................................17
        *iv.*    *Implementation of Employee Retention Programs* .....................................17
        *v.*     *Setting a Bar Date, Objecting to and Resolving Certain Claims*....................18
        *vi.*    *Rejection of Certain Executory Contracts and Unexpired Leases*................18
        *vii.*   *Modification and Assumption of Home Port Lease* .....................................18
        *viii.*  *Resolution of Certain Contract Issues with Boeing* .....................................18
        *ix.*    *The Committee Litigation Against the Partners*..........................................19
    D.    The Debtors in Their Reorganized Form...................................................................20
V. THE PLAN OF REORGANIZATION.....................................................................................20
    A.    Explanation of Chapter 11........................................................................................20
    B.    Description of the Claims Against and Interests in the Debtors................................22
        *i.*      *Unsecured Non-Insider Claims*..................................................................22
        *ii.*     *Aker and Boeing Claims*............................................................................23
        *iii.*    *Energia, Yuzhmash and Yuzhnoye Claims*.................................................23
        *iv.*    *Interests in the Debtors*..............................................................................23
    C.    Key Terms of the Plan of Reorganization.................................................................23
        *i.*      *Classification And Treatment Summary*......................................................23
        *ii.*     *Vesting of Assets* ........................................................................................23
        *iii.*    *Pursuit of Avoidance Actions* .....................................................................23
        *iv.*    *Issuance of New Interests and Cancellation of Old Interests* .....................24
        *v.*     *Creditor Trust* ............................................................................................24
        *vi.*    *Management and Board of Directors* ..........................................................25
        *vii.*   *Post-Confirmation Funding of the Debtors* ................................................25
        *viii.*  *Filing of Amended Organizational Documents*...........................................25
        *ix.*    *Assumption of Contracts and Leases* ..........................................................25
        *x.*     *Discharge of Debtors* ..................................................................................26

| | | | |
|---|---|---|---|
| | | *xi.* | *Exculpations* ..........................................................................26 |
| | | *xii.* | *The Filing of Plan Documents* ...............................................28 |
| | | *xiii.* | *Post-Confirmation Reports and Fees* .....................................29 |
| | D. | Securities Law Matters .........................................................................29 |
| | | *i.* | *Issuance of New Securities under the Plan* ...........................29 |
| | | *ii.* | *Transfer of New Securities* ....................................................29 |
| VI. | POST-CONFIRMATION MANAGEMENT OF THE DEBTORS .............................31 |
| VII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............32 |
| | A. | Introduction ..........................................................................................32 |
| | B. | Federal Income Tax Consequences To the Debtors ...............................33 |
| | | *i.* | *Generally* ...............................................................................33 |
| | | *ii.* | *Issues Relating to COD Income* .............................................33 |
| | | *iii.* | *Analysis And Treatment Of Potential CMDI Claims Asserted By The U.S. And California Taxing Entities* ............................................................34 |
| | C. | Federal Income Tax Consequences To Creditors ...................................35 |
| | | *i.* | *Generally* ...............................................................................35 |
| | | *ii.* | *Potential Bad Debt Deduction* ...............................................35 |
| | | *iii.* | *Creditors Holding* ..................................................................36 |
| | | *iv.* | *Accrued Interest* ....................................................................37 |
| | | *v.* | *Backup Withholding* ...............................................................38 |
| | D. | Federal Income Tax Consequences To Interest Holders .........................38 |
| | E. | General Disclaimer ...............................................................................38 |
| VIII. | FINANCIAL INFORMATION ...........................................................................38 |
| IX. | LIQUIDATION VALUE OF THE DEBTORS .......................................................39 |
| X. | CERTAIN RISK FACTORS TO BE CONSIDERED ............................................39 |
| | A. | Risks Relating to the Projections ..........................................................39 |
| | B. | Market for New Common Stock .............................................................40 |
| | C. | General Business Risks .........................................................................40 |
| | D. | Continuing Leverage .............................................................................40 |
| | E. | No Dividends ........................................................................................41 |
| | F. | Applicable Law and Regulations...........................................................41 |
| XI. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........41 |
| | A. | Liquidation Alternative .........................................................................41 |
| | B. | Other Alternatives if the Plan is Not Confirmed ...................................42 |
| XII. | VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION ...............42 |
| | A. | Acceptance of the Plan .........................................................................42 |
| | B. | Parties in Interest Entitled to Vote .......................................................42 |
| | C. | Vote Required for Acceptance by Class of Claims or Interests...............42 |
| | D. | Confirmation Without Acceptance by All Impaired Classes ...................43 |
| XIII. | CONFIRMATION OF THE PLAN .....................................................................43 |
| | A. | Requirements for Confirmation of the Plan ...........................................43 |
| | | *i.* | *Feasibility of the Plan* ............................................................44 |
| | | *ii.* | *Best Interests Test* .................................................................45 |
| | B. | Conditions Precedent to the Effective Date of the Plan .........................47 |
| | C. | Amendments to or Modification of the Plan ..........................................48 |
| | D. | Cram Down ...........................................................................................48 |
| | | *i.* | *Secured Creditors* ..................................................................49 |
| | | *ii.* | *Unsecured Creditors* ..............................................................49 |
| | | *iii.* | *Equity Interest Holders* .........................................................49 |
| XIV. | CONCLUSION .................................................................................................50 |

# I.   INTRODUCTION AND PLAN SUMMARY

Sea Launch Company, L.L.C. ("**Sea Launch**"), a Delaware limited liability company, Sea Launch Limited Partnership ("**SLLP**"), a Cayman Islands exempted limited partnership, and its direct and indirect subsidiaries, Sea Launch ACS Limited ("**ACS Ltd.**"), an Isle of Man exempted company, Sea Launch ACS Limited Partnership ("**ACS LP**"), an Isle of Man exempted limited partnership, Platform LDC ("**Platform LDC**"), a Cayman Islands exempted limited duration company, and Platform Limited Partnership ("**Platform LP**"), a Cayman Islands exempted limited partnership (each a "**Debtor**", and collectively, the "**Debtors**"), hereby submit this disclosure statement (the "**Disclosure Statement**") pursuant to Section 1125, Title 11, United States Code (the "**Bankruptcy Code**") in connection with the solicitation of acceptances for their Joint Plan of Reorganization (the "**Plan**"), a copy of which is attached hereto as Exhibit A. The purpose of this Disclosure Statement, in accordance with the requirements of Section 1125 of the Bankruptcy Code, is to provide "adequate information" concerning the Plan, of a kind and in sufficient detail to enable a hypothetical reasonable investor, typical of holders of the Classes[2] of Claims being solicited, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement should be read in conjunction with the Plan and the other exhibits to this Disclosure Statement. Nothing in this Disclosure Statement shall be regarded as a statement or admission by any of the members of Sea Launch or the Partners (as such term is defined below) or their affiliates as to any of the facts surrounding the failure of the business or within the framework or connected or related to any present or future disputes among them in other fora. Further, the members of Sea Launch and the Partners (as such term is defined below), do not necessarily agree with all of the factual assertions set forth in this Disclosure Statement, and, therefore, expressly reserve all of their rights with respect to such assertions. Finally, Boeing (as defined in the Plan) and Aker (as defined in the Plan) do not support the Plan as currently proposed and believe that the Plan is not confirmable unless, among other things, the terms of the Boeing Aker UCC Settlement Agreement (as defined in the Plan) are implemented. Boeing and Aker, therefore, expressly reserve all of their rights to object to the confirmation of the Plan in the event that the Boeing Aker UCC Settlement Agreement has not been approved at a subsequent date, notwithstanding the Bankruptcy Court's approval of this Disclosure Statement, and the Debtors and the Committee reserve all of their rights in connection with any such objections. Yuzhmash maintains that the proposed modification and assumption of the Yuzhmash BOA by Reorganized Sea Launch is impermissible without Yuzhmash's prior consent to any such modification, and absent such assumption of the Yuzhmash BOA the Plan is not feasible.

## A.   Case Background.

On June 22, 2009, the Debtors filed their bankruptcy cases under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Cases**"). As discussed in more detail below, the Bankruptcy Cases were commenced in order to effectuate a restructuring of the Debtors business and debts. Accordingly, since that time, the Debtors have negotiated new supply agreements and

---

[2]     Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

- 1 -

customer contracts, reached an arrangement for an exit equity investment of $140 million, negotiated an exit financing agreement in the amount of $200 million, and otherwise restructured their business model around which the Debtors intend to reorganize.

The Plan attached hereto represents the Debtors' best judgment as to how to allocate the value of the Debtors' estates, so as to continue operating as a going concern upon the conclusion of these Bankruptcy Cases. The Debtors have actively worked with the New Investor and the Committee to formulate the Plan, and they expect that the Committee will support the Plan.

## B. Summary of Classes Under the Plan and Their Treatment.

Set forth below is a summary description of the treatment of all Claims and Interests provided for in the Plan. The summary is qualified in its entirety by reference to the more detailed information elsewhere in this Disclosure Statement, to the Plan and to the exhibits to this Disclosure Statement and the Plan. This summary does not purport to be complete and should not be relied upon for voting purposes. A more complete description of the Plan is provided in *Section V, The Plan of Reorganization*, below. Finally, the estimate of the amount of Claims in each category or Class listed below represents the Debtors' best reasonable estimate, based on information received to date, and based on what the Debtors believe are reasonable and correct grounds for which to object to certain Claims that have been filed. If the amount of Claims is greater than the estimates set forth below, then creditors may receive a lower recovery than what is estimated by the Debtors. By the same token, the Debtors are still in the process of completing their Claims reconciliation, and certain of the Claim amounts set forth below may be further reduced, after the Debtors have completed this task.

| | |
|---|---|
| ***Administrative Claims*** | **Unimpaired.** Each Administrative Claim that is or becomes an Allowed Claim against a particular Debtor shall be paid in full in cash by the particular Debtor on the later of (i) the Effective Date and (ii) a date within 30 days after the date such Administrative Claim becomes an Allowed Claim; *provided however,* that any Administrative Claims representing liabilities incurred by a Debtor in the ordinary course of business during the Reorganization Case shall be paid by the respective Debtor in accordance with the terms and provisions of the particular transactions and agreements and orders of the Bankruptcy Court, if any, relating thereto. |
| Estimated Amount of Allowed Claims: $21,000,000 (this number does not include amounts due to the DIP Lender, and will drop as claims are paid in the ordinary course of business) | |
| | **Estimated Recovery:** Payment in full, in cash, of the Allowed amount of each Administrative Claim. |
| ***DIP Facility Claims*** | **Unimpaired.** In full satisfaction, settlement, release, and discharge of and in exchange for each DIP Facility Claim, on the Effective Date, all Allowed DIP Facility Claims shall, at the election of the DIP Lender, either |
| Estimated Amount of Claims: | |

$32,000,000

(a) be paid in full and in Cash from the proceeds of the Exit Financing, or (b) be converted into New Common Stock to the extent requested by the DIP Lender in accordance with the DIP Facility Agreement.

**Estimated Recovery:** Payment in full.

*Priority Tax Claims*

Estimated Amount of Claims: $250,000

**Unimpaired.** Each Priority Tax Claim that is or becomes an Allowed Claim against a particular Debtor, shall, at the option of that Debtor, (i) be paid Cash equal to the amount of such Priority Tax Claim; (ii) receive such other treatment as to which the Debtors or the Reorganized Debtors and the Holder of such Priority Tax Claims shall have agreed upon in writing; or (iii) such other treatment as will cause such Claims not to be Impaired, including, but not limited to, payment as set forth in Section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that any Priority Tax Claim not due and owing on the Effective Date will be paid when such Claim becomes due and owing.

**Estimated Recovery:** Payment in full, in cash or in deferred cash payments, of the Allowed amount of each Priority Tax Claim.

*Class 1 – Priority Claims*

Estimated Allowed Amount of Claims: $1,000,000

**Unimpaired.** To the extent not previously paid as allowed by the Bankruptcy Court, each Class 1 Claim that is or becomes an Allowed Claim shall, at the option of the Debtors, either (i) be paid in Cash equal to the amount of such Priority Non-Tax Claim; (ii) receive such other treatment as to which the Debtors or the Reorganized Debtors and the Holder of such Priority Tax Claims shall have agreed upon in writing; or (iii) receive such other treatment as will cause such Claims not to be Impaired; provided, however, that any Priority Non-Tax Claim not due and owing on the Effective Date will be paid when such Claim becomes due and owing.

**Estimated Recovery:** Payment in full, in cash, of the Allowed amount of each Priority Claim.

*Class 2 – Other Secured Claims*

Estimated Allowed Amount of Claims:

**Unimpaired.** On the Effective Date, each Holder of an Other Secured Claim, if any, shall have its Claim

- 3 -

| $50,000 | Reinstated. |
|---|---|

**Estimated Recovery:** Payment in full.

**Class 3 – Current Trade Vendor Unsecured Claims**

Estimated Allowed Amount of Claims: $5,800,000

**Impaired.**    On the Effective Date, or as soon as practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Current Trade Vendor Unsecured Claim, if any, each Holder of an Allowed Current Trade Vendor Unsecured Claim, if any, shall be paid seventeen and a half percent (17.5%) of such Allowed Current Trade Vendor Unsecured Claim in Cash on the Effective Date from the proceeds of the Exit Financing or otherwise (to the extent unpaid prior to the Effective Date).

**Estimated Recovery:**    Seventeen and a half percent (17.5%)

**Class 4 – Customer or Trade Vendor Unsecured Claims**

Estimated Allowed Amount of Claims: $114,000,000

**Impaired.**  This Class includes all Customer or Trade Vendor Unsecured Claims against any Debtor other than Current Trade Vendor Claims.  Unless the Holder of an Allowed Customer or Trade Vendor Unsecured Claim agrees to a different treatment with the Debtors approved by the Bankruptcy Court pursuant to a settlement under Bankruptcy Rule 9019 or the modification, assumption and assignment of an executory contract, and provided Class 4 accepts the Plan, on the Effective Date, or as soon as practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for all Allowed Customer or Trade Vendor Unsecured Claims, if any, each Holder of an Allowed Customer or Trade Vendor Unsecured Claim shall receive a Pro Rata share of the Customer Recovery Fund and the proceeds of the Creditor Trust Actions against Holders of Claims in Class 7, not to exceed an Allowed Claim dividend of seventeen and one-half percent (17.5%), provided, however, that if aggregate dividends payable to Allowed Customer or Trade Vendor Unsecured Claims pursuant to such calculation would be less than the Customer Class Recovery Floor, in such event the dividend payable to Holders of Allowed Customer or Trade Vendor Unsecured Claims shall only be limited by the amount of the Customer Class Recovery Floor. If Class 4 does not accept the Plan, each Holder of an

Allowed Customer or Trade Vendor Claim will receive a Pro Rata share of the Creditor Trust Equity Interests attributable to the Customer Equity Recovery.

**Estimated Recovery:** Unknown. If Class 4 accepts the Plan, the estimated recovery will be between $9,000,000 and $15,000,000, which should be approximately 17.5% of the total Allowed Claims in the Class. If Class 4 does not accept the plan, the value of the Creditor Trust Equity Interests will be determined at the Confirmation Hearing. The amounts to be received from the Creditor Trust cannot be determined or estimated at this time.

***Class 5 – Aker and Boeing Claims***

Estimated Allowed Amount of Claims: $1,755,772,000 (Claims are currently the subject of objection by the Committee)

**Impaired.** Unless Aker, Boeing and the Committee agree to a different treatment, on the Effective Date, or as soon as practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for all Allowed Partner Claims held by Aker and Boeing, if any, Aker and Boeing shall receive, on account of their respective Allowed Partner Claims, a Pro Rata share of the Creditor Trust Equity Interests attributable to the Partner Equity Recovery (the Partner Equity Recovery being a total of 5% of the of the stock of Reorganized Sea Launch.

**Estimated Recovery:** Unknown (depends of the value of the Creditor Trust Equity Interests).

***Class 6 – Energia Claims***

Estimated Allowed Amount of Claims: $76,053,000 (Claims are currently the subject of objection by the Committee, which the Committee has advised will be withdrawn without prejudice subject to confirmation of the Plan)

**Impaired.** Unless Energia agrees to a different treatment, on the Effective Date, or as soon as practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Partner Currency Control Claim held by Energia, Energia shall receive $28,800,000 in Preferred Stock of Reorganized Sea Launch, and shall be deemed to have waived Partner Claims held by Energia that are not Allowed Partner Currency Control Claims.

**Estimated Recovery:** Unknown (depends of the value of the Preferred Stock).

***Class 7 – Yuzhmash and Yuzhnoye Claims***

**Impaired.** Unless Yuzhmash and Yuzhnoye (with the approval of the New Investor) agree to a different treatment with the Debtors, on the Effective Date, or

Estimated Allowed Amount of Claims: $147,630,000 (Claims are currently the subject of objection by the Committee)

as soon as practicable after the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Partner Currency Control Claim held by Yuzhmash and Yuzhnoye, if any, Reorganized Sea Launch shall assume and modify the Yuzhmash and Yuzhnoye BOAs to provide for (i) cure of any previously deferred payments for hardware or services ordered by the Debtors, but not yet delivered to the Debtors, at the time of delivery or over a period of not more than two years from the Effective Date, and (ii) future incremental payments of five hundred thousand ($500,000) per successful launch up to a maximum of six million six hundred thousand dollars ($6,600,000), and Yuzhmash and Yuzhnoye shall be deemed to have waived Partner Claims held by Yuzhmash and Yuzhnoye that are not Allowed Partner Currency Control Claims, provided Class 7 accepts the Plan. In the event Class 7 does not accept the Plan, for each Allowed Partner Claim, Yuzhmash and Yuzhnoye shall receive a Pro Rata share of the Creditor Trust Equity Interests up to a maximum of one half percent (0.5%) attributable to the Partner Equity Recovery and shall not be entitled any separate distribution or treatment for Allowed Partner Currency Control Claims.

**Estimated Recovery:** Unknown (depends of the value of the Creditor Trust Equity Interests and whether the Class accepts the Plan). If Class 7 accepts the Plan, the estimated recovery is $6,600,000, plus cure of deferred amounts over time.

***Class 8 – Sea Launch Equity Interests***

Estimated Allowed Amount: N/A.

**Impaired.** No property or assets of any kind shall be distributed to, or retained by, the holders of Interests classified in Class 8 in respect of any such Interest so classified, regardless of whether such Interest is Allowed.

**Estimated Recovery:** Nothing.

| *Class 9 – Subsidiary Interests* | **Unimpaired.** Each holder of an Allowed Class 9 Interest shall retain such Interest. provided, however, that with respect to Class 9 Subsidiary Interests, on or after the Effective Date, the Subsidiary Interests in those Debtors shall be cancelled, with the consent of the holders thereof, if there is a dissolution of those Debtors; if, after the Effective Date, those Debtors are instead merged with other Debtors or other corporate transactions take place under and in accordance with applicable state or foreign law to dispose of those Debtors, then the Class 9 Subsidiary Interests shall be disposed of as part of such transactions. |
|---|---|
| Estimated Allowed Amount: N/A. | |
| | **Estimated Recovery:** Retention of all Interests (unless cancelled as noted above), the value of which is unknown. |

## C. Impaired Claims Entitled to Vote.

Holders of Allowed Claims in each of Class 3 (Current Trade Vendor Unsecured Claims), Class 4 (Customer or Trade Vendor Unsecured Claims), Class 5 (Aker and Boeing Claims), Class 6 (Energia Claims), and Class 7 (Yuzhmash and Yuzhnoye Claims) are impaired and will receive a partial recovery under the Plan, and as such, are entitled to vote on the Plan. Please refer to the summary instructions below and the more detailed instructions in the enclosed Order [name of voting procedures order] for how to vote on the Plan and related deadlines.

## D. Claims and Interests Not Entitled to Vote.

Holders of Allowed Claims in the unclassified Classes (Administrative Claims and Priority Tax Claims), and Holders of Allowed Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are unimpaired and therefore are presumed to have accepted the Plan, and are not entitled to vote. Holders of Interests in Class 8 (Interest in Sea Launch) are impaired and shall not receive or retain any property or distribution under the Plan on account of their respective Claims or Interests. As such, they are presumed to have rejected the Plan and are not entitled to vote.

## E. The Debtors' and Other Parties' Recommendation.

The Plan reflects the Debtors' negotiations with their customers, major suppliers and the Committee. The Debtors and the Committee believe that acceptance of the Plan is in the best interests of Creditors and will maximize the return to all Creditors. Accordingly, you are urged to support the Plan and if you are entitled to vote on the Plan, to vote to accept the Plan. However, for a discussion of certain factors that should be considered in connection with a vote on the Plan, see *Section X, Certain Risk Factors to be Considered*, below.

**F.     Plan Voting Procedures and Deadlines.**

To vote in favor of, or against, the Plan, you must be a holder of record of a Class 3, Class 4, Class 5, Class 6 or Class 7 Claim as of May 1, 2010. To vote, you must fill out and sign a separate Ballot. Enclosed herewith are:

(i)      A Class 3 Ballot, for holders of Current Trade Vendor Unsecured Claims;

(ii)     A Class 4 Ballot, for holders of Customer or Trade Vendor Unsecured Claims;

(iii)    A Class 5 Ballot for holders of Aker and Boeing Claims; and

(iv)     A Class 6 Ballot for holders of Energia Claims.

(v)      A Class 7 Ballot for holders of Yuzhmash and Yuzhnoye Claims.

Once you have completed your Ballot, send it to the Debtors' claims and balloting agent at the following address:

**[to be provided]**

**The voting deadline to accept or reject the Plan is 4:00 p.m., prevailing Eastern Time, on [_____ __, 2010] unless extended by the Debtors. All votes must be <u>received</u> by the above-listed party by that time on that date, or they will not be counted.**

**G.     Reservations and Disclaimers, Available Information and Cautionary Statement Concerning Forward-Looking Statements.**

The Plan has not been approved or disapproved by the U.S. Securities and Exchange Commission (the "**Commission**"), any state securities commission or the Bankruptcy Court, nor has the Commission, any state securities commission or the Bankruptcy Court passed upon the fairness or merits of these transactions. Any representation to the contrary is a criminal offense.

In addition, the Debtors have filed various pleadings and other papers with the Bankruptcy Court since the commencement of these cases, which may contain information you would want to know. All such documents may be viewed at the office of the Clerk of the Bankruptcy Court, 5th Floor, 824 Market Street, Wilmington, Delaware 19809, or may be viewed by visiting the Bankruptcy Court's website, located at http://www.deb.uscourts.gov/, or at http://chapter11.epiqsystems.com/slc.

No person has been authorized to give any information or make any representation not contained in this Disclosure Statement and, if given or made, such information or representation should not be relied upon. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities other than those to which it relates, or an offer to sell or a solicitation of an offer to buy any securities in any jurisdiction in which, or to any person to whom, it is unlawful to make such offer or solicitation. The delivery of this Disclosure Statement after the date hereof should not, under any circumstances, create an implication that

there has been a change in the affairs of the Debtors or in the information contained herein since the date hereof.

Certain statements in this Disclosure Statement are forward-looking statements that involve known and unknown risks, uncertainties and other factors which may cause the actual results of the Debtors to be materially different from any future results expressed or implied by such forward-looking statements. Forward-looking statements include, among others, statements regarding the ability of the Debtors to successfully complete the restructuring outlined in this Disclosure Statement and achieve the business plan projections and the projected or assumed future operations and financial results of the Debtors. Factors that may cause actual results of the Debtors to differ from future results expressed or implied by forward-looking statements include, among others, the following: the likelihood of the Debtors' success in developing and expanding their businesses and maintaining financing on reasonable terms; general economic and business conditions, both in the United States and other countries in which the Debtors sell or purchase services and products; the effect of competition in the markets served by the Debtors; the risks described in *Section X, Certain Risk Factors to be Considered*, below; and the ability of the Debtors to obtain confirmation of the Plan. Some of these assumptions inevitably will not materialize, and unanticipated events may occur which could materially affect the Debtors' results and financial performance. Given these uncertainties, holders of Claims entitled to vote on the Plan are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote to accept or reject the Plan or to take other action under the Plan.

## II.    GENERAL INFORMATION ABOUT THE DEBTORS AND THESE CASES

### A.    The Debtors and their Pre-Petition Operations.

The Debtors were formed in May 1995 by Boeing Commercial Space Company ("**Boeing**"); S.P. Korolev Rocket and Space Company, Energia, a corporation partly owned by the Government of Russia ("**Energia**"); Kvaerner Moss Technology a.s., located in Oslo, Norway ("**Kvaerner**"),[3] KB Yuzhnoye ("**Yuzhnoye**"), a corporation wholly owned by the Government of Ukraine; and PO Yuzhny Mashinostroitelny Zavod, a corporation wholly owned by the Government of Ukraine ("**Yuzhmash**" and, collectively with Boeing, Energia, Kvaerner and Yuzhnoye, the "**Partners**").

Though the Debtors have approximately 100 suppliers of goods and services, the goods and services provided by the Partners make up a substantial portion of the costs associated with the Debtors' day-to-day operations and the costs incurred in connection with the commercial launch of satellites. For example, the majority of all capital equipment purchased by the Debtors related to their commercial launch of satellites was either purchased from or constructed and installed by the Partners.

---

[3]    Kvaerner was ultimately taken over by Aker Maritime Finance, AS and its affiliates (collectively, "**Aker**") in 2000. Accordingly, references to Kvaerner after 2000 are to Aker.

The Debtors comprise a business that draws upon an international consortium of American, Russian, Ukrainian and Norwegian businesses and provides a reliable, cost effective, heavy-lift commercial satellite launch service for primarily satellite operators. The Debtors offer a one-of-a-kind sea-based equatorial launch site that provides the most direct route to geostationary orbit, offering maximum lift capacity for increased payload mass and/or extended spacecraft life.

For equatorial launches, the Debtors provide fully integrated launch services out of their home port in Long Beach, California. Specifically, following completion of fueling and encapsulation in the state-of-the-art payload processing facility, the satellite is transferred to the assembly command ship named "Sea Launch Commander" (the "**ACS**") for integration with the launch vehicle. After the encapsulated payload is integrated into the launch vehicle, the integrated launch vehicle (the "**ILV**") is transferred to the semi-submersible launch platform named "Odyssey" (the "**Launch Platform**"), where it is stored in an environmentally controlled hangar during transit to the launch site at the equator.

At the equatorial launch site, once the Launch Platform is positioned, the ILV is rolled out of its environmentally controlled hangar and erected on the Launch Platform and prepared for launch. After the ILV receives its final preparations, the ILV is a "go" for launch.

In 2005, using existing infrastructure at the Baikonur Space Center, in Kazakhstan, the Debtors supplemented their equatorial sea-based launch operations with a land-based launch system based upon the Debtors' sea-based launch vehicle. At the land-based site, the Debtors provide contracting and management functions for the land launch system. Space International Services, Ltd., based in Moscow, provides hardware and services originating in Russia, Ukraine and Kazakhstan, in a subcontracting arrangement with the Debtors.

In addition to forming Sea Launch LP, Yuzhnoye, Yuzhmash, Energia, and Boeing have provided and continue to provide certain goods and services to the Debtors. Yuzhnoye and Yuzhmash design and manufacture the first and second stages of the rocket that the Debtors use to launch their customers' commercial satellites. Yuzhnoye also provides payload integration and mission analysis ("**PIMA**") services to the Debtors, along with Energia and Boeing. The PIMA services are required to launch each particular satellite into its proper orbit. Yuzhnoye and Yuzhmash also provide the Debtors with necessary personnel to conduct and oversee the launch operations, along with Energia and Boeing.

Energia designs and builds the third or upper stage of the rocket that provides the final propulsion to place the satellites into geosynchronous orbit. As described above, in addition to the upper stage, Energia also provides the Debtors with essential PIMA services and necessary personnel to conduct and oversee the launch operations. Boeing designs and builds the payload assembly that encapsulates and protects the satellite during the initial ascent of the launch. As described above, in addition to the payload assembly, Boeing also provides the Debtors with essential PIMA services and necessary personnel to conduct and oversee the launch operations. Kvaerner designed, built, and modified the ACS and the Launch Platform, both of which form the infrastructure of the Debtors' marine-based satellite launch system. Yuzhnoye, Yuzhmash,

and Energia manufactured and installed the launch support systems on the ACS and the Launch Platform.

## B.     Launch History

On March 27, 1999, the Debtors executed an inaugural launch that demonstrated their sea-based launch system. The success of the Debtors' inaugural mission represented the culmination of four years of intense development work performed by aerospace and marine professionals throughout the world. Since the Debtors' inaugural mission, the Debtors have experienced performance enhancements that have enabled them to increase the payload capacity of their launch vehicle, increase reliability, and streamline processing operations.

Since the successful inaugural launch, the Debtors have experienced thirty-two (32) successful launches, twenty-eight (28) from the Launch Platform (sea-based) and four (4) from the Baikonur Space Center (land-based), the most recent of which occurred on November 30, 2009.

## C.     Launch Anomaly

On January 30, 2007, the Debtors experienced an unsuccessful launch on their 24th sea-based mission (the "**Launch Anomaly**"). The incident occurred seconds after ignition, resulting in the loss of both the launch vehicle and its payload. While the Launch Platform remained intact and suffered no significant structural damage, critical launch support equipment was damaged. Accordingly, the Debtors decided to bring the Launch Platform and ACS back to home port for inspection and necessary repairs.

As a result of the Launch Anomaly and the required inspection and repair, the Debtors informed Hughes Network Systems, LLC ("**Hughes**") that it would be unable to proceed with the Hughes launch scheduled to occur in May 2007 (the "**Hughes Launch**"). Hughes entered into negotiations with one of the Debtors' competitors to arrange a replacement launch in July or August 2007. Thereafter, Hughes announced that it had entered into a launch services agreement with that competitor for the replacement launch.

In response to Hughes' launch services agreement with Arianespace, a dispute arose between the Debtors and Hughes concerning Hughes' obligation to proceed with the Hughes Launch, the status of the Hughes Launch, the effect of Hughes' contract with Arianespace, and the parties' rights and obligations. On May 11, 2007, Hughes terminated the launch services agreement relating to Hughes' Spaceway-3 Launch as a result of the Launch Anomaly and filed a claim for the refund of $44.4 million in advance payments plus interest related to the launch contract. The Debtors contested the validity of Hughes' termination and/or its entitlement to any amounts. In March 2009, the International Centre for Dispute Resolution concluded that Hughes was entitled to recover the amounts advanced plus simple interest at a rate of 10% per annum on the advances, accruing from July 10, 2007, plus the arbitration expenses, totaling approximately $53.2 million (the "**Hughes Arbitration Award**").

After the International Centre for Dispute Resolution entered the Hughes Arbitration Award, Hughes and the Debtors entered into a standstill agreement whereby Hughes agreed not to confirm or otherwise seek to enforce the Hughes Arbitration Award. After the expiration of the standstill agreement, Hughes filed its Petition for Confirmation of Arbitration Award in the Superior Court of the State of California for the County of Los Angeles on June 4, 2009. Hughes and the Debtors subsequently entered into a stipulation extending the time within which the Debtors had to answer the petition to enforce the Hughes Arbitration Award through and including June 22, 2009.

## D.    Return to Sea-Based Launch Capabilities

On November 1, 2007, the Debtors dispatched the Launch Platform and ACS for the launch of the Thuraya-3 satellite. After minor weather delays, the first post-anomaly liftoff proceeded without complication on January 15, 2008. Since the January 15, 2008 launch, the Debtors have had eight (8) successful launches, five (5) from the Launch Platform (sea-based) and three (3) from the Baikonur Space Center (land-based).

The most recent sea-based launch occurred on April 20, 2009, when the Debtors successfully launched Telespazio's SICRAL 1B communications satellite from the Launch Platform. The most recent land launch occurred on November 30, 2009, when the Debtors successfully launched Intelsat's IS-15 satellite from the Baikonur Space Center.

## E.    Customer Payments/Obligations

The Debtors' primary customers consist of commercial satellite manufacturers and operators in the United States and throughout the world. Due to timing and financial requirements associated with launching commercial satellites, pursuant to the terms of the parties' launch services agreement, customers remit initial payments and progress payments (collectively, the "**Payments**") to the Debtors for launch services to be provided in the future.

All customer launch services agreements contain termination clauses that enable customers to terminate the agreements for cause or to repurpose (i.e., modify) the launch detail. Depending on the reason for the termination, a creditor may be entitled to a return of all of the Payments or a fraction thereof.

In essence, the customers hold contingent claims of varying amounts against the Debtors pending the launch of their satellites. It is contemplated, as part of the confirmation of the Plan, that most, if not all, of the customer contracts will be modified and assumed, thereby dealing with the majority of the customer contingent claims.

## III.    DEBTORS' PREPETITION DEBT STRUCTURE

## A.    Bank Debt

On October 13, 2004, Debtor ACS LP completed the financing of its Sea Launch ACS Loan (the "**ACS Loan**") for $31.0 million with Sumitomo Mitsui Banking Corporation. The ACS Loan accrued interest at a rate of 4.0375% and matured on October 13, 2009. As of the

Petition Date, the balance on the ACS Loan was approximately $3.1 million and Boeing and Aker guaranteed the ACS Loan in full.

On July 13, 2005, SLLP entered into a $100.0 million Private Placement Loan through Citibank (the "**Citibank Loan**"). The Citibank Loan was to mature on July 12, 2015, with a balloon payment of full principal amount due at maturity. Interest on the Citibank Loan accrued at a floating rate, based on the three-month USD Libor and was paid quarterly. As of the Petition Date, the balance on the Citibank Loan was approximately $100.0 million and Boeing and Aker guaranteed the Citibank Loan in full.

On August 31, 2005, SLLP entered in a $100.0 million credit agreement arranged by Sumitomo Mitsui Banking Corporation (the "**Sumitomo Loan**"). The Sumitomo Loan was to mature on August 31, 2010, with a balloon payment of full principal amount due at maturity. Interest on the Sumitomo Loan accrued at a floating rate, based on the three-month USD Libor and was paid quarterly. As of the Petition Date, the balance on the Sumitomo Loan was approximately $100 million and Boeing and Aker guaranteed the Sumitomo Loan in full.

On June 19, 2006, SLLP signed an amended and restated credit agreement with Citicorp USA, Inc. (the "**Citibank $260m Loan**") that replaced a previous loan with Citicorp USA, Inc. On June 12, 2008, Sea Launch signed letter Amendment No. 1 to the Citibank $260m Loan, which eliminated the installment payment due in 2008 and revised the amount due upon maturity to $245.0 million. Interest on the Citibank $260m Loan accrued at a floating rate, based on the USD Libor rate. As of the Petition Date, the balance on the Citibank $260m Loan was approximately $245.0 million and Boeing and Aker guaranteed the Citibank $260m Loan in full.

The principal payment requirements associated with the ACS Loan, the Citibank Loan, the Sumitomo Loan, and the Citibank $260m Loan (collectively, the "**Bank Loans**") required principal payments of $251.2 in 2009; $100.0 million in 2010; no payments in 2011, 2012, or 2013; and $100.0 million thereafter. Subsequent to the Petition Date, the various bank lenders called the guarantees, and Boeing satisfied the Bank Loans in full. Boeing and Aker subsequently entered into an agreement under which Aker agreed to pay Boeing a portion of the amount Boeing paid to satisfy the bank guarantees. Boeing and Aker now assert claims against the Debtors equivalent to the Bank Loans that Boeing satisfied.

## B.    Partner Debt

In addition to providing essential goods and services to the Debtors, since the Debtors' formation, the Partners have provided significant financial resources to the Debtors. First, in February 1996, Boeing and Kvaerner entered into loan agreements with the Debtors whereby Boeing and Kvaerner lent the Debtors $275,000,000 (the "**Partner Loans**"). Energia, Yuzhnoye, and Yuzhmash guaranteed respective shares of the Partner Loans pro-rata to their shares of interest in the Debtors. In 1997 Boeing and Kvaerner agreed to lend the Debtors $1,000,000 more without any guarantees. Upon the issuance of the Bank Loans, the Partners subordinated the Partner Loans to the Bank Loans.

The Partner Loans originally accrued interest at an annual rate of interest of 12% per year, compounded quarterly. In February 2002, Boeing and Aker agreed to lower the interest rate on the Partner Loans to 6% effective January 1, 2002, and continuing through December 31, 2004. Subsequently, Boeing and Aker agreed to maintain the interest rate at 6% through December 2008, at which time the interest rate would be reevaluated. As of December 31, 2008, the balance of the Partner Loans, increased by $1,000,000, including principal and interest, totaled $760,801,984.

Pursuant to the terms of the Partner Loans, the Debtors' repayment obligations are tied to the Debtors' ability to make distributions to the Partners. Specifically, the Debtors are required to pay Boeing and Aker 100% of cash available for distribution to the Partners, after all external debts have been repaid, until the Partner Loans are repaid in full.

In connection with the Partner Loans, SLLP purportedly granted Boeing and Aker a security interest in all revenues, income, receipts, and money received by or on behalf of SLLP, as a stand-alone entity, and real property, equipment furnishings, fixtures, and other tangible personal property owned by SLLP, in existence or acquired. Boeing and Aker, however, took no steps to perfect their security interests and, therefore, do not hold perfected security interests in any property of the Debtors.

During the Debtors' development phase, the Partners experienced cost overruns on certain fixed-price contracts that the Partners had with the Debtors. The Debtors also experienced indirect cost overruns. By the end of the Debtors' development phase, unpaid cost overruns totaled $136,000,000, although they were reduced by a $17,000,000 payment to Kvaerner, and are now approximately $119,000,000 (the "**Cost Overruns**"). In 1998, the Partners determined that the Debtors would reimburse the Partners for the Cost Overruns. However, due to insufficient funds, in 2000 the Partners agreed to defer the Debtors' obligation to repay the Cost Overruns for an indefinite period of time without interest. The Cost Overruns remain outstanding.

## IV.  THE CHAPTER 11 CASES

As result of the Debtors' liquidity position, recurring losses from operations, declining conditions, the Launch Anomaly, and the Hughes Arbitration Award, the Debtors began to consider various alternatives to maximize the value of their businesses for the benefit of all of their stakeholders. Working with their counsel and advisors, the Debtors determined that commencing cases under Chapter 11 of the Bankruptcy Code provided the best avenue to preserve value and maximize the value of their estates.

### A.  Matters Leading to the Bankruptcy Cases.

Since their formation, the Debtors have struggled to recognize the success envisioned by the Creation Agreement. Because the Debtors were not immediately able to provide commercial launch services, the Debtors incurred indebtedness to finance their developmental costs as well as day-to-day cash needs. Though the Debtors successfully completed the design and construction of the ACS and Launch Platform, and have had a number of significant and valuable

launch services contracts, due to the cost of its debt, an increased cash demand for flight hardware production due to increased number of launches per year, unexpected increases in the costs of launch hardware, and government-financed competition, the Debtors were not able to stabilize their business or meet their financial targets. As a result, the Debtors' cost structure was not in line with the revenues they could generate and resulted in operating losses.

To manage the Debtors' liquidity position, the Partners agreed to defer the Debtors' obligation to repay the balance of Cost Overruns for an indefinite period of time without interest. When the Debtors' liquidity worsened, to enable the Debtors to make required cash payments due and owing to unaffiliated creditors, the Debtors' decided to postpone partially paying the Partners for goods and services that the Partners provided to the Debtors in connection with the Debtors' launch services.

Prior to the Petition Date, the Debtors actively pursued launch opportunities with numerous customers. However, the Debtors' operating results were negatively impacted by the worldwide economic recession, a glut of available launch slots offered by competitors, and the Launch Anomaly. Given the ongoing credit constrictions, economic decline, weakness in the commercial satellite industry, and the effect of the Launch Anomaly, the Debtors were unable to resolve their liquidity and cash flow problems prior to their bankruptcy filings. While the Partners disagree as to the underlying cause of the bankruptcy and reserve their rights thereto, there is no dispute that the inability to settle with Hughes Network Systems was the immediate cause.

**B.    The Filing of the Bankruptcy Cases**.

On June 22, 2009, the Debtors filed their Chapter 11 petitions for relief.

**C.    Significant Post-Petition Events**.

*i.    Obtaining Post-Petition Financing.*

On November 6, 2009, the Debtors filed their first motion seeking approval of debtor-in-possession financing (the "**First DIP Motion**"). On November 10, 2009, the Court entered an interim order approving the First DIP Motion and on December 3, 2009, the Court entered a final order approving the First DIP Motion (the "**First DIP Order**"). Pursuant to the First DIP Order, the Debtors borrowed $12.5 million (the "**First DIP Loan**") from Space Launch Services, LLC (the "**First DIP Lender**"), on the terms and conditions of the loan documents approved by the aforementioned orders.

As noted by the Debtors in the First DIP Motion and at the interim and final hearings held to consider same, the amount committed by the First DIP Lender under the First DIP Loan was not projected to be sufficient to provide the Debtors the necessary liquidity to carry them through a plan of reorganization in these cases. As noted by the Debtors, further financing was necessary to see the Debtors through to an exit. Although the orders approving the First DIP Motion approved the Debtors' borrowing up to $25 million from the First DIP Lender, the First DIP Lender would only commit to lend the $12.5 million already borrowed.

The Debtors ultimately reached an agreement with the First DIP Lender and The Heinlein Prize Trust (the "**Trust**") to advance an additional $12 million to the Debtors. On February 22, 2010, the Debtors filed the Second Emergency Motion (the "**Second DIP Motion**") seeking the entry of Interim And Final Orders Authorizing The Debtors To Obtain Postpetition Secured Financing Pursuant To 11 U.S.C. §§ 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Scheduling A Final Hearing.

On February 24, 2010, the Court held an interim hearing on the Second DIP Motion, and granted interim relief authorizing the Debtors to borrow an additional $3 million from the First DIP Lender on the same terms and conditions as set forth in the First DIP Facility and First DIP Order (the "**Additional Borrowing**"). On March 17, 2010, the Court held a final hearing on the Second DIP Motion, and entered an order granting final relief on the Second DIP Motion (the "**Second DIP Order**"), and authorizing the Debtors to borrow an additional $9 million from the Trust and the First DIP Lender on the terms and conditions of the Amended and Restated Debtor in Possession Financing Agreement (the "**Amended DIP Facility**").

Although the Trust funded the Debtors' initial $3 million draw on its $6 million commitment, unfortunately, the Trust refused to fund the second draw on its $6 million commitment as required by the terms of the Amended DIP Facility. The Trust appeared to be claiming that the Debtors had failed to satisfy one or more of the conditions to the funding set forth in section 2.2(b) of the Amended DIP Facility. Although the Debtors strongly dispute the Trust's contention, and intend to bring appropriate claims for breach of contract against the Trust at the appropriate time, they simply did not have the time at this moment to force the issue with the Trust in lengthy and costly litigation.

Accordingly, the Debtors sought and obtained a third lender, Energia Overseas Limited (Russia), a Russian Federation limited liability company (the "**Third DIP Lender**"), an entity related to Energia, which is one of the Debtor's equity holders, to provide the financing that was necessary, in the amount of $30 million ($12.5 million to pay off the First DIP Loan, $3 million to pay off the Additional Borrowing, $3 million to pay off the first draw on the Amended DIP Facility, $9.5 million in incremental liquidity, and $2 million is original issue discount), on the terms and conditions as set forth in the third Debtor in Possession Financing Agreement, dated April 29, 2010 (the "**Third DIP Facility**"). This Third DIP Facility was approved by the Bankruptcy Court by interim and final orders entered on April 27, 2010 and May 12, 2010, respectively.

*ii.* *Retention of Professionals.*

Early in the Bankruptcy Cases, pursuant to Sections 327 and 328 of the Bankruptcy Code and Bankruptcy Rule 2014 and orders of the Bankruptcy Court, the Debtors retained the following professionals in the case: (i) Alston & Bird LLP and Young Conaway Stargatt & Taylor LLP as bankruptcy counsel, (ii) Jefferies & Company, Inc. ("**Jefferies**") as financial advisor, and (iii) Epiq Bankruptcy Solutions ("**Epiq**") as noticing and claims agent. With the exception of Epiq, since the Petition Date these professionals have been paid 80% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court. Pursuant to Bankruptcy Court order, Epiq has been paid for

its fees and expenses in full, as billed to the Debtors in the ordinary course of business. On November 16, 2009, nunc pro tunc to October 16, 2009, the Debtors obtained authorization from the Bankruptcy Court to retain Christopher L. Picone of Buccino & Associates, LLC as Chief Restructuring Officer (the "**CRO**"). The CRO has been paid 100% of his fees and expenses on a monthly basis.

### iii. *Evaluating the Debtors' Assets.*

Upon its appointment as the Debtors' financial advisors, Jefferies, and later with the assistance of the CRO, undertook a thorough review and evaluation of the Debtors' operations, in order to (i) raise DIP financing, (ii) determine means to conserve cash during the Bankruptcy Cases, (iii) determine potential values for the Debtors as going concerns, and (iv) in conjunction with the Debtors' management, develop a reorganization strategy.

Jefferies and the CRO have been largely successful in these endeavors, as they assisted the Debtors in obtaining operational efficiencies and decreasing costs. In addition, Jefferies thoroughly marketed the Debtors, leading to several parties expressing interest in providing the DIP and becoming an equity sponsor of the Debtors reorganization efforts. At least two of those parties did extensive due diligence on the Debtors, ultimately leading to the Plan.

### iv. *Implementation of Employee Retention Programs.*

The Debtors have enjoyed relatively low turnover of management and employees during the pendency of these cases. Despite numerous layoffs and increased responsibilities falling upon the shoulders of remaining management and employees, the existing labor force has performed remarkably well in maintaining the value of the enterprise. As discussed below, the Debtors' senior executives have many years experience with the Debtors, and have long-standing relationships with key customers and suppliers. *See Section V, Post-Confirmation Management of the Debtors.*

Finally, to maintain the loyalty and confidence of their employees, the Debtors obtained Bankruptcy Court approval at various times in these cases (i) to pay merit or performance based bonuses to certain key members of management, and (ii) to enter into retention plans providing "stay bonuses" for certain key, non-management employees. The time period for non-management employees to remain with the Debtors in order to obtain their stay bonuses is confirmation of a plan of reorganization, and all obligations under the retention plans are anticipated to be satisfied on the Effective Date of the Plan. With regard to the management incentive plan, various amounts are payable depending on the occurrence and timing of certain trigger events. Some amounts are anticipated to be paid (or, in the case of equity in the reorganized Debtors, distributed) upon the Effective Date of the Plan. Other amounts are payable post-confirmation depending on the occurrence and timing of certain trigger events. No other retention plans currently are in place.

*v.* *Setting a Bar Date, Objecting to and Resolving Certain Claims.*

On October 6, 2009, this Court established November 20, 2009 (the "**General Bar Date**") as the final date to file proofs of claim on account of pre-petition Claims against the Debtors for non-governmental entities, and December 21, 2009 as the final date to file proofs of claim on account of pre-petition Claims against the Debtors for governmental entities. As of the date of this Disclosure Statement, 130 proofs of claim have filed. The Debtors expect in to file objections to certain of those claims, so that the final group of creditors may be determined.

*vi.* *Rejection of Certain Executory Contracts and Unexpired Leases.*

Since the Petition Date, the Debtors have engaged in aggressive cost-cutting actions, including the rejection of their headquarters office lease of non-residential real property, and consolidation of operations at the Debtors Home Port facility. In addition, the Debtors have rejected several executory contracts which were not needed during the pendency of the Bankruptcy Cases. The rejection of these contracts and leases has given rise to pre-petition rejection damage Claims, but has saved the Debtors in excess of $2,650,000 million per year in operational costs, allowing the Debtors to emerge from bankruptcy with a healthier balance sheet and more cost-effective operations.

*vii.* *Modification and Assumption of Home Port Lease.*

The Debtors, as a cost savings measure, decided, in their reasonable business judgment, to operate their businesses out of their Port of Long Beach office and pier space (the "**Home Port**") on a go-forward basis. The Home Port is also the location of the Debtors' state-of-the-art Payload Processing Facility, and the location where the ACS and the Launch Platform are docked when not conducting launch operations.

The Debtors operate the Home Port pursuant to that certain unexpired nonresidential real property lease by and between Sea Launch Company and The City of Long Beach (the "**City**"), dated as of January 15, 2003, as the same has been amended and proposed to be amended by the parties thereto (the "**Lease**"). After the Petition Date, the Debtors and the City negotiated a rent reduction and deferral on the Lease. Those negotiations resulted in an agreement by the City and Sea Launch to amend the Lease to provide for a substantial rent deferral on the Lease, as well as for the assumption thereof. By order dated December 3, 2010, the Court authorized the assumption of the Lease, as amended, subject to certain conditions subsequent.

*viii.* *Resolution of Certain Contract Issues with Boeing.*

Boeing and Sea Launch are parties to a Loan of Personnel Agreement that became effective November 1, 2005 (Contract No. BCSC-SLC-LOP-05-01) (the "**Personnel Agreement**"). Pursuant to the Personnel Agreement, Boeing provides the Company with approximately 36 loaned employees (the "**Loaned Employees**"). The Loaned Employees are utilized by the Debtors across all levels of employment and including executive positions at the Debtors, engineering staff, spacecraft processing and launch personnel, environmental safety and

- 18 -

health personnel, export compliance personnel, and operational staff in the areas of contracts, marketing, and security.

Prior to the Petition Date, Sea Launch and Boeing also entered into that certain Services Agreement (Contract No. BCSC-SLC-05-01), dated as of January 1, 2005, (as amended, supplemented, or restated, the "**Old Services Agreement**"). On October 8, 2009, the Bankruptcy Court entered the Order Approving Debtors; Motion (I) to Approve Postpetition Contract with The Boeing Company and Boeing Commercial Space Company, and (II) for Allowance of Administrative Claims (the "**Contract Approval Order**"), which approved, among other things, the Debtors' entry into that certain Services Contract with Boeing (Contract No. BCSC-SLC-08-07-09, dated as of August 7, 2009 (the "**New Services Agreement**"). Under the New Services Agreement, Boeing still supplies certain engineering services (and has the obligation to "ramp up" those services) in order to allow the Debtors to continue to offer new launches to its customers. The New Services Agreement, approved by the Court via Stipulation, was intended to reduce the run-rate of administrative expenses for the Company while in Chapter 11.

In addition, the Contract Approval Order provided that Boeing Commercial Space Company is entitled to priority as administrative expenses pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code and that are not subject to any subordination, recharacterization, or other attempt to reduce the priority of such amounts (it being the intention of the parties that the immediately foregoing clause shall be construed to mean that the referenced claims shall be treated as ordinary course administrative expenses arising under Sections 503(b) and 507(a)(2), and shall not be treated differently from other ordinary course administrative expenses arising under Sections 503(b) and 507(a)(2) based solely on the fact that the amounts are due to Boeing, as opposed to some other party) in the amounts of (a) $1,581,014 for amounts accruing during the period from the Petition Date through the Effective Date of the New Services Agreement under the Old Services Agreement, and (b) $2,492,616 for amounts accruing on and after the Petition Date through August 27, 2009, under the Personnel Agreement, and such other amounts accruing after August 27, 2009 through the date that the Court enters an order authorizing the Debtors to assume or reject the Personnel Agreement.

ix.     *The Committee Litigation Against the Partners.*

The Committee initially filed a motion on October 8, 2009, requesting the Bankruptcy Court to grant the Committee standing to pursue a claim against Boeing (the "**Standing Motion**"), asserting a debt recharacterization and/or equitable subordination claim against Boeing dealing with about 35% to 40% of the asserted claims of Boeing (principally the Subordinated Loans). The Standing Motion was continued from time to time and never granted. In light of the continued inability to obtain standing, on March 4, 2010, the Committee filed an objection to the Boeing and Aker claims under Section 502 of the Bankruptcy Code (the "**First Claim Objection**"). The Committee sought an accelerated discovery schedule in respect of the litigation of the First Claim Objection. Ultimately, the parties agreed to mediate the First Claim Objection on a non-binding basis. As noted above, the indications arising out of the mediation are that the parties have reached a settlement, but that settlement has not been effectuated as of the date of this Disclosure Statement. The parties indicate that they have reached a tentative agreement, subject to the fulfillment of certain conditions. That settlement will provide for a

release by the Debtors' estates, the Committee, each of the Committee members and the other creditors in these cases other than the Partners (subject to opt out), of all claims against Boeing and Aker. In exchange, Boeing and Aker will accept their treatment under the Plan. All of this is conditioned upon the Boeing Aker UCC Settlement Agreement being approved at or prior to the Confirmation Hearing.

Separately, the Committee also filed an objection to the claims of Energia, Yuzhmash and Yuzhnoye on much the same grounds as the First Claim Objection (the "**Second Claim Objection**", and together with the First Claim Objection, the "**Claims Objection**"). As of the date of this Disclosure Statement, no significant progress has been made on the Second Claim Objection. However, the Committee has indicated that it will withdraw the Second Claim Objection as to Energia without prejudice, pending confirmation of the Plan (as it may be amended from time to time).

## D.     The Debtors in Their Reorganized Form

Upon consummation of the Plan, certain of the Debtors will merge into others of the Debtors, all as described in the New Investment Agreement, with the result being that the Reorganized Debtors will be streamlined into fewer entities. In addition, certain of the Debtors will be re-incorporated (or re-formed) as Swiss entities.

## V.     THE PLAN OF REORGANIZATION

## A.     Explanation of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and stockholders. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote equality of treatment of creditors and equity security holders of equal rank with respect to the distribution of a debtor's assets.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity security holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This

- 20 -

Disclosure Statement is presented to holders of Claims against and Interests in the Debtors to satisfy the requirements of Section 1125 of the Bankruptcy Code.

Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. At a minimum, however, the plan of reorganization must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan of reorganization. Holders of impaired claims or interests who fail to vote will not be counted as either accepting or rejecting the plan.

In general, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified under the plan of reorganization. Classes of claims that are not impaired under a plan of reorganization are conclusively presumed to have accepted the plan of reorganization and thus are not entitled to vote. Classes of claims or equity interests receiving no distribution under a plan are impaired and are conclusively presumed to have rejected the plan and thus are not entitled to vote. Acceptances of the Plan in this case are being solicited only from those persons who hold Claims in an impaired Class that is not a deemed accepting or rejecting Class.

Even if all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may nonetheless find such a plan unconfirmable. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and, among other things, requires that a plan of reorganization meet the "best interests" test and be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan of reorganization without the need for further financial reorganization. The Debtors believe that both of these requirements are satisfied by the Plan. *See Section XIII, Confirmation of the Plan.*

The proponents of the plan of reorganization (in this case, the Debtors) also must meet all other applicable requirements of Section 1129(a) of the Bankruptcy Code (except Section 1129(a)(8) if the proponent proposes to seek confirmation of the plan under the provisions of Section 1129(b) of the Bankruptcy Code). These other requirements include, among other things, that the plan comply with applicable provisions of Title 11 and other applicable law, that the plan be proposed in good faith and that at least one impaired class of creditors has voted to accept the plan. The Debtors believe that the Plan satisfies all of these and all other applicable requirements of Section 1129(a) of the Bankruptcy Code.

The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite the rejection of a class of impaired claims or interests, the proponent of the plan of reorganization must show, among other things, that the plan of reorganization does not

discriminate unfairly and that the plan of reorganization is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan of reorganization.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain, on account of its claim, property that has a value, as of the effective date of the plan of reorganization, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain, on account of such junior claim or equity interests, any property at all unless the senior class is paid in full. The bankruptcy court must further find that the economic terms of the plan of reorganization do not unfairly discriminate, as provided in Section 1129(b) of the Bankruptcy Code, with respect to the particular objecting class. The Debtors believe they will be able to satisfy these requirements of Section 1129(b) of the Bankruptcy Code, as well.

## B. Description of the Claims Against and Interests in the Debtors.

### i. Unsecured Non-Insider Claims.

As of the Petition Date, the Debtors had, on a consolidated basis, approximately $106 million in unsecured, non-insider claims. In addition, the Debtors owed an additional approximately $285 million on a contingent basis to customers representing amounts paid by such customers in advance of certain launches.

Classes 3 and 4 consist largely of (i) Claims by unaffiliated trade vendors, (ii) lease and executory contract rejection Claims, (iii) certain pre-petition litigation Claims, (iv) certain unpaid employee Claims, and (v) contingent and non-contingent current and former customer Claims.

As set forth in Section 3.2 of the Plan and as discussed below, by accepting this Plan, the holders of Current Trade Vendor Unsecured Claims (Class 3) will receive, in full satisfaction, settlement, release, and discharge of and in exchange for each Current Trade Vendor Unsecured Claim, Cash in the amount of seventeen and a half percent (17.5%) of such Allowed Current Trade Vendor Unsecured Claim. The holders of Customer or Trade Vendor Unsecured Claims (Class 4) (which Class includes all non-insider unsecured Claims that are not Current Trade Vendor Unsecured Claims) will receive, if Class 4 accepts the Plan, Cash in the minimum amount of nine million dollars ($9,000,000), and up to a maximum of seventeen and a half percent (17.5%) of such Allowed Customer or Trade Vendor Claims, subject to a hard cap of fifteen million dollars ($15,000,000) for all Allowed Claims in Class 4, in full satisfaction, settlement, release, and discharge of and in exchange for each Customer or Trade Vendor Unsecured Claim. Other proceeds would potentially be available to support this recovery, including Creditor Trust Actions against members of Class 7 and SLS, and if the Administrative Expense Ceiling of fifteen million dollars ($15,000,000) is not reached. However, this recovery could be degraded if the actual administrative expenses exceed the Administrative Expense Claim Ceiling, as then the amounts due under the SLEIP would be paid out of the Customer/Trade Vendor Recovery Fund. If Class 4 does not accept the Plan, it will receive a Pro

- 22 -

Rata share of the membership interests in the Creditor Trust on account of the Customer Equity Recovery (which will be ten percent (10%) of the equity interests in Reorganized Sea Launch).

ii.     *Aker and Boeing Claims.*

The Boeing and Aker Claims consist of various amounts, including loans, guarantees of loans, cost overruns experienced on certain fixed-price contracts, trade claims for goods and services provided, and total approximately $1.755 billion. The Committee has filed objections to substantially all of said Claims, and thus the ultimate allowance of such Claims remains uncertain. Boeing, Aker and the Committee have engaged in mediation of the objections, and indications of a settlement are positive, but as of the date of this Disclosure Statement, no settlement had been finalized.

iii.    *Energia, Yuzhmash and Yuzhnoye Claims.*

The Energia, Yuzhmash and Yuzhnoye Claims consist of cost overruns experienced on certain fixed-price contracts, trade claims for goods and services provided, and total approximately $224 million. The Committee has filed objections to substantially all of said Claims, and thus the ultimate allowance of such Claims remains uncertain.

iv.     *Interests in the Debtors.*

As of the Petition Date, the identity and the amounts of the holders of the membership interests in Sea Launch, and the limited partnership interests in SLLP, were as follows: Boeing held approximately 40% of such interests, Energia held approximately 25% of such interests, Aker held approximately 20% of such interest, Yuzhmash held approximately 10% of such interests, and Yuzhnoye held approximately 5% of such interests. The interests in the other Debtors are held by Sea Launch and SLLP.

## C.     Key Terms of the Plan of Reorganization.

i.      *Classification And Treatment Summary.*

*See Section I.B, Summary of Classes Under the Plan and Their Treatment.*

ii.     *Vesting of Assets.*

On the Effective Date the property of the Debtors' Estates will vest in the respective Reorganized Debtors, free and clear of liens not specifically contemplated to either survive the Reorganization Cases or be created or granted in connection therewith. Claims of the Debtors' Estates not released under the Plan or transferred to the Creditor Trust are preserved for the benefit of the respective Reorganized Debtor or the beneficiaries under the Plan.

iii.    *Pursuit of Avoidance Actions.*

The Debtors have identified approximately $22.59 million in payments made to non-insider vendors during the ninety days prior to the Petition Date against which they may assert

causes of action as voidable preferences pursuant to Section 547 of the Bankruptcy Code. As with all litigation, the potential recovery on these claims cannot be determined with any certainty, although the Debtors and their professionals believe that some of the claims may be meritorious and that a recovery may occur by prosecuting these actions. However, it is likely that many of such claims will be subject to valid defenses, such as the ordinary course of business defense or the new value defense. Under the Plan, the Avoidance Actions will be transferred to the Creditor Trust, with the Class 4 (if it does not accept the Plan), 5 and 7 (if it does not accept the Plan) Creditors receiving in return membership interests in the Creditor Trust, unless otherwise agreed.

  *iv.*  *Issuance of New Interests and Cancellation of Old Interests.*

  On the Effective Date of the Plan, Sea Launch and SLLP will be merged, the existing interests in Sea Launch and SLLP shall be canceled, and reorganized Sea Launch ultimately will become a corporation organized under the laws of Switzerland, and will issue new equity interests in the form of shares of common stock, to be distributed 85% to 95% to the New Investor, and 5% to 15% to the Creditor Trust (depending on whether Class 4 accepts the Plan), for the benefit of Classes 4 (if it does not accept the Plan), 5 and 7 (if it does not accept the Plan, each to the extent provided in the Plan. In addition, certain shares of preferred stock will be issued to Energia on account of approximately $28.8 million in Partner Currency Control Claims. The articles of incorporation and other relevant formation documents of the Reorganized Debtors will govern the rights, obligations and preferences under the Preferred Stock. Further, the articles of incorporation and other formation documents may be amended in accordance with applicable law.

  *v.*  *Creditor Trust*

  As set forth in *Section IV.C.ix, The Committee Litigation Against the Partners*, above, the Committee believes that the Debtors' estates have causes of action against Aker, Boeing, Energia, Yuzhmash and Yuznoye consisting of a combination of avoidance action claims, equitable subordination and recharacterization claims, and potentially other causes of action.

  The Plan contemplates the creation of the Creditor Trust, and to the extent that such claims against the Partners are not resolved prior to the Effective Date, control of the litigation against the Partners, other than Energia, including the Claim Objections, shall shift to the Creditor Trust, with the Class 4 (if it does not accept the Plan), 5 and 7 (if it does not accept the Plan) Creditors receiving in return membership interests in the Creditor Trust.

  Pursuant and subject to the Creditor Trust Agreement, the affairs of the Creditor Trust shall be managed by one Creditor Trust Manager, who shall be designated in accordance with the provisions of the Creditor Trust Agreement. Pursuant to the Creditor Trust Agreement, decisions regarding the administration of the Creditor Trust and the prosecution and settlement of the claims and avoidance actions transferred to the Creditor Trust shall be made by the sole Creditor Trust Manager.

  It is contemplated that the Creditor Trust Manager shall hire employees and retain professionals as needed to bring these claims, and that proceeds received through the prosecution

YCST01:9311369.1    068473.1001

and/or settlement of the claims and avoidance actions transferred to the Creditor Trust, net of professional fees, costs and expenses incurred by the Creditor Trust, shall be distributed to the holders of Creditor Trust Equity Interests, as provided in the formation documents for the Creditor Trust.

  *vi.  Management and Board of Directors.*

  *See Section VI, Post-Confirmation Management of the Debtors.*

  *vii.  Post-Confirmation Funding of the Debtors.*

  The Debtors anticipate that their post-Effective Date funding needs will be met by a combination of the New Investment Amount and the Exit Financing. Other than these amounts, the Debtors do not anticipate any financing needs, and their projections show adequate funds on hand throughout the post-Effective Date period with which to satisfy all business obligations and obligations under the Plan. However, during the period between Confirmation of the Plan and the Effective Date, the Debtors may have certain funding needs, which they anticipate will be met by an additional loan from the New Investor, to be credited against the New Investment Amount. The amount of the additional funding is currently unknown, as it will vary depending on the length of time between the Confirmation Date and the Effective Date.

  *viii.  Filing of Amended Organizational Documents.*

  On the Effective Date, each Reorganized Debtor's organizational documents will be deemed to be amended and restated in their entirety, and each Reorganized Debtor shall file such amended and restated organizational documents with the appropriate jurisdiction in which they are organized in accordance with the applicable laws of that jurisdiction.

  *ix.  Assumption of Contracts and Leases.*

  All contracts and leases not expressly assumed or rejected by the Debtors pursuant to a Bankruptcy Court order entered prior to the Confirmation Date, or subject to a motion for assumption or rejection filed on or before the Confirmation Date, shall be deemed rejected, unless assumed pursuant to the Plan. The issuance of the Preferred Shares to Energia under the terms of the Plan shall be deemed to cure contractual defaults for purposes of assumption. It is anticipated that the Debtors will assume, and thus continue to honor post-confirmation as fully enforceable obligations, most, if not all, of their contracts with their customers, as such contracts have been amended during the pendency of these cases. It is not anticipated that the Debtors will have to cure any defaults under these contracts or leases, nor that such assumption will create any Administrative Claims that are immediately due or payable. However, with respect to certain of those customer contracts, it is likely that some of their contingent claims will remain as general unsecured claims in Class 4. It is currently unknown how much of those claims will remain. In addition, with respect to other customer contracts, while such contracts will be assumed, and thus the contingent claims associated with such contracts will be resolved by giving the customers credits against future launches, it is possible that those claims may be reasserted in certain

situations (for example, if the post-reorganization Debtors were to default on such a contract). Accordingly, some reserve will have to be made for such potential claims.

x.    *Discharge of Debtors.*

On the Effective Date except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors will be discharged from liability on all Claims which arose prior to Confirmation.

*xi.*    **Exculpations.**

**The Plan contains an exculpation provision that is consistent with those that have been approved by the Bankruptcy Court and other courts of the Third Circuit. The exculpation provision provides as follows:**

> **From and after the Effective Date, the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, negotiating or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of approval of the Disclosure Statement and confirmation of this Plan, the confirmation of this Plan, the Plan Documents, the consummation of this Plan or the administration of this Plan or the property to be distributed under this Plan, or the restructuring transactions contemplated hereunder; provided, however, that the foregoing provision shall not apply to an act or omission that is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence. Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

**Plan at § 10.2(a).**

In addition, the Debtors will be releasing the Released Parties as well, pursuant to the following provision:

> **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and Reorganized Debtors in their individual capacities and as debtors-in-possession on behalf of each of the Debtors' Estates will be deemed to release and forever waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise against the Released Parties, that are based in whole or part on any act,**

- 26 -

omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, this Plan or the Disclosure Statement, or any document or agreement related thereto; provided, however, that the foregoing provision shall not apply to an act or omission that is determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence.

Plan at § 10.2(b).

The Plan also provides for a voluntary release of claims by Holders of Claims and Interests of the Released Parties, in exchange for entitlement to participate in the Call Option, as follows:

As of the Effective Date, to the fullest extent permitted by law, each Holder of a Claim or Interest that does not otherwise elect in accordance with voting on this Plan, shall in consideration for the obligations of the Debtors and the Reorganized Debtors under this Plan and the Cash, the securities, including the Call Option under the Exit Financing Commitment Letter and New Investment Agreement, contracts, instruments, releases and other agreements or documents to be delivered in connection with this Plan, be deemed to have forever released, waived and discharged all claims, demands, debts, rights, causes of action or liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, this Plan or the Disclosure Statement, the Plan Documents, or the restructuring transactions contemplated thereby, existing as of the Effective Date or thereafter that are based in whole or part on any act, omission, transaction event, or other occurrence taking place on or prior to the Effective Date, against the Released Parties. Any Holder of a Claim or Interest who does not elect to offer the Releases described in this paragraph shall not be entitled to any direct or indirect benefits from the Call Option under the Exit Financing Commitment Letter and New Investment Agreement as may be more fully described in the Shareholders Agreement between reorganized Sea Launch, the Creditor Trust and the New Investor.

Plan at § 10.2(c).

Finally, the Plan provides for a voluntary release of claims by Holders of Claims and Interests of Boeing and Aker:

Subject to Bankruptcy Court approval of Boeing Aker UCC Settlement Agreement (as such term is defined below), as of the Effective Date, to the fullest extent permitted by law, each Holder of a Claim or Interest that does not otherwise elect in accordance with voting on this Plan, shall, in

consideration for Boeing and Aker agreeing to the Boeing Aker UCC Settlement Agreement, be deemed to have forever released, waived and discharged all claims, demands, debts, rights, causes of action or liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, this Plan or the Disclosure Statement, the Plan Documents, or the restructuring transactions contemplated thereby, existing as of the Effective Date or thereafter that are based in whole or part on any act, omission, transaction event, or other occurrence taking place on or prior to the Effective Date, against Boeing and Aker, provided that nothing in such agreement shall contradict Section 10.5 of the Plan.

Plan at § 10.2(h).

With regard to the releases, the Plan provides the following exception:

Nothing in the Plan, including, but not limited to, Sections 10.2 and 10.3 of the Plan, Confirmation Order, or any other document in connection with such documents shall release or discharge the claims, if any, of The Boeing Company, Boeing Commercial Space Company, Kvaerner Sea Launch Limited, Kvaerner Sea Launch U.S., Inc., Aker Maritime Finance AS, Kvaerner AS, Aker ASA, S.P. Korolev Rocket and Space Corporation Energia, KB Yuzhnoye, and PO Yuzhny Mashinostroitelny Zavod Production Association, against entities other than the Debtors; provided, however, that nothing contained in this Section 10.5 shall constitute an acknowledgement by any party of any right or fact with respect to any claims.

Plan at § 10.5.

 *xii.* *The Filing of Plan Documents*

Not later than five (5) Business Days prior to the objection deadline set with respect to the Plan, the Debtors shall File the various documents comprised within the Plan Supplement including, but not limited to, the Articles of Incorporation, the By-Laws, the term sheet for the Exit Financing Credit Agreement, the Reorganized Sea Launch Shareholders Agreement, the Reincorporation Transactions Document, the Current Trade Vendor List, the Creditor Trust Agreement, the Exit Financing Commitment Letter, Sea Launch Board Resolution No. 2010-04-1-103 dated April, 2010, and any other documents relevant to the implementation of this Plan, except for the list of directors and officers of Reorganized Sea Launch and the Reorganized Debtors, which shall be filed with the Bankruptcy Court not later than three (3) Business Days prior to the Confirmation Hearing, and the New Investment Agreement, which shall be filed with the Bankruptcy Court not later than five (5) days prior to the objection and voting deadline on the Plan.

 

*xiii.    Post-Confirmation Reports and Fees*

Post-confirmation, the Reorganized Debtors shall continue to file such operating reports as are required by the Bankruptcy Code and Rules, and shall continue paying such U.S. Trustee fees as are owed, until such time as the Chapter 11 Cases are closed.

## D.    Securities Law Matters.

With respect to the New Common Stock and the New Preferred Stock and any warrants or options to purchase New Common Stock (collectively, the "**New Securities**") to be issued or exchanged under and pursuant to the Plan, the Debtors intend to rely upon the exemptions from the registration requirements of the Securities Act of 1933 (as amended, the "**Securities Act**"), and of equivalent state securities or "blue sky" laws, provided by Section 1145(a)(1) and (a)(2) of the Bankruptcy Code.

*i.    Issuance of New Securities under the Plan.*

Sections 1145(a)(1) and 1145(a)(2) of the Bankruptcy Code exempt the issuance of securities, including warrants, options, rights to subscribe or conversion privileges, under a plan of reorganization from registration under the Securities Act and under equivalent state securities or "blue sky" laws if three principal requirements are satisfied: (i) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan; (ii) the recipients of the securities must hold a claim against the debtor, an interest in the debtor or a claim for an administrative expense against the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. The Debtors believe that the exchange of the New Securities for Claims under the Plan satisfies the requirements of Section 1145(a)(1) or 1145(a)(2) of the Bankruptcy Code and is, therefore, exempt from registration under federal and state securities laws.

*ii.    Transfer of New Securities.*

(A)    <u>New Securities Issued Pursuant to Section 1145 Exemption</u>

Except to the extent provided in the Shareholders Agreement, the New Securities (all of which will be issued under the Section 1145(a)(1) or 1145(a)(2) exemption discussed above) may be freely transferred by most recipients thereof, and all resales and subsequent transfers of the New Securities are exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b)(1) of the Bankruptcy Code defines four types of underwriters:

(i) persons who purchase a claim against, an interest in, or a claim for administrative expense in a case concerning a debtor with a view to distributing any security received in exchange for such a claim or interest;

(ii) persons who offer to sell securities issued under a bankruptcy plan on behalf of the holders of such securities;

(iii) persons who offer to buy securities issued under a bankruptcy plan from the persons receiving such securities, if the offer to buy is made with a view to distributing such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer of securities under the plan; and

(iv) a person who is an "issuer" with respect to the securities, as the term "issuer" is used in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such debtor (and therefore be an underwriter for purposes of Section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or affiliate's or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Securities pursuant to the Plan, resales by such persons would not be exempted by Section 1145(a)(1) of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters, however, may be able to sell such securities without registration subject to other exemptions available under the Securities Act, including the provisions of Rule 144 under the Securities Act as discussed below.

(B)     New Securities Held by Underwriters.

Holders of New Securities who are deemed to be "underwriters" within the meaning of Section 1145(b)(1) of the Bankruptcy Code or who may otherwise be deemed to be "affiliates" of, or to exercise "control" over, the Debtors within the meaning of Rule 405 of Regulation C under the Securities Act, may, in addition to any other exemptions that may be available under federal and state securities laws, under certain circumstances, be able to sell their securities pursuant to the more limited safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that if certain conditions are met (e.g., volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who resell such securities and are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act.

The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. The Debtors do not make any representations concerning, and do not provide any opinion or advice with respect to, the securities law and bankruptcy law matters described above. In view of the uncertainty

concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws to a recipient of New Securities who may be deemed to be an "underwriter" (within the meaning of Section 1145(b)(1) of the Bankruptcy Code) and/or an "affiliate" of, or a person who exercises "control" over, the Debtors under applicable federal and state securities laws, the Debtors encourage each person who is to receive New Securities pursuant to the Plan to consider carefully and consult with its own legal advisor(s) with respect to such (and any related) matters.

## VI.    POST-CONFIRMATION MANAGEMENT OF THE DEBTORS

The current executive officers of the Debtors, a brief biography of each, and their salaries for the past fiscal year are as follows:

| Name | Position | Salary – Fiscal 2009 |
|------|----------|----------------------|
| Kjell J. Karlsen | President and General Manager | Salary: $309,000/year |
| Brett A. Carman | Vice President and Chief Financial Officer | Salary: $206,000/year |

*Kjell J. Karlsen*:  Mr. Karlsen joined the Debtors in 1999 as Vice President and Chief Financial Officer.  He was promoted to Executive Vice President in 2002, and became President and General Manager in July of 2008.  Prior to joining the Debtors, Mr. Karlsen was employed for 2 years by Kvaerner, Inc. and Kvaerner Financial Services, and from 1988-1997, he held increasingly responsible executive positions with Den norske Bank of Oslo, Norway, and its New York-based operation.  He obtained his B.S. from the University of Oregon and his M.B.A. from Lehigh University.  He is also a graduate of the Executive Development Program of The Wharton School at the University of Pennsylvania.

*Brett A. Carman*:  Mr. Carman officially joined the Debtors in 2001 as Controller.  He was promoted to Vice President and Chief Financial Officer in 2008.  Prior to joining the Debtors, Mr. Carman worked from 1983 to 1997 for Rockwell International in various accounting and management positions in the Space & Satellite Systems Division, including four years at Kennedy Space Center.  He then worked for Boeing Space & Defense Systems as a Senior Manager in Financial Accounting and Accounting Systems from 1997 to 2001 after Boeing purchased Rockwell's space and defense divisions (during which time he began serving as the Debtors' Controller).  Mr. Carman obtained his B.S. from California State University, Long Beach, and his M.B.A. from Florida Tech.

It is expected that Messrs. Karlsen and Carman will continue in their current positions post-Confirmation, although such decisions are ultimately the responsibility of the New Investor. It is expected that Messrs. Karlsen and Carman will, shortly before or after the Confirmation Date, execute employment agreements with the New Investor.  It is also expected that post-Confirmation, Messrs. Karlsen and Carman and perhaps other members of management will be

granted a certain amount of New Common Stock or options to purchase New Common Stock in order to align their interests with the success of the Reorganized Debtors. Some or all of such New Common Stock will be awarded pursuant to the SLEIP, approved by the Court during the pendency of the Bankruptcy Cases.

As to directors, on the Effective Date, the current directors shall be deemed to have resigned, without any further action on the part of any Person. On the Effective Date, the boards of directors of each Reorganized Company shall consist of the parties designated in a "Notice of Filing of Initial Board Members" to be filed with the Plan Supplement.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Introduction.

Implementation of the Plan may have federal, state, local or foreign tax consequences to the Debtors as well as to Creditors and Interest Holders. No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion does not address every aspect of the U.S. federal income tax laws that may be relevant to Creditors or Interest Holders in light of their individual circumstances, or to certain types of Creditors or Interest Holders subject to special treatment under U.S. federal income tax laws (such as financial institutions, mutual funds, broker-dealers, tax-exempt entities, insurance companies, foreign persons and persons to whom property was or is transferred in connection with the performance of services). The following discussion does not attempt to consider any facts or limitations applicable to any particular Creditor or Interest Holder which may modify or alter the consequences described below. This disclosure also does not address state, local, or foreign tax consequences, other than certain California tax issues noted below, or the consequences of any federal tax other than the federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), the Treasury regulations promulgated thereunder, and published rulings and court decisions in effect as of the date hereof, all of which are subject to change, possibly retroactively, and such changes could modify or adversely affect the federal income tax consequences summarized below. There can be no assurance that the Internal Revenue Service (the "**Service**") will agree with the federal income tax consequences described below.

**The federal income tax consequences of the Plan are complex. All Creditors and Interest Holders are strongly urged to consult their own tax advisors as to the particular federal, state, local and foreign income and other tax consequences of the transactions contemplated by the Plan.**

YCST01:9311369.1                                                                 068473.1001

## B.    Federal Income Tax Consequences To the Debtors.

### i.    *Generally*

Subject to certain exceptions, a debtor realizes income (referred to herein as "cancellation of debt" or "COD" income) upon the discharge or cancellation of its outstanding indebtedness in an amount equal to the excess (if any) of:  (i) the amount of the indebtedness discharged over (ii) the amount of cash plus the issue price of any new indebtedness issued plus the fair market value of any other consideration (including New Common Stock) given in satisfaction of the indebtedness.

One of the exceptions to this general rule provides that a debtor is not required to include COD income in gross income if the debtor is under the jurisdiction of the court in a Title 11 case and the discharge is granted by the court or it is pursuant to a plan approved by the court (the "**Bankruptcy Exception**").   Instead, the amount excluded from gross income is applied to reduce the following tax attributes in the following order:  (a) net operating losses and net operating loss carryovers ("**NOLs**"); (b) general business credits; (c) minimum tax credits; (d) capital loss carryovers; (e) basis of property of the taxpayer; (f) passive activity loss or credit carryovers; and (g) foreign tax credit carryovers.  Tax attributes generally are reduced by one dollar for each dollar excluded from gross income, except that tax credits are reduced by one-third of the amount excluded from gross income.  Notwithstanding the general order of attribute reduction, the Internal Revenue Code provides a debtor with an election to reduce its tax basis in depreciable assets prior to reducing NOLs.  The reduction in tax attributes generally takes place after the federal income tax is determined for the tax year in which the debt discharge occurs.  As Sea Launch is a partnership for Federal income tax purposes, these rules will apply at the partner level only.  Consequently, Sea Launch cannot in all circumstances exclude COD income even though it is under the jurisdiction of a Title 11 case.

### ii.    *Issues Relating to COD Income.*

The Debtors anticipate that a significant amount of its indebtedness will be discharged in the bankruptcy proceeding.  For Federal and State of California income tax purposes, COD income is treated as taxable income.  Accordingly, during the Debtors' 2010 tax year, the Debtors anticipate that they will realize a substantial amount of COD income.

In general, the Debtors are required to pay a Federal withholding tax under Section 1446 of the Internal Revenue Code if they have any effectively connected income attributable to a U.S. trade or business that is allocable to a foreign partner.  A portion of the COD income to be realized by the Debtors may be characterized as "effectively connected income" within the meaning of Section 1446(c) of the Internal Revenue Code.  The State of California has withholding tax obligation rules similar to the Federal rules, and, as a result, the Debtors may be liable for State of California withholding tax obligations.

Section 108 of the Internal Revenue Code allows taxpayers in certain situations to exclude COD income from taxable income.  In the case of a partnership, the Section 108 rules generally apply at the partner level (and not at the partnership level).  The Debtors have not

determined whether the partners can exclude their allocable shares of COD income under Section 108 (at the partner level). However, pursuant to the rules of Section 1446 of the Internal Revenue Code, the Debtors may be liable for withholding tax obligations at the partnership level regardless of the income tax treatment of the partners.

A partnership is legally obligated to withhold the Section 1446 tax if it applies. Each foreign partner is then allowed a credit for the partner's share of the withholding tax paid by a partnership under Section 1446 on its Federal corporate income tax return and, if appropriate, receives a refund. As with the Federal income tax, any California tax withheld on behalf of a partner is creditable on the partner's California corporate income tax return.

Since its inception, the Debtors have reported losses for tax purposes. Each partner's allocable share of the Federal and State of California income tax losses have been reported to it on annual Forms K-I, Partner's Share of Income, Credits, Deductions and Other Items. The Debtors do not have knowledge of the Federal and State of California income tax positions of its foreign partners (nor its domestic partners). However, it is anticipated that the tax losses allocable to the foreign partners have given rise to "net operating loss carryovers" for Federal and State of California income tax purposes equal to a portion or to all of the allocable tax losses. The Regulations permit foreign partners to certify their net operating loss carryovers to the Debtors, who can rely on such certifications to offset such partner's allocable share of U.S. effectively connected taxable income from the partnership. In that case, the Debtors may reduce or eliminate their obligation to withhold under Section 1446. The State of California effectively adopts the same regime and uses the federal rules and forms in computing the required State of California withholding.

As part of the Debtors' ongoing efforts to emerge from the bankruptcy proceeding as a going concern, the Debtors have requested the assistance of each foreign partner to prepare and submit to it a Form 8804-C, Certificate of Partner-Level Items to Reduce Section 1446 Withholding. Any failure by non-U.S. resident partners to submit the requested Form 8804-C will have an adverse impact on the Debtors' estimate of potential claims. *See* Section VII.B.iii, *infra*.

     *iii.*     *Analysis And Treatment Of Potential CMDI Claims Asserted By The U.S. And California Taxing Entities.*

To address the contingent claims of the U.S. and the California Franchise Board in respect of the argument that the Debtors are responsible to withhold, on behalf of its foreign partners, sums due in the approximate amount of $250,000, the Plan shall provide that the claims of the U.S. and the California Franchise Board will be addressed as follows:

     A.     The Plan will treat any putative or contingent claim of the United States for the State of California as a prepetition unsecured claim under Section 101(5) of the Bankruptcy Code. *See also In re Roth American*, 975 F.2d 949 (3d Cir. 1992); *In re Sunarhauserman*, 126 F.3d 811 (6th Cir. 1992). Neither the United States nor the State California has filed a proof of claim in respect of the contingent claims and, as a result, the Debtors' position is that the claims

           

will be barred and discharged under the provisions of Section 1141 of the Bankruptcy Code. *See also* 11 U.S.C. § 502(b)(9).

B.     To the extent that the taxing authorities are able to demonstrate cause for the late filing of the claims in respect of the withholding liability, the Debtors shall provide payment for the claim if allowed pursuant to the terms of the Plan.

C.     The Plan shall provide that the liability for withholding will be capped in the amount of $250,000 and be capped for distributional purposes under Section 502(c) of the Bankruptcy Code. In order for the Debtors to stay within this cap, the non-U.S. resident partners must submit the requested Form 8804-C to the Debtors. Any failure to timely deliver the form to the Debtors will have an adverse impact on the Debtors' estimate of potential claims. *See* Section VII.B.ii, *supra*.

D.     If and to the extent that the Debtors receive a discharge pursuant to Sections 524 and 1141(d) of the Bankruptcy Code, the Debtors shall have no further liability for such claims other than as set forth in the Plan.

## C.     Federal Income Tax Consequences To Creditors.

### i.     *Generally.*

The federal income tax consequences of the Plan to a Creditor will depend upon several factors, including but not limited to: (i) whether the Creditor's Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Creditor in exchange for the Claim; (iii) whether the Creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iv) whether the Creditor has taken a bad debt deduction or worthless security deduction with respect to its Claim. **Creditors are strongly advised to consult their tax advisors with respect to the tax treatment under the Plan of their particular Claims.**

### ii.     *Potential Bad Debt Deduction*

Section 166(a)(1) of the Internal Revenue Code allows a deduction for "any debt which becomes worthless during the taxable year." Section 166(a)(2) allows a deduction for partially worthless debts. *See* Treas. Reg. § 1.166-2(b) (a bad debt deduction is warranted if "the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on judgment . . . .") Each partner must make its own determination as to whether and when the Section 166 criteria are met with respect to their loans. Notwithstanding whatever election any particular partner may make, the treatment of any putative liability to the United States or to the California Franchise Board shall be defined and governed by the terms of the Plan. In particular, the Plan shall effect a discharge, pursuant to Sections 524 and 1141 of the Bankruptcy Code, of any and all claims arising by virtue of any putative holding liability or responsibility of the Debtors pursuant to the Internal Revenue Code of 1986, as amended.

- 35 -

*iii.* *Creditors Holding "Securities".*[4]

    (A)   <u>Generally</u>.

The federal income tax consequences of the Plan to Creditors who will receive membership interests in the Creditor Trust (which in turn will receive, in part, shares of New Common Stock) will depend in large part on whether the exchange of their Claims for such consideration will be treated, in part, as a "recapitalization" within the meaning of Section 368(a)(1)(E) of the Internal Revenue Code.

If the exchanges contemplated by the Plan are made pursuant to such a recapitalization, then an exchanging Creditor generally will not recognize any gain (except to the extent of "boot" and any consideration attributable to accrued but unpaid interest) or loss for federal income tax purposes. See "Federal Income Tax Consequences to Creditors - Accrued Interest" below. If an exchange is not made pursuant to a recapitalization, then an exchanging Creditor will recognize gain or loss on such exchange. This discussion assumes that each Creditor will hold any membership interests in the Creditor Trust received under the Plan, as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code.

In order for an exchange contemplated by the Plan to constitute a tax-free recapitalization, the Claim exchanged by a Creditor must qualify as a "security" for federal income tax purposes, and the Creditor must receive stock (and/or securities) in the exchange. The term "security" is not defined in the Internal Revenue Code or the regulations issued thereunder, and has not been clearly defined by court decisions. In general, a debt instrument constitutes a "security" if it represents a participating, continuing interest in the issuer, rather than merely the right to a cash payment. Thus, the term of the debt instrument is usually regarded as a significant factor in determining whether it is a security. The Service has ruled that a debt instrument with a maturity of ten (10) years or more is treated as a security. However, under the case law, debt instruments with maturities ranging between five (5) and ten (10) years are often held to be securities. Instruments with a five-year term or less rarely qualify as tax securities. Further, claims arising out of the extension of trade credit or litigation generally will not constitute tax securities.

    (B)   <u>Tax Consequences of an Exchange</u>.

If an exchange of a Claim for membership interests in the Creditor Trust is treated as a recapitalization within the meaning of Section 368(a)(1)(E) of the Internal Revenue Code, the federal income tax consequences to such Creditors would be as follows:

    (i)    Subject to the discussion below with respect to accrued but unpaid interest, a Creditor would not recognize loss on the exchange, but would recognize gain to the extent of the lesser of (a) the amount of gain realized in the exchange and (b) the fair market value of any property and cash, if any, received (hereinafter referred to as "boot"). The amount of gain

---

[4]    It is likely that the discussion in this Section applies, if at all, only to the Partners in Classes 5, 6 and 7.

realized, if any, would be equal to the excess of (a) the sum of the fair market value of the membership interests in the Creditor Trust and boot received, over (b) such Creditor's adjusted tax basis in its Claim.

(ii)     Any such gain recognized on the exchange would constitute capital gain, and such capital gain would qualify as long-term capital gain if such Creditor held the Claim for more than one year as of the Effective Date.

(iii)    Except for the consideration treated as received in exchange for accrued but unpaid interest: (A) a Creditor should have an aggregate tax basis in the membership interests in the Creditor Trust equal to such Creditor's adjusted tax basis in the Claims exchanged therefor, reduced by the amount of any boot received and increased by any gain recognized on the exchange, and (B) the holding period of the membership interests in the Creditor Trust should include the holding period of the Claims exchanged therefor.

If the exchange by a Creditor for membership interests in the Creditor Trust and boot, if any, does not qualify as a "recapitalization" within the meaning of Section 368(a)(1)(E) of the Internal Revenue Code, but instead constitutes a taxable exchange under Section 1001 of the Internal Revenue Code, the federal income tax consequences to the Creditors of such Claims would be as follows:

(i)      Subject to the discussion below as to accrued but unpaid interest, a Creditor would recognize gain or loss on the exchange in an amount equal to the difference between (A) the sum of the fair market value of the membership interests in the Creditor Trust and boot as of the Effective Date and (B) such Creditor's adjusted tax basis in its Claim.

(ii)     Any such gain or loss should constitute capital gain or loss, and such capital gain or loss should qualify as long-term capital gain or loss if such Creditor held its Claim for more than one year as of the Effective Date.

(iii)    A Creditor's tax basis in the membership interests in the Creditor Trust would be equal to the fair market value of the membership interests as of the Effective Date. The holding period of the membership interests would begin on the day immediately following the Effective Date.

*iv.*     *Accrued Interest.*

**A Creditor will recognize ordinary income to the extent that any consideration received pursuant to the Plan is allocable to accrued but unpaid interest not previously included in such Creditor's taxable income. If the amount of accrued but unpaid interest previously included in such Creditor's taxable income exceeds the amount of consideration allocable to such interest, the Creditor should be treated as recognizing an ordinary loss.**

*v.* *Backup Withholding.*

A noncorporate Creditor may be subject to backup withholding at the rate of 28% through the end of 2010 on the proceeds from the exchange of his or her Claim if he or she fails to supply his or her taxpayer identification number, furnishes an incorrect taxpayer identification number, receives a notification from the Service that he or she is subject to backup withholding, or, under certain circumstances, fails to provide a certified statement, under penalties of perjury, that he or she is not subject to backup withholding. Any amount withheld by the Debtors is not an additional tax, but will be credited against such Creditor's U.S. federal income tax liability.

**D.     Federal Income Tax Consequences To Interest Holders**.

**Under the Plan, all Interests in Sea Launch and SLLP will be canceled, and the holders thereof will not be entitled to any distribution under the Plan. Each holder of an Interest in Sea Launch and SLLP will be entitled to recognize a loss on its Interests at the time such Interests became worthless for tax purposes, in an amount equal to its tax basis in the Interests. If the Interests were held as a capital asset, the loss will be a long-term capital loss, if the Interest Holder's holding period is greater than one year, or a short-term capital loss, if the Interest Holder's holding period is not greater than one year.**

**E.     General Disclaimer**.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing discussion is not intended to be a substitute for careful tax planning, particularly since certain of the federal income tax consequences of the Plan will not be the same for all Creditors or Interest Holders due to their individual circumstances. Each Creditor and Interest Holder is strongly urged to consult with its own tax advisor in determining the federal, state, local, and foreign income and other tax consequences of the transactions contemplated by the Plan.**

## VIII.   FINANCIAL INFORMATION

Attached as <u>Exhibit B</u> to this Disclosure Statement is a consolidated pro forma balance sheet as of September 1, 2010, reflecting the effects of a successful Plan. Attached also as part of <u>Exhibit B</u> are the Debtors' pro forma consolidated income statement, balance sheet and statement of cash flows, for the balance of 2010, and for 2011, 2012 and 2013.

The Debtors do not generally publish their business plans and strategies or make public projections of anticipated financial positions or results of operations. Accordingly, after the Effective Date, the Reorganized Debtors do not intend to update or otherwise revise the projections to reflect circumstances existing since their preparation or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Furthermore, the Reorganized Debtors do not intend to update or revise the projections to reflect changes in general economic or industry conditions.

The feasibility of the Plan, and the Debtors' ability to meet their obligations in the future, is premised upon their anticipated financial performance after the Effective Date. The financial

projections are provided to demonstrate the feasibility of the Plan. Although all projections are based on assumptions of future events and circumstances that necessarily are uncertain in nature, the Debtors' management believes the financial projections are reasonable. Inclusion of these projections in this Disclosure Statement should not be regarded as a representation by any person that the projected results would be achieved.

Nevertheless, the actual results achieved from time to time during the projection period may vary from projected results and no assurance can be provided that these projections will be realized. The financial projections are based generally upon overall economic assumptions, and specifically on certain assumptions regarding the general demand for the services of the Debtors and the competitive position of the Debtors in meeting that demand, and the ability to operate profitably under the anticipated conditions that the Debtors will face in the near and long-term. These projections do not attempt to quantify any adverse effect on projected operations or cash flows that may result from any bankruptcy filing by the Debtors, if necessary.

Certain of the assumptions on which the financial projections are based may not materialize and unanticipated events and circumstances beyond the Debtors' control may occur subsequent to the Effective Date, that may materially affect the Debtors' actual financial results. In the past, the Debtors' results have varied, at times significantly, from their prior forecasts. Actual profitability achieved during any period may also vary from year to year due to factors that are exceedingly difficult to predict.

Although the Debtors believe that their assumptions are reasonable in light of the circumstances under which they were made, no assurance can be given that the financial projections will be realized. The Debtors urge that the financial projections be examined carefully by each party in evaluating the Plan. The Debtors' independent auditors have not examined or compiled the financial forecast presented herein and, accordingly, assume no responsibility for it.

## IX.    LIQUIDATION VALUE OF THE DEBTORS

See Exhibit C hereto for a liquidation value of the Debtors.

## X.    CERTAIN RISK FACTORS TO BE CONSIDERED

In determining how to vote with respect to the Plan, each holder of a Claim should carefully consider the following factors, together with all of the other information contained in this Disclosure Statement.

## A.    Risks Relating to the Projections.

The Debtors have prepared projections of the financial performance of their business following the consummation of the Plan. The projections represent the Debtors' best estimate of the most likely results of their operations following consummation of the Plan. However, consistent with the disclaimers and statements in *Section VIII, Financial Information*, above, the projections were based on numerous assumptions with respect to industry performance, general

business and economic conditions and other matters, such as interest rates, that are beyond the Debtors' control.

In addition, the Debtors' operations are subject to customer demand, as well as general economic conditions. Customer demand will have a strong impact on the performance of the Debtors in the future, and although the Debtors' services have proven desirable in the past, there is no guarantee this will continue. As to economic factors, the Debtors have been impacted by the general economic downturn that has affected the global economy over the last 24 months. Thus, the slowness of the recovery, and any further negative changes to the economy would likely result in lower earnings for the Debtors, as well. The Debtors also source critical components from the USA, Ukraine and Russia. The sourcing of these products could be negatively impacted by ITAR or export control regulations and economic conditions in those regions or by international trade restrictions due to political changes over which the Debtors have no control. Further, positive financial performance for the Debtors is also dependent on strong relations with their customers; although the Debtors believe they will maintain such relations in the future, various factors could strain or negatively affect these relationships.

**B.      Market for New Common Stock**.

The Debtors will not apply for listing of the New Common Stock or any other securities on any major exchange, and thus there will likely be little or no market for the New Common Stock.

**C.      General Business Risks.**

After the Plan is confirmed, the Debtors' principal business risk is whether they can achieve the financial results the Plan requires, under certain adverse circumstances. A deterioration in required financial performance could result in the Debtors being unable to achieve the results predicted under the Plan.

In addition to the various uncertainties described above, the Debtors will continue to be subject to the normal operational risks associated with their operations. Such risks include, among others, the possibility of demographic and economic factors causing certain of the Debtors' operations to be less successful, the difficulty in attracting and retaining a sufficient quality workforce and the ability to obtain and maintain necessary liquidity. While the Debtors do not feel such risks are extraordinary and they have historically acted in ways to minimize such risks, there can be no assurance that such risks will remain minimal and not have a material adverse effect on the business or results of operations of the Debtors.

**D.      Continuing Leverage.**

The Debtors will remain leveraged once they emerge from bankruptcy. The Debtors and their financial advisors believe that completion of the restructuring will significantly reduce the Debtors' debt obligations, and that the obligations of the Debtors under the Plan can be satisfied, but this is no guarantee. In addition, after consummation of the Plan, a substantial amount of the Debtors' obligations will be secured by virtually all of the assets of the Debtors.

YCST01:9311369.1                                                          068473.1001

## E. No Dividends.

The Debtors do not anticipate paying any significant dividends on the New Common Stock in the foreseeable future.

## F. Applicable Law and Regulations.

The Debtors' businesses are subject to a high degree of regulation, and thus, changes in tariffs, excise taxes, or trade regulations could adversely affect the Debtors.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A. Liquidation Alternative.

If no plan can be confirmed, the Debtors' Chapter 11 cases may be converted to cases under Chapter 7 of the Bankruptcy Code. Under Chapter 7, a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the creditors in accordance with priorities established by the Bankruptcy Code. Discussion of the effect that a Chapter 7 liquidation would have on the recovery of holders of impaired claims and Interests is set forth above at *Section IX, Liquidation Value of the Debtors*, which refers to the liquidation analysis attached as part of Exhibit C. The Debtors believe that liquidation under Chapter 7 would result in little or no distributions being made to Creditors because of (a) additional administrative expenses involved in the appointment of a trustee, attorneys and other professionals to assist such trustee, (b) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from operating losses and the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations, (c) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of expeditiously, and (d) costs to be incurred in the removal of ITAR and other protected technology and equipment before certain of the assets (i.e., the ASC and the Launch Platform) can be sold or transferred.

In a liquidation under Chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, probably resulting in somewhat greater recoveries. Further, if a trustee were not appointed, as one is not required under a Chapter 11 case, the expenses for professional fees may be lower than in a Chapter 7 case. Although preferable to a Chapter 7 liquidation, the Debtors still believe that a liquidation under Chapter 11 would still not realize the full going-concern value of the Debtors' assets, especially given the amount of time the Debtors have already spent in bankruptcy and the concerns that would be raised by employees, suppliers and customers and, as it is likely to be a more protracted proceeding than the Chapter 11 case effected by the Plan, would involve greater administrative expenses. Consequently, the Debtors believe that a liquidation under Chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors than what would likely be realized in a Chapter 11 liquidation. As to Interest Holders, the Debtors believe that under a Chapter 7 or 11 liquidation, they would receive

nothing on account of their Interests. The highly specialized nature of the assets makes them significantly less valuable if not sold in connection with an ongoing launch services business.

**B.      Other Alternatives if the Plan is Not Confirmed.**

If the Plan is not confirmed, the Debtors could attempt to formulate a different plan, as could any other party in interest, if the Debtors' exclusive right to file a plan is lost during the cases. Such a plan might involve either reorganization or continuation of the Debtors' business or an orderly liquidation of their assets. With respect to an alternative plan, the Debtors and their financial advisors have explored various other alternatives in connection with the formulation and development of the Plan. The Debtors believe the Plan as described herein enables Creditors to realize far greater value under the circumstances than available alternatives.

## XII.    VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION

**A.      Acceptance of the Plan.**

As a condition to confirmation, the Bankruptcy Code requires that each impaired Class of claims or interests accept a plan of reorganization, except as described at Section 12.D hereof relating to "cram down." Classes of claims or interests that are not "impaired" under a plan are deemed to have accepted the plan and are not entitled to vote.

**B.      Parties in Interest Entitled to Vote.**

Chapter 11 of the Bankruptcy Code does not require or entitle each holder of a claim against a debtor or each Interest Holder to vote in favor of the plan of reorganization in order for the Bankruptcy Court to confirm the plan. Pursuant to the Bankruptcy Code, only classes of claims or interests that are "impaired" are entitled to vote on the plan. Generally speaking, a claim or interest is impaired under a plan of reorganization if the plan provides that such claim or interest will not be repaid in full or that the legal, equitable or contractual rights of the holder of such claim or interest are altered. Only Claims in Classes 3, 4, 5, 6 and 7 are impaired under the Plan and are therefore entitled to vote.

Claims and Interests in Classes 1, 2 and 9 are unimpaired under Section 1124 of the Bankruptcy Code and holders of Claims or Interests in these unimpaired Classes are deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

Class 8 receives nothing under the Plan, and is deemed to have rejected the Plan because the members of this Class will receive or retain nothing on account of their Interests.

**C.      Vote Required for Acceptance by Class of Claims or Interests.**

The Bankruptcy Code defines acceptance of a plan of reorganization by a class of claims as acceptance by a majority in number and at least two-thirds in amount of the claims of that class allowed under the Bankruptcy Code that have actually voted on the plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of holders of interests as acceptance by the holders of at least two-thirds in number of the shares of that class allowed

under the Bankruptcy Code that have actually voted on the plan. Because, under the Bankruptcy Code, only those who vote to accept or to reject the Plan will be counted for purposes of determining acceptance or rejection of the Plan by any impaired class of claims or interests, the Plan could be approved by any impaired class of claims with the affirmative vote of significantly less than two-thirds in principal amount and a majority in number of the claims in such class.

**If the Bankruptcy Court confirms the Plan, each holder of an Allowed Claim or Allowed Interest in a Class will receive the same consideration in respect of such Allowed Claim or Allowed Interest as the other members of such Class receive in respect of their Allowed Claims or Allowed Interests in such Class, whether or not such holder voted to accept the Plan. Moreover, upon Confirmation, the Plan will be binding on all Creditors and Interest Holders of the Debtors regardless of whether such Creditors or Interest Holders voted to accept the Plan, or voted at all.**

D.      **Confirmation Without Acceptance by All Impaired Classes.**

In the event that any impaired Class or Classes reject the Plan, Section 1129(b) of the Bankruptcy Code provides that, so long as at least one impaired Class has accepted the Plan, the Debtors may seek confirmation of the Plan under a process known as "cram down." To obtain such confirmation, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to any dissenting Class. The "unfair discrimination" test requires, among other things, that the Plan recognize the relative priorities among unsecured Creditors and Interest Holders. *See also Section XIII, Confirmation of the Plan.* The Debtors believe that the Plan satisfies all of the prerequisites to confirmation of the Plan through the "cram down" process.

## XIII.   CONFIRMATION OF THE PLAN

A.      **Requirements for Confirmation of the Plan.**

The Debtors will request that the Bankruptcy Court hold a Confirmation Hearing as promptly as practicable, upon such notice to parties in interest as is required by the Bankruptcy Code and the Bankruptcy Court. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. Any procedures established by the Bankruptcy Court for the filing and service of objections to confirmation of the Plan will be provided to parties in interest.

In order for the Plan to be confirmed, and regardless of whether all impaired Classes of Claims vote to accept the Plan, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the requirements of Section 1129 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code requires for confirmation, among other things, that: (i) the Plan be accepted by the requisite votes of holders of impaired Claims and Interests except to the extent that confirmation, despite dissent, is available under Section 1129(b) of the Bankruptcy Code (*see Section XIII.D, Cram Down*, below), (ii) the Plan is feasible (that is, there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan and continue to operate their businesses without further financial reorganization); and (iii) the

Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy Code, which requires that with respect to each impaired Class, each holder of a Claim or Interest either (a) accepts the Plan or (b) receives at least as much pursuant to the Plan as such holder would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

Although the Debtors believe that the Plan will meet such tests, as well as the other requirements of Section 1129, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

>    *i.    Feasibility of the Plan.*

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court find that confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors (the "**Feasibility Test**"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtors will possess the resources and working capital necessary to operate profitably and will be able to meet the obligations under the Plan.

The Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for the three-year period ending December 31, 2013. These projections, and the significant assumptions on which they are based, are included as <u>Exhibit B</u> to this Disclosure Statement. The Debtors believe, based on this analysis, that the Plan provides a feasible means of reorganization and operation from which there is a reasonable expectation that, subject to the risks disclosed in this Disclosure Statement, the Debtors will be able to perform pursuant to the Plan. Neither the Debtors, the Debtors' professionals, nor the Committee's professionals have performed an independent investigation of the accuracy or completeness of such financial projections, and Creditors are cautioned not to place undue reliance on the projections.

The Debtors do not as a matter of course make public projections as to future sales, earnings or other results. However, the management of the Debtors have prepared the projected consolidated information set forth herein to present the anticipated effects of the restructuring contemplated by the Plan.

**The projections in this Disclosure Statement were not prepared with a view toward public disclosure, or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Debtors' management, were prepared on a reasonable basis, reflect the best currently available estimates and judgments and present, to the best of management's knowledge and belief, the expected course of action and expected future financial performance of the Debtors assuming the consummation of the Plan. However, this information is not fact and should not be relied upon as necessarily indicative of future results, and readers of this Disclosure Statement are cautioned not to place undue reliance on the projected consolidated financial information.**

The projections indicate that the Reorganized Debtors should have sufficient cash flow to make the payments required under the Plan on the Effective Date and to repay and service their debt obligations to maintain their operations. Accordingly, the Debtors believe that the Plan complies with the standard of Section 1129(a)(11) of the Bankruptcy Code. As noted in the projections, however, the Debtors caution that no representation can be made as to the accuracy of the projections or as to the Debtors' ability to achieve the projected results after the Effective Date. Many of the assumptions upon which the projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtors' financial results, both during and after the Bankruptcy Cases.

*ii.* *Best Interests Test.*

With respect to each impaired Class, confirmation of the Plan requires that each holder of a Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To determine what holders of each impaired Class of Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 liquidation case. Secured Claims (resulting from the DIP Facility) and the costs and expenses of the liquidation case or resulting from the original Chapter 11 case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition unsecured Claims and Interests.

In applying the Best Interests Test, it is possible that Claims and Interests in the Chapter 7 case may not be classified according to the classification provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all unsecured Claims arising prior to the Petition Date which have the same rights upon liquidation and would be treated as one Class for purposes of determining the potential distribution of the liquidation proceeds resulting from the Debtors' Chapter 7 cases. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each Creditor holding a Claim. Therefore, Creditors who claim to be third-party beneficiaries of any contractual subordination provisions might be required to seek to enforce such contractual subordination in the Bankruptcy Court or otherwise. Section 510 of the Bankruptcy Code specifies that such contractual subordination provisions are enforceable in a Chapter 7 liquidation case. Section 510(b) also requires, among other things, that any claim for damages arising from the purchase or sale of a security of the Debtors shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security.

After consideration of the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors and Interest Holders, including (i) increased costs and expenses of liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy

and professional advisors to such trustee, (ii) in the erosion in value of assets in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail, (iii) the adverse effects on the salability of business that could result from the probable departure of key employees, (iv) the costs attributable to the time value of money resulting from what is likely to be a more protracted proceeding than if the Plan is confirmed (because of the time required to liquidate the assets of the Debtors, resolve Claims and related litigation and prepare for distributions) and (v) the application of the rules of distribution under a Chapter 7 liquidation, the Debtors have determined that confirmation of the Plan will provide each Creditor or holder of an Interest in an impaired Class with a greater recovery (or in the case of holders of Interests, the same recovery) than such Creditor or Interest Holder would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. *See also* comments in Section XI.A.

The Liquidation Analysis for the Debtors is found in <u>Exhibit C</u> of this Disclosure Statement. The Liquidation Analysis was substantially completed as of May 28, 2010, and the Debtors are not aware of any events subsequent to such date that would materially impact the Liquidation Analysis.

Accordingly, while the analyses that follow are necessarily presented with numerical specificity, there can be no assurances that the values assumed would be realized if the Debtors were in fact liquidated, nor can there be any assurance that a Bankruptcy Court would accept these analyses or concur with such assumptions in making its determination under Section 1129(a) of the Bankruptcy Code.

Actual liquidation proceeds could be materially lower or higher than the amounts set forth in <u>Exhibit C</u>. No representation or warranty can be or is being made with respect to the actual proceeds that could be received in Chapter 7 liquidations of the Debtors.

The liquidation valuations have been prepared solely for purposes of estimating the proceeds available in Chapter 7 liquidations of the Debtors' Estates and do not represent values that may be appropriate for any other purpose. Nothing contained in these valuations is intended to constitute a concession or admission of the Debtors for any other purposes.

As set forth in the Liquidation Analysis, the Debtors believe that conversion to Chapter 7 and resulting pendency of liquidation sales of the Debtors' business operations and assets would adversely affect the Debtors and the morale of their employees as well as significantly impair their ability to maintain adequate working capital. Further, there can be no assurance that the conversion to Chapter 7 liquidations would result in the Debtors' ability to continue to raise working capital under any credit facilities. As a result, secured creditors may not voluntarily finance efforts to maximize assets beyond that necessary to satisfy secured creditor's claims, and recoveries could therefore be even lower than set forth on the liquidation analysis.

YCST01:9311369.1 068473.1001

**B.     Conditions Precedent to the Effective Date of the Plan**.

Except as expressly waived by the Debtors (with the prior written consent of the New Investor where required), the following conditions must occur and be satisfied before the Effective Date may take place:

(1)     The Confirmation Order confirming this Plan shall have been entered by the Bankruptcy Court and shall not have been stayed.

(2)     The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Plan Documents) shall have been Filed without prejudice to the Reorganized Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement in accordance with the terms hereof.

(3)     All other documents and agreements necessary to implement this Plan on the Effective Date, including, but not limited to the Plan Supplement and the Plan Documents, shall have been duly and validly executed and delivered by all parties thereto

(4)     All other actions, documents, and agreements determined by the Debtors to be necessary to implement the Plan shall have been effected or executed.

(5)     The Exit Financing Credit Agreement and the New Investment Agreement and all related documents provided for therein or contemplated thereby shall have been duly and validly executed and delivered by all parties thereto, all conditions precedent thereto shall have occurred or shall have been satisfied or waived in the manner provided therein.

(6)     The entire proceeds of the New Investment Amount shall be made available to the Reorganized Debtors to fund distributions under the Plan.

(7)     All of the Conditions Preceding the Effective Date set forth in the Exit Financing Commitment Letter shall have occurred or have been waived by the New Investor.

(8)     All DIP Facility Claims shall have been paid in full and in Cash or converted to New Common Stock at the election of the DIP Lender, or the Debtors shall have provided reasonably satisfactory evidence that such Claims shall be paid from the proceeds of the Exit Financing.

(9)     Prior to or at the Hearing on the Disclosure Statement, the Bankruptcy Court shall have entered an order that the "Right to Match" provision of, SLS DIP Financing Agreement has been fully offered by the Debtors and shall be of no further force and effect, and such order shall not have been stayed.

(10)    All corporate actions required to be taken by Article VII of this Plan shall have been taken.

(11)    Any material alteration to, or interpretation of, any term or provision of this Plan by the Bankruptcy Court shall have been acceptable to the Debtors and the New Investor.

(12)    The Articles of Incorporation and other organizational documents of the reorganized Debtors, as necessary, shall have been adopted and filed with the applicable authorities of the relevant jurisdictions of incorporation or organization and shall have become effective in accordance with the corporate laws of such jurisdictions.

(13)    All authorizations, consents, certifications, approvals, rulings, no-action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement this Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on Reorganized Sea Launch.

(14)    All conditions set forth in the New Investment Agreement shall have been satisfied or waived in the manner provided therein.

(15)    All conditions to Confirmation have been satisfied and remain true, unless expressly waived by the Debtors and the New Investor.

## C.    Amendments to or Modification of the Plan.

The Debtors reserve the right to amend or modify the terms of the Plan in accordance with the provisions of Section 1127 of the Bankruptcy Code, including the right to amend the treatment of any rejecting class to meet the minimum requirements of Section 1129(b) of the Bankruptcy Code.   Under the Bankruptcy Rules, such amendments or modifications may be approved by the Bankruptcy Court at confirmation without resolicitation of the votes of the members of any class whose treatment is not adversely affected by such amendment or modification.   The Debtors will give holders of Claims and Interests such notice of such amendments or waivers as may be required by applicable law.   The Debtors reserve the right to use acceptances of the Plan to confirm any amendment of the Plan to the extent permitted by law.

After the date on which the Plan has been confirmed by the Bankruptcy Court and the Confirmation Order has been entered by the Clerk, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan so long as the holders of Claims and Interests are not adversely affected and prior notice of such proceeding is served as may be required by applicable law or Bankruptcy Court order.

## D.    Cram Down.

To obtain confirmation under the concept known as "cram down," the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to any dissenting Class.   The "unfair discrimination" test requires, among other things, that the Plan recognize the relative priorities among unsecured Creditors and Interest Holders.   The Bankruptcy Code establishes different "fair and equitable" tests for

- 48 -

secured creditors, unsecured creditors and equity interest holders. The respective tests are as follows:

     *i.*      *Secured Creditors.*

Either (i) each impaired creditor of the rejecting class (x) retains its liens in the collateral securing such Creditor's claim or in the proceeds thereof to the extent of the Allowed amount of its secured claim and (y) receives deferred cash payments in at least the Allowed amount of such secured claim with a present value at the Effective Date at least equal to such creditor's interest in its collateral or in the proceeds thereof or (ii) the plan provides each impaired secured creditor with the indubitable equivalent of its claim.

     *ii.*     *Unsecured Creditors.*

Either (i) each impaired unsecured Creditor of the rejecting class receives or retains under the plan property of a value equal to the amount of its Allowed Claim or (ii) the holders of claims and interests that are junior to the claim of the dissenting class do not receive or retain any property under the plan.

     *iii.*     *Equity Interest Holders.*

Either (i) each equity interest holder of the rejecting class receives or retains under the plan property of a value equal to the greater of (x) the fixed liquidation preference or redemption price, if any, of the equity interest it holds or (y) the value of such equity interest or (ii) the holders of interests that are junior to such equity interest do not receive or retain any property under the plan.

If all other conditions to confirmation are met, the Debtors will seek to apply Section 1129(b) of the Bankruptcy Code to the extent the Plan is not accepted by any impaired Class of unsecured Claims or Interests.

YCST01:9311369.1     068473.1001

## XIV. CONCLUSION

The Debtors believe that the Plan is in the best interests of the Debtors' Creditors, Interest Holders and all other parties in interest. If you are a member of Class 3, Class 4, Class 5, Class 6 or Class 7, the Debtors urge you to vote in favor of the Plan.

Sea Launch Company, L.L.C.
Sea Launch Limited Partnership
Sea Launch ACS Limited
Sea Launch ACS Limited Partnership
Platform LDC
Platform Limited Partnership


By:

_____
Kjell Karlsen
President and General Manager

Dated: June 21, 2010


YOUNG CONAWAY STARGATT
& TAYLOR LLP
Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6600

   - and -

ALSTON & BIRD LLP
Dennis J. Connolly
Matthew W. Levin
1201 West Peachtree Street
Atlanta, GA 30309-3424
(404) 881-7000

Counsel for the Debtors and Debtors in Possession